Case No. 24-6839

# In the United States Court of Appeals for the Ninth Circuit

RICHARD BLAIR,

*Plaintiff-Appellant,*

v.

AUTOMOBILI LAMBORGHINI SpA,

*Defendant-Appellee.*

On Appeal from
The United States District Court
For the District of Arizona
Case No. 2:22-cv-01439-ROS
The Honorable Judge Roslyn O. Silver

## APPELLANT'S OPENING BRIEF

Brett E. Lewis
Anna Iskikian
**LEWIS & LIN, LLC**
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Tel: (718) 243-9323
Brett@iLawco.com
Anna@iLawco.com

*Attorneys for Appellant Richard Blair*

## **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ........................................................................i

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT .......................................................3

STATEMENT OF ISSUE ...................................................................4

STATEMENT OF THE CASE .............................................................4

SUMMARY OF ARGUMENT ............................................................9

STANDARD OF REVIEW ...............................................................11

ARGUMENT ..................................................................................11

   I.     THE DISTRICT COURT WRONGLY RESOLVED SEVERAL FACTUAL DISPUTES WHEN IT GRANTED SUMMARY JUDGMENT ON LAMBORGHINI'S ANTICYBERSQUATTING COUNTERCLAIM ....................................................................11

      A.    The Unique Circumstances Surrounding Blair's Acquisition of <lambo.com> Should Have Precluded Summary Judgment ..............13

         i.    Blair did not intend to profit from Lamborghini's goodwill because "Lambo" is a widely used term and surname not exclusively known as a nickname for Lamborghini automobiles.................................16

         ii.   Blair adopted "Lambo" as a moniker in 2019 and "Lambo" has since been commonly used to identify Blair.........................................22

         iii.  Blair had no intention to sell <lambo.com>, much less to Lamborghini ...................................................................25

         iv.  Blair's lack of cybersquatting history despite his extensive domain name portfolio raised a fact question for the jury.........................30

      B.    The Statutory Factors Demonstrated A Triable Issue of Fact As to Blair's Lack of Bad Faith Intent to Profit ...........................................31

         i.    Factor II – "Lambo" is Commonly Used to Identify Blair............31

         ii.   Factor V – Blair had no intent to and did not divert consumers from Lamborghini ...................................................................34

iii.    Factor VI – Blair's Listing of <lambo.com> for Sale did not indicate a bad faith intent to profit ............................................................37

iv.    Factor IX – While "Lamborghini" is a famous and distinctive mark, "Lambo" is not................................................................................39

CONCLUSION ............................................................................................41

STATEMENT OF RELATED CASES............................................................42

CERTIFICATE OF COMPLIANCE ............................................................43

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986) ...................................................................................16

*Autodesk, Inc. v. Dassault Sys. SolidWorks Corp.*,
    No. 08-04397, 2008 WL 6742224, at *2n.1 (N.D. Cal. Dec. 18, 2008) .......17

*Black v. Irving Materials, Inc.*,
    2019 WL 1995342 (N.D. Cal. May 6, 2019) ..............................................26

*Calista Enterprises Ltd. v. Tenza Trading Ltd.*,
    43 F. Supp. 3d 1099 (D. Ore. 2014) ...........................................................18

*Carter v. Oath Holdings, Inc.*,
    2018 WL 3067985 (N.D. Cal. June 21, 2018) ............................................17

*Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.*,
    89 F. Supp. 2d 464 (S.D.N.Y. 2000) ...............................................15, 21, 30

*Collision Chiropractors LLC v. Collision Injury Chiropractic PLLC*,
    2022 WL 16793363 (D. Ariz. Nov. 8, 2022)...............................................29

*Gioconda Law Group PLLC v. Kenzie*,
    941 F. Supp. 2d 424 (S.D.N.Y. 2013) ........................................................38

*GoPets Ltd. v. Hise*,
    657 F.3d 1024 (9th Cir. 2011) ....................................................................24

*Interstellar Starship Servs., Ltd. v. Epix Inc.*,
    184 F.3d 1107, 1109 (9th Cir. 1999) ..........................................................11

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*,
    304 F.3d 936 (9th Cir. 2002) ...............................................................passim

*Kremen v. Cohen*,
    337 F.3d 1024 (9th Cir. 2003) ....................................................................24

*Lahoti v. VeriCheck, Inc.*,
    586 F.3d 1190, 1202 (9th Cir. 2009) ........................................................12

*Lucas Nursery and Landscaping, Inc. v. Grosse*,
    359 F.3d 806 (6th Cir. 2004) ....................................................................36

*Nigro v. Sears, Roebuck and Co.*,
    784 F.3d 495 (9th Cir. 2015) ....................................................................19

*Nu Pagamentos S.A. – Instituicao de Pagamento v. Hudson*,
    2023 WL 2377641 (N.D. Ga. Feb. 22, 2023)...................................26, 28, 39

*Omega S.A. v. Omega Eng'g, Inc.*,
    228 F. Supp. 2d 112 (D. Conn. 2002) ........................................................21

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ..............................................................passim

*Ricks v. BMEzine.com, LLC*,
    727 F. Supp. 2d 936 (D. Nev. 2010)..........................................................36

*Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*,
    493 F. Supp. 3d 64 (E.D.N.Y. 2020) ...................................................13, 32

*Sporty's Farm L.L.C. v. Sportsman's Mar.*, Inc.
    202 F.3d 489 (2d Cir. 2000) ............................................................24, 31, 33

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
    445 F. Supp. 3d 139 (N.D. Cal. 2020)........................................................17

*Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research*,
    527 F.3d 1045 (10th Cir. 2008) ................................................................36

*Virtual Works, Inc. v. Volkswagen of Am., Inc.*,
    238 F.3d 264 (4th Cir. 2001) ....................................................................38

*Wagner v. lindawagner.com*,
    202 F. Supp. 3d 574 (E.D. Va. 2016) ........................................................38

**Statutes**

15 U.S.C. § 1114(2)(D)(v)................................................................4

15 U.S.C. § 1125(d) ........................................................................1

15 U.S.C. § 1125(d)(1)(B)..............................................................13

15 U.S.C. § 1125(d)(1)(B)(i)(II)......................................................33

15 U.S.C. § 1125(d)(1)(B)(i)(V) ................................................36, 38

28 U.S.C. § 1291 .............................................................................4

28 U.S.C. § 1331 .............................................................................4

28 U.S.C. § 2107(a) .........................................................................4

28 U.S.C. § 2201 .............................................................................4

Fed. R. Evid. 201(b) ......................................................................18

FRAP 4(a)(1)...................................................................................4

**Other Authorities**

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:55
    (5th ed. 2020) ........................................................................33

H.R. Rep. No. 106-412 (October 25, 1999) ........................................33, 41

## <u>INTRODUCTION</u>

Appellant Richard Blair ("Blair") brings this appeal following the entry of summary judgment against him and in favor of Appellee Automobili Lamborghini S.p.A. ("Lamborghini"). The sole issue on appeal is whether Blair acted with a "bad faith intent to profit" in acquiring the disputed domain name, <lambo.com> (the "Domain Name"), in violation of the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d). Despite the fact-intensive nature of the "bad faith intent to profit" inquiry, as well as the hotly contested issues of material fact bearing on the issue, the District Court found that no reasonable factfinder could conclude that Blair did not act with bad faith in acquiring <lambo.com>. This decision was reversible error.

In so erring, the District Court disregarded this Court's repeated admonition that, "because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (citations omitted). The District Court also erred by rigidly applying the ACPA's non-exclusive statutory factors that a court *may* consider when determining whether a domain name registrant acted with a bad faith intent to profit. As a result, the court relegated "*the unique circumstances of the case,*" which are "the most important grounds for finding [or not finding] bad faith" under this Court's precedent, to a mere afterthought. *Interstellar Starship*

1

*Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946–47 (9th Cir. 2002) (citations omitted) (emphasis added). Additionally, the District Court erred by construing the facts and the statutory factors in Lamborghini's favor, instead of viewing the evidence in the light most favorable to the non-moving party. *Rearden LLC*, 683 F.3d at 1202 (citations omitted). Finally, the District Court erred in making explicit credibility determinations and inappropriately weighing the evidence instead of determining whether genuine issues of material fact regarding Blair's intentions precluded summary judgment.

For instance, the District Court wholly disregarded (1) evidence showing that "Lambo" is a **surname** associated with hundreds of businesses – not just Lamborghini; (2) evidence that Blair adopted and used "Lambo" as a moniker long before any dispute with Lamborghini arose; (3) evidence that Blair lacked any intent to divert consumers from Lamborghini's website; and (4) evidence that Blair's listing of the Domain Name for sale for $75 million did not indicate a bad faith intent to profit under the ACPA, but rather an intent to discourage people from trying to buy the name. These facts, alone, create a genuine dispute as to material facts for trial that precludes a grant of summary judgment on Lamborghini's ACPA claim. Having ignored these material facts presented by Blair, due to an *a priori* and improper determination as to their credibility, the District Court conveniently arrived at the conclusion that there were no triable issues of fact.

While the District Court correctly recognized that Blair has no history of cybersquatting and a domain name portfolio comprised entirely of generic and dictionary words and phrases, it nonetheless reached the conclusion that those facts did not "absolve him of an ill-intent to profit from Lamborghini's mark." 1-ER-15. The District Court's reasoning suffered from its failure to construe the facts in the non-movant's favor, as it assigned little to no evidentiary value for those of the statutory factors that the District Court found favored Blair, as well as its failure to recognize that Blair's lack of cybersquatting history despite his extensive domain name portfolio created a question of fact for the jury regarding Blair's intent in acquiring the Domain Name.

This Court should reverse and remand for trial on the issue of Blair's intent in acquiring <lambo.com>.

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Arizona (the "District Court") had original subject matter jurisdiction over Lamborghini's APCA claim under 28 U.S.C. § 1331, 15 U.S.C. § 1114(2)(D)(v), and 28 U.S.C. § 2201.

The District Court entered summary judgment in favor of Lamborghini on all claims on October 17, 2024. 1-ER-2. The District Court's judgment is a final order, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

3

Blair's Notice of Appeal was filed on November 8, 2024, and is therefore timely pursuant to 28 U.S.C. § 2107(a) and FRAP 4(a)(1). 3-ER-394.

## STATEMENT OF ISSUE

1.     Whether, in granting summary judgment on Lamborghini's Anticybersquatting Consumer Protection Act claim, the District Court erred by ignoring the unique circumstances of this case and disregarding Blair's sworn Affidavit, as well as significant evidence of Blair's lack of bad faith intent to profit, including but not limited to that "Lambo" is not exclusively associated with Lamborghini, that Blair adopted "Lambo" as a moniker in good faith years before any dispute with Lamborghini arose, that Blair lacked any intent to divert consumers from Lamborghini, and that the listing of a domain name for sale for an absurdly and prohibitively high amount does not automatically indicate a bad faith intent.

## STATEMENT OF THE CASE

### *Blair Acquires <lambo.com> and Adopts "Lambo" as a Moniker*

Blair has invested in domain names since 2009. 1-ER-14; *see also* 2-ER-32. Blair maintains a portfolio of about 130 common dictionary word and random character domain names, some of which he sells, and some of which he develops. 1-ER-14; *see also* 2-ER-32.   Blair acquired the domain name <lambo.com> on February 16, 2018. 1-ER-4; *see also* 2-ER-20.   Prior to his acquisition of <lambo.com>, Blair conducted a search of the term "Lambo," per his usual practice,

4

on different sites, including LinkedIn, OpenCorporates, the USPTO, and DotDB.com. 2-ER-30. Blair did not encounter any live trademarks registered to Lamborghini, but he did find many third-party uses of "Lambo" across different industries. 2-ER-30. Blair, therefore, concluded that "Lambo" was a common generic term, available for various uses. 2-ER-30.

Blair acquired <lambo.com> because it was a brandable, pronounceable, single word dot com domain name, which he thought would be a good name to develop. 1-ER-4–5; *see also* 2-ER-24–25, 30. He had early plans to develop an active website at <lambo.com>, though he subsequently decided to remain focused on developing another website at <ceec.com>, and to resume development of <lambo.com> at a later date. 1-ER-12; *see also* 2-ER-31. As Blair develops his websites, he has limited capacity to take on projects. 2-ER-24–25. Once <Ceec.com> reached certain development milestones, Blair planned to build <lambo.com> into a blog. 2-ER-24–25, 30. Importantly, Blair's early plans with and development of <lambo.com> have nothing to do with Lamborghini or the automobile industry. 2-ER-30.

Despite delayed development of <lambo.com>, Blair adopted "Lambo" as his online moniker as early as October 2019. 1-ER-9; *see also* 2-ER-22–25. Blair – who could be considered by some to be eccentric – was drawn to the name "Lambo" as a play on the word "Lamb," with an outlier generic aptitude and intelligence, hence

"Lamb-O." The name resonated with Blair on a personal level, and he thought it perfectly encapsulated his identity and ethos. 1-ER-9; *see also* 2-ER-31. Blair started to identify himself as "Lambo" and "Lambodotcom" across different Internet platforms, including WhatsApp, Telegram, X.com (formerly Twitter), NamePros.com, and lichess.org. 1-ER-9; *see also* 2-ER-22–24. He also created an iconography in connection with "Lambo" as a stylized lamb with *protruding blue brain*, which is consistently used in connection with his online moniker "Lambo," and his perception of himself as a person having "*outlier generic aptitude intelligence*." 1-ER-9; *see also* 2-ER-22–24, 31.

Years before Lamborghini submitted its complaint to WIPO, on September 17, 2020, Blair identified himself as "Lambo" in a post on NamePros.com, entitled "I am Lambo, Q&A Anything with Me" (the "Q&A Post"). 2-ER-22–24. Blair offered to share information about himself and his experiences with domain names, and users under the Q&A Post greeted and recognized Blair as "Lambo." 2-ER-22–24. In this post, Blair even openly stated "I'm gonna moniker a dotcom of mine, otherwise what kind of domainer would I be?!" 2-ER-22–24. Blair is known by the Lambo moniker in the field of domain name investment and development, and, although "Lambo" is not part of Blair's legal name, he is also frequently addressed as "Lambo" among friends and family — including by his father. 2-ER-22–24.

As <lambo.com> became more valuable to Blair as an integral part of his

identity, he increased the listed price for <lambo.com> in order to discourage people he deemed to be "time wasters" from making offers to purchase it. 1-ER-11–12; *see also* 2-ER-26–27, 29. Blair's lack of interest in selling the Domain Name is corroborated by his past public statements: "Not all my domains are actively for sale *really*, I do incubate, nurture and build too." 2-ER-26–27, 33 (emphasis added). Over the years, Blair received many inquiries expressing interest in purchasing the Domain Name. 1-ER-12; *see also* 2-ER-26–27, 31. However, he never seriously entertained any offers or attempted to negotiate a sale of the Domain Name. 1-ER-12; *see also* 2-ER-26–27, 29, 31.

Blair lists other domain names in his portfolio, which he personally values the most, for as much as *$38,996,555*. 2-ER-33. None of his 129 other domain names infringe on known trademarks. 2-ER-32. In fact, Blair conscientiously avoids targeting established trademarks before he acquires a domain name, which reflects his good faith practices as a domain name investor. 2-ER-32–33.

In the fourteen years since Blair entered the domain name industry, he has never before been accused of cybersquatting, been a party to a UDRP proceeding, or been a party to an action under the ACPA. 1-ER-14; *see also* 2-ER-33. His acquisition and use of the <lambo.com> domain name have nothing to do with Lamborghini, and he never provided any false or misleading information in connection with his use and maintenance of <lambo.com>. 1-ER-13; *see also* 2-ER-

7

30, 33.  Blair has never offered to sell <lambo.com> to Lamborghini. 1-ER-14; *see also* 2-ER-30.  Nor has he used <lambo.com> to divert users searching for Lamborghini to a website with pay-per-click ads, or to prevent Lamborghini from representing its LAMBORGHINI trademark in a domain name. 2-ER-31.

### Lamborghini Initiates UDRP Proceedings against Blair

On April 29, 2022, much to Blair's surprise, Lamborghini submitted a complaint with the World Intellectual Property (WIPO) arbitration and mediation center, initiated an administrative proceeding against Blair's registration of <lambo.com>, and sought an order to transfer the ownership rights of <lambo.com> to Lamborghini pursuant to the Uniform Domain Name Dispute Resolution Policy ("UDRP"). 3-ER-374.  The UDRP proceeding, *Automobili Lamborghini S.p.A. v. Domain Administrator, See PrivacyGuardian.org / Richard Blair Case No. D2022-1570* (the "UDRP Proceeding") was decided by a three-member WIPO panel on August 2, 2022, with one panelist dissenting. 3-ER-375.   The majority of the panel issued a decision directing the transfer of <lambo.com> to Lamborghini. Blair was not represented by legal counsel in the UDRP Proceeding. 3-ER-375.

### Blair Files Suit in the District Court for Declaratory Judgment

Within ten days of the WIPO panel's decision, on August 24, 2022, Blair filed this suit against Lamborghini to stop the transfer of <lambo.com> from taking place and sought a declaration that Blair's acquisition of <lambo.com> is not unlawful

under the ACPA; that Blair's acquisition and use of <lambo.com> does not constitute a registration with bad faith intent to profit; that Blair is not required to transfer <lambo.com> to Lamborghini; and that Registrar NameSilo LLC shall not transfer the registration of <lambo.com> to Lamborghini. *See generally* 3-ER-383–93.

On March 9, 2023, Blair amended his complaint to add factual allegations that are not in dispute for purposes of this appeal. *See generally* 3-ER-368–82. On July 28, 2023, Lamborghini answered the First Amended Complaint, asserting a counterclaim under the ACPA based on Lamborghini's allegations that Blair acquired <lambo.com> with bad faith in violation of the ACPA.

On May 5, 2024, Lamborghini moved for summary judgment on its ACPA counterclaim, which the District Court granted on October 17, 2024, ruling that no reasonable factfinder could find that Blair acted with anything other than bad faith in acquiring <lambo.com>. 1-ER-17. In so holding, the District Court ignored and dismissed uncontroverted facts presented by Blair, relying instead on Lamborghini's material omissions and misrepresentations of fact and engaging in improper determinations regarding each party's credibility, prompting this appeal.

## SUMMARY OF ARGUMENT

The District Court erred in ruling that Blair acted with a bad faith intent to profit as a matter of law. In so doing, the District Court ignored this Court's repeated admonition to avoid summary judgment in trademark and cybersquatting disputes.

The District Court's analysis under the ACPA was mistaken in at least two respects. First, the District Court mechanically applied the ACPA's non-exhaustive bad-faith factors instead of prioritizing the unique circumstances of the case. Rather than determining the relative importance to this particular case of each factor, the District Court simply marched through the factors in a one-size-fits-all approach. Second, the District Court made a number of impermissible determinations that went to the credibility and weight of the evidence, instead of construing facts in the light most favorable to the non-movant.

The record demonstrated that Blair acquired <lambo.com> after conducting searches of the term "lambo" and determining that it was a generic term and surname available for a multitude of uses and there were no live trademark registrations for "lambo." Shortly thereafter, Blair adopted "Lambo" as a moniker and came to be known by that name in the field of domain name investment and development. The record also demonstrated that Blair has an established practice of assigning exorbitant – sometimes absurdly so – prices to those of the domain names in his portfolio that he deems valuable as a personal matter – not just <lambo.com>. Having adopted "Lambo" as a moniker, he assigned <lambo.com> the highest dollar-value of all in an effort to discourage prospective inquirers from attempting to purchase the domain name – *it was not really for sale*. Finally, the record demonstrated that Blair had no intent to divert Lamborghini's consumers or to

10

otherwise profit from Lamborghini's goodwill in the Lamborghini trademark.

In short, the record demonstrated facts sufficient to support a finding that Blair acquired <lambo.com> in good faith, or at a minimum, that he lacked the bad-faith intent to profit required for liability under the ACPA. However, the District Court discounted virtually all of Blair's evidence, by deeming it "not credible," granting it less weight than Lamborghini's conflicting view of the facts, or disregarding it entirely, which enabled it to reach the erroneous conclusion that there were no disputed issues of material fact.

## STANDARD OF REVIEW

A district court's decision on summary judgment is reviewed *de novo*. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012). The Court must view the evidence in the light most favorable to the non-moving party to "determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (quoting *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1029 (9th Cir. 2011)). Further, "[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999) (citations omitted).

## ARGUMENT

### I.     THE DISTRICT COURT WRONGLY RESOLVED SEVERAL FACTUAL DISPUTES WHEN IT GRANTED SUMMARY

11

## JUDGMENT ON LAMBORGHINI'S ANTICYBERSQUATTING COUNTERCLAIM

The Anti-Cybersquatting Consumer Protection Act is violated only if "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected marked owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark." *Rearden*, 683 F.3d 1190, 1219 (9th Cir. 2012) (citing 15 U.S.C. § 1125(d)(1)(A)). A "finding of bad faith is an essential prerequisite to finding an ACPA violation." *Id.* at 1265-66. Here, the parties disputed only the "bad faith intent to profit" element. 1-ER-8.  The District Court erroneously resolved factual disputes on Lamborghini's Motion for Summary Judgment (the "Motion") and determined that a reasonable factfinder could only conclude that Blair's actions with respect to <lambo.com> were made with a bad faith intent to profit from the goodwill of Lamborghini. 1-ER-16–17.

Congress set forth nine non-exhaustive factors a court "*may* consider" in "determining whether a person has a bad faith intent to profit." 15 U.S.C. § 1125(d)(1)(B) (emphasis added). However, the court need not "march through the nine factors seriatim because the [Act] itself notes that use of the listed criteria is permissive." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009) (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001)). Rather, cybersquatting claims require a flexible analysis because "the most important grounds for finding [or not finding] bad faith are the unique circumstances

of the case, which do not fit neatly into the specific factors enumerated by Congress." *Interstellar Starship Servs.*, 304 F.3d at 946-947. Moreover, "a bad faith intent to profit" under the ACPA is a term of art and "cannot be equated with 'bad faith' in other contexts (such as trademark infringement)." *Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*, 493 F. Supp. 3d 64, 130 (E.D.N.Y. 2020) (citations omitted). Rather, an ACPA "plaintiff must show that the defendant's use of the domain name is an attempt to profit specifically from 'squatting' on the domain name with bad faith, rather than simply another aspect of the alleged trademark infringement." *Id.*

### A. The Unique Circumstances Surrounding Blair's Acquisition of \<lambo.com\> Should Have Precluded Summary Judgment

Several significant circumstances demonstrate a genuine issue of material fact, as to Blair's lack of bad faith. First, "Lambo" is a surname that is widely used by businesses around the world, and not exclusively associated with Lamborghini. The District Court wrongly failed to take into account evidence of widespread third-party use of "lambo." Prior to acquiring \<lambo.com\>, Blair conducted searches of the term "Lambo" on several websites, each of which generated search results indicating that "Lambo" was a common generic term, available for multiple uses across different contexts and industries. During his research, Blair did not encounter any live trademark registrations of the term "Lambo" belonging to Lamborghini.

Second, Blair adopted "Lambo" as a moniker since at least October 2019 as part of a publicly announced strategy, long before any dispute arose between

Lamborghini and himself, *i.e.* before Lamborghini initiated UDRP proceedings against him in 2022. "Lambo" was an attractive *nom de scene* for Blair because it was a pronounceable, catchy, and five-letter term, and not because it was associated with Lamborghini. Having committed the original sin of disregarding evidence showing the common and widespread usage of "Lambo," the District Court continued with its undue assumption that Blair must have targeted Lamborghini's goodwill and that he therefore could not have used "Lambo" as a nickname in good faith. The District Court adopted an unduly narrow construction of the ACPA's second factor, use of a name that is commonly used to identify the domain owner, deeming Blair's adoption of "Lambo" as a moniker "immaterial" on the theory that use of a nickname is only probative of good faith if the usage occurred prior to Blair's acquisition of the domain name. 1-ER-9. This conclusion was error because it defies logic, was unwarranted by the law the ACPA's legislative history, and because it failed to evaluate holistically the unique circumstance of Blair's good-faith use of "Lambo" in online communities and in the field of domain name investment and development.

Third, Blair has a history of listing certain of the domain names in his portfolio for astronomical prices in order to reflect the idiosyncratic value he personally places on those domain names – *properties that he owns* – and not because he intends to sell those domain names, much less to trademark holders. The District Court found

14

– with the lone exception of <lambo.com> – Blair's entire portfolio of domain names to be comprised of common dictionary terms, which he, therefore, had the right to price in whatever manner he chose, whether it made sense to anyone but Blair, or not. Blair should have been afforded the same latitude by the District Court as to his explanation for why he chose a comically high price for <lambo.com>. Blair submitted credible evidence that his rationale for listing <lambo.com> at $75 million was to communicate to the world the high value he places on the domain name bearing his online moniker, and to discourage "time wasters" from clogging his inbox with offers to buy it – not for the purpose of obtaining an extortionate sum as Lamborghini contended in the proceedings below. The District Court erred by concluding that Blair's explanation was not credible, and instead assuming that "[a]n offer to sell an item necessarily requires an intention to sell that item." 1-ER-12–13.

And finally, Blair has no history of cybersquatting, and a portfolio of 130 domain names, all of which are comprised of common words, letters, and phrases, and none of which target known trademarks – only Lamborghini has claimed that Blair is a cybersquatter. This unique circumstance is powerful evidence of Blair's good faith in acquiring the Domain Name and thus raises a triable issue of fact for a jury. *Cf. Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.*, 89 F. Supp. 2d 464, 474 (S.D.N.Y. 2000) ("bad faith" was a jury question where the defendant submitted evidence that the registered the disputed domain "cello.com" along with "the names

15

of approximately twenty musical instruments."). While the District Court correctly recognized that Blair's lack of cybersquatting history is a factor that weighs in his favor, it failed to conclude that this important evidence raises a triable issue of fact for a jury.

At a minimum, these four factual circumstances present genuine issues of material fact for trial, which the District Court resolved prematurely by weighing the evidence and making credibility determinations. *Cf. Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986) (directing trial courts to not weigh the evidence or determine its truth).

i.  <u>Blair did not intend to profit from Lamborghini's goodwill because "Lambo" is a widely used term and surname not exclusively known as a nickname for Lamborghini automobiles</u>

Prior to acquiring the Domain Name, Blair conducted his own due diligence – he searched for "lambo" on LinkedIn, OpenCorporates, the USPTO, and DotDB.com, which is his usual practice. 2-ER-30. These searches found many third-party uses of Lambo and several registered trademarks, none of which were registered to Lamborghini. Based on the results of his searches, Blair came to the understanding that "lambo" was a generic term because it was used by hundreds of non-party businesses in the United States and around the world in connection with a vast array of goods and services, and he presented evidence to the District Court to this effect. 2-ER-20–21, 30.  For instance, Blair presented the District Court with

16

evidence that a search for the term "Lambo" on tmdn.org, a global trademark search engine supported by the European Union Intellectual Property Network, returns thirty (30) live registrations with the single word "Lambo" for products and/or services outside the automobile industry. 2-ER-20–22. Likewise, a search with the same tool returns thirty-one (31) live registrations with the term "Lambo" combined with one other word or design elements. 2-ER-20–22. "Lambo" is also a surname. 2-ER-20–22. Furthermore, Blair presented evidence showing that a search of the term "Lambo" on Dun & Bradstreet (dnb.com) returns five hundred and ninety-seven (597) results for companies and business entities from various industries across the world using or incorporating "Lambo" in their names. 2-ER-20–22.[1]

The commonplace and widespread usage of "Lambo" by hundreds of businesses in a variety of contexts – and multitude of potential available uses – strongly reflects Blair's lack of intent to profit from Lamborghini's goodwill or to

---

[1] The Court should take judicial notice of the existence of these search results documented at 3-ER-163–342 because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Autodesk, Inc. v. Dassault Sys. SolidWorks Corp.*, No. 08-04397, 2008 WL 6742224 (N.D. Cal. Dec. 18, 2008) (taking judicial notice of trademark registrations and applications publicly available on USPTO website) (citing *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 (Fed. Cir. 1993)); *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 145 (N.D. Cal. 2020) ("[m]aterials in the online files of the USPTRO and other matters of public record are proper subjects of judicial notice"); *Carter v. Oath Holdings, Inc.*, 2018 WL 3067985, at *2 (N.D. Cal. June 21, 2018) (taking "judicial notice of the well-known fact that internet search engines index third-party web content and dynamically return relevant search results in response to user-entered search terms").

divert its customers. Where a term has common and widespread uses, courts are less likely to infer a bad faith intent to divert customers. *Calista Enterprises Ltd. v. Tenza Trading Ltd.*, 43 F. Supp. 3d 1099, 1132 (D. Ore. 2014) (denying summary judgment and crediting "Calista's contention that the phrase 'porn tube' is common and that its use of the word 'porntube' in combination with other arbitrary and suggestive words was merely an attempt to appeal to a consumers' search for adult-entertainment streaming videos on the Internet, as opposed to attempting to divert Tenza's customers"). At a minimum, based on the widespread and diverse uses of "Lambo," a reasonable juror could conclude that Blair lacked any bad faith intent to profit from Lamborghini's goodwill when he registered the Domain Name.

The District Court erred when it disregarded this evidence. The District Court stated in a footnote that "[t]his evidence does not affect the Court's decision" in response to Lamborghini's objection to the admissibility of Blair's evidence showing the widespread and common usage of "lambo." 1-ER-5.[2]  Evidence of widespread third-party use of the term "Lambo" clearly goes to Blair's intent in registering the Domain Name and is critical to his defense. Indeed, whether "Lambo" is exclusively associated with Lamborghini or is a widely-used trademark, surname, and business

---

[2] In the proceedings below, Lamborghini provided no cases to support its contention that any of Blair's evidence was inadmissible; it only cited cases which stand for the proposition that only admissible evidence may create a disputed issue of material fact on summary judgment. *See* Defendant's Reply in Support of the Motion for Summary Judgment, D. Ariz. Case No. 2:22-cv-01439-ROS, Dkt. No. 60, at 3–4.

name makes all the difference in the world to a bad faith inquiry. If the former, then Blair's choice of domain name would seem *much* more suspicious, but if the latter, then a reasonable juror could conclude that Blair registered "Lambo" for its widespread appeal, and not to target the nickname for Lamborghini's cars. Blair plainly states in his declaration that he was motivated by the latter, but the District Court gave no consideration to either his declaration or other evidence of record. 1-ER-5.

While the District Court did not explicitly decide the issue of the admissibility of Blair's declaration submitted with his Brief in Opposition to Summary Judgment, it disregarded Blair's sworn statements. It is black letter law that Blair's declaration was admissible, even if the District Court found it to be self-serving. *See Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 498 (9th Cir. 2015) (holding that a "self-serving" declaration was "sufficient to establish a genuine dispute of material fact"). Had the District Court properly credited it, the District Court would have to have concluded that it created genuine issues of material fact. While courts may "disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence," it was error for the District Court to disregard Blair's declaration, which detailed *facts* concerning his motivations and research into, and *findings* regarding, widespread third-party use of "lambo." *Id.* at 497 (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007)). Where, as here, the declaration at issue

19

contains factual material instead of merely conclusory statements, the District Court must take it into consideration on summary judgment. *Id.* ("[a]lthough the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature"). For example, Blair's declaration submitted in support of his opposition to the Motion contained facts regarding, *inter alia*, his history in domain name investment and portfolio, his interest in registering <lambo.com>, his acquisition strategy, his adoption of "Lambo" as a moniker, and the searches he performed on LinkedIn, OpenCorporates, USPTO, and DotDB.com websites. 2-ER-35–36, 37. Accordingly, Blair's declaration ought to have been considered by the District Court and the facts detailed therein raised multiple genuine issues of material fact.

Whether LAMBO is a term exclusively associated with Lamborghini, or a common word and surname, widely used by hundreds of businesses around the world, makes an enormous difference in a bad faith inquiry, where the issue is whether Blair registered <lambo.com> to squat on Lamborghini's trademark rights in the nickname, "Lambo." By relying on the distinctiveness of Lamborghini's LAMBORGHINI trademark – not the word "lambo" – and drawing the assumption, therefrom, that no reasonable factfinder could conclude that, in acquiring <lambo.com>, Blair had any motivation other than to target *Lamborghini* and profit

from its goodwill in its *LAMBORGHINI* mark, the District Court erred. To the extent that evidence of the strength of Lamborghini's LAMBORGHINI mark was persuasive in countering Blair's evidence of the lack of exclusive association between "Lambo" and Lamborghini, it merely goes to establish the existence of a triable issue of material fact that should have precluded summary judgment.

After disregarding evidence of widespread third-party uses of "lambo," the District Court even went so far as to opine that "it is obvious the public's strong association of LAMBO with LAMBORGHINI is the most enticing reason for a prospective buyer's acquisition of the Disputed Domain." 1-ER-16. This is precisely the type of evidence-weighing and credibility determination prohibited at summary judgment—rather, it is the type of determination that a factfinder may make on trial. *See Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 133 (D. Conn. 2002) (denying summary judgment because "the credibility of defendants' explanation" that it purchases the disputed domain name as part of a "general marketing strategy" was "more properly assessed by a jury"); *Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.*, 89 F. Supp. 2d 464, 474 (S.D.N.Y. 2000) ("bad faith" was a jury question where defendant submitted evidence supporting that that he registered the disputed domain "cello.com" because of his interest in registering domain names of musical instruments). The District Court's own choice of words alone is enough to show that summary judgment was improper.

ii.  <u>Blair adopted "Lambo" as a moniker in 2019 and "Lambo" has since been commonly used to identify Blair</u>

On September 17, 2020, after Blair acquired <lambo.com> and years before Defendant submitted its complaint to WIPO, Blair made a post on namepros.com, titled as "I am Lambo, Q&A Anything with Me" (the "Q&A Post"). 2-ER-22–24.  In this post, Blair offered to share information about himself and his experiences with domain names. Users under the Q&A Post greeted and recognized Blair as "Lambo." 2-ER-22–24.  In response to the question "Why lambo name?", Blair stated "I'm gonna moniker a dotcom of mine, otherwise what kind of domainer would I be?!". 2-ER-22–24.  Additionally, Blair has created and consistently used an iconography of a stylized lamb with ***protruding blue brain***, as shown as his profile picture in the Q&A Post, in connection with his online moniker "Lambo" on different Internet platforms. 2-ER-22–24.  The protruding blue brain exemplifies how Blair sees his alter ego and himself – as possessing ***outlier generic aptitude and intelligence***. 1-ER-9; *see also* 2-ER-31.

Though "Lambo" is not part of Blair's *legal* name, Blair presented specific evidence to the District Court which showed that he is commonly known as "Lambo" in multiple contexts, including his general online presence, the field of domain name investment and development, public discussions of his experiences with domain names, as well as in personal relationships. Specifically, Blair has been actively using "Lambo," "Lambo.com," and/or "Lambodotcom" as his moniker, in

22

multiple online communities including lichess.org, namepros.com, X.com (formally Twitter), WhatsApp, and Telegram, since as early as October 2019. 2-ER-22–24. Users on X.com and NamePros.com refer to Blair as "Lambo." 2-ER-22–24. Blair is also frequently addressed as "Lambo" among friends and family, including his father. 2-ER-22–24.

Engaging in a rigid application of the ACPA's statutory factors, and without giving due consideration to the unique circumstances of the case, the District Court dismissed this evidence and deemed it "immaterial" that Blair adopted "Lambo" as a moniker before Lamborghini's commencement of the UDRP proceeding. 1-ER-9. To arrive at this conclusion, the District Court adopted an unduly narrow construction of the ACPA's second bad-faith factor, discussed at Section I.B.i, *infra*, and eschewed this Court's directive that "the most important grounds for finding bad faith are the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress." *Interstellar Starhip Servs.*, 304 F.3d at 946-947. While Blair's adoption of "Lambo" as a nickname post-dated his acquisition of <lambo.com>, Blair's evidence on this point was material in demonstrating his lack of bad faith intent to target Lamborghini and profit from its goodwill. Blair's evidence shows that his adoption of the moniker "Lambo" had nothing to do with Lamborghini, cars, or the automotive industry; Blair has never been a competitor of Lamborghini; and Blair's adoption of the moniker predates any

23

dispute with Lamborghini by years. *Cf. Sporty's Farm L.L.C. v. Sportsman's Mar.*, *Inc.* 202 F.3d 489, 499 (2d Cir. 2000) (noting defendant's plan to enter plaintiff's industry and consumer market, as well as defendant's creation of another company in an unrelated business months after the initiation of the lawsuit at issue that received the name "Sporty's Farm"); *Rearden*, 683 F.3d at 1220-1221 (timing of defendant's acquisition of disputed domain names indicative of bad faith where acquisition post-dated trademark dispute between the parties).

Indeed, <lambo.com> is Blair's property. *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003); *see also GoPets Ltd. v. Hise*, 657 F.3d 1024, 1031 (9th Cir. 2011). Blair has the right to conceive of different uses of his property after he acquires it, just as any property owner does – he is not restricted to the original use he had in mind for his property. Indeed, if <lambo.com> were a house, no court would question whether Blair intended to renovate the home after purchasing it – but changed his mind – or painted it, when he believed he would install vinyl siding. Human beings have intentions, and those intentions change – it does not make them cybersquatters, and there is no bright-line rule that says that deciding to moniker a domain name some period of time after its acquisition supports a finding of bad faith.

It is possible for a domain name's owner both to adopt a domain name as a moniker in good faith or bad, and whether the name was adopted before or after the acquisition of a domain name is not dispositive of that intent. The fact that Blair

24

decided to use "Lambo" – a short, memorable, widely-used surname – as his moniker a year after he acquired the domain name, and long before Lamborghini ever asserted a claim to it, at a minimum, raises a jury issue. Blair presented sufficient, specific evidence to raise a triable issue of fact regarding his good faith intent because a reasonable factfinder, crediting Blair's affidavit and drawing all reasonable inferences in Blair's favor, could find that Blair acquired <lambo.com> in good faith, and later decided to make it a moniker, rendering summary judgment inappropriate.

### iii. Blair had no intention to sell <lambo.com>, much less to Lamborghini

Blair presented nonconclusory evidence to the District Court that he has a history of listing some of the domain names in his domain name portfolio for sale at prohibitively high prices when he does not intend to sell them. For example, Blair presented evidence that he currently lists <dnas.com> for sale for $38,996,555, <cryptocorp.com> for $9,679,721, <newsmedia.com> for $4,355,874, and <templarcrown.com> for $3,300,000. 2-ER-33. None of the domain names that Blair has listed for an exorbitant price is similar to any famous trademark or displays a pattern of targeting mark holders. Rather, Blair assigns high prices to selective domain names to discourage people from making offers for those domain names, and this rationale was explained to the District Court. *See* 1-ER-14–15; *see also* 2-ER-26–27, 30. The domain names that are most valuable to Blair, and which he least

25

wants to part with, are assigned the highest prices for precisely that reason. 2-ER-26–27, 30, 33.

Consistent with this history, Blair listed <lambo.com> for sale for an absurdly high price to discourage prospective purchasers, because he believed he had the right to do so as the Domain Name's rightful owner, and not because he intended to part with <lambo.com> for a price. *See Nu Pagamentos S.A. – Instituicao de Pagamento v. Hudson*, 2023 WL 2377641, at *13 (N.D. Ga. Feb. 22, 2023) (finding genuine dispute of material fact where domain owner "quoted an exorbitant price because he thought himself the rightful owner of the domain and he wanted to make Plaintiff "go away."); *cf. Black v. Irving Materials, Inc.*, 2019 WL 1995342, at *10 (N.D. Cal. May 6, 2019) (finding genuine disputes of material fact where domain name owner disputed trademark holder's interpretation of his offer to sell the domain name and argued that "since he has made bona fide use of the Domain, he own[ed] that property that it [was] immaterial as to this factor whether or not he ever offered to sell it.").

As stated above, Blair monikered the Domain Name as one of the dotcom domains he possesses in association with his participation in the domain name industry. 2-ER-22–24. Deeming <lambo.com> a property of high value to ***himself***, Blair listed <lambo.com> for increasingly exorbitant prices to discourage people from making offers to purchase it. 2-ER-26–27, 31. As he explained in the Q&A

26

Post, years before Lamborghini initiated UDRP proceedings against him, "[n]ot all my domains are actively for sale *really*, I do incubate, nurture and build too." 2-ER-26–27 (emphasis added). Blair received multiple inquiries from third parties, seeking the asking price of <lambo.com>, but he never made any attempt to negotiate a sale price with them. 1-ER-11–12; *see also* 2-ER-26–27. Instead, he directed them back to the exorbitant price(s) listed at that time. 1-ER-12; *see also* 2-ER-26–27. Blair increased the price of <lambo.com> several times to ***discourage*** people from making offers, as the domain name became more valuable to him as a part of his identity. 2-ER-26–27, 31. Accordingly, a reasonable jury could find that Blair did not list <lambo.com> for sale for financial gain, much less to profit off the nickname for Lamborghini's automobiles. 2-ER-26–27.

Blair also presented evidence regarding his plans to develop <lambo.com> into an active website, including evidence that he completed a WordPress installation and a landing page on May 2, 2019. 1-ER-12; *see also* 2-ER-6–7, 31. Due to limited personal capacity, Blair decided to focus on developing another website at <ceec.com>, and to resume development of <lambo.com> at a later date. 1-ER-12; *see also* 2-ER-6–7, 31. Accordingly, Blair's evidence demonstrated that he did not in engage in the typical behavior of ACPA violators who seek to sell domain names (that incorporate famous or distinctive trademarks) without using or intending to use them, or at least created a disputed issue of material fact regarding his listing of

27

<lambo.com>.

Yet despite this evidence, the District Court opined that "Blair has not offered a *credible* response to substantiate his claim that he intended to make legitimate use of [<lambo.com>]. 1-ER-12. The District Court's words, once again, make clear that it engaged in impermissible determinations as to credibility, rather than deciding whether genuine issues of material fact precluded summary judgment. Having deemed Blair's evidence not credible, the District Court likewise erred when it made the unwarranted assumption that "[a]n offer to sell an item necessarily requires an intention to sell that item," for which it cited no authority in support. 1-ER-12. In contrast, Blair cited a federal district court opinion in support of the proposition that a genuine dispute of material fact exists where a domain owner quotes an exorbitant price in order to discourage inquiring parties, and not with the intent to actually sell the domain name. *See Nu Pagamentos S.A. – Instituicao de Pagamento v. Hudson*, 2023 WL 2377641, at *13 (N.D. Ga. Feb. 22, 2023). The District Court disregarded this authority, and instead adopted the conclusion it deemed more credible, which is not permitted on summary judgment.

The District Court also made the erroneous assertion that "Blair provides no explanation as to how listing [<lambo.com>] for sale discourages prospective purchasers." 1-ER-13. Blair did provide an explanation and evidence on this issue, but the District Court omitted any mention of them from its decision. Blair explained

28

that he listed <Lambo.com> for increasingly astronomical amounts to discourage "time wasters" from asking him to sell it. 2-ER-26–27, 29.  Blair also received multiple inquiries from third parties, seeking the asking price of <lambo.com>, but he never made any attempt to negotiate a sale price with them. 2-ER-26–27.  For example, Blair presented evidence of an interested inquirer stating that the listed price of $50,000,000 was "crazy" and asked what sort of price Blair was looking for. 2-ER-29.  In response, Blair merely said "I understand. Thanks anyway for your interest and best wishes" without negotiating for any price to sell., and Blair terminated the conversation without further responding to the individual's question of "what's your best price?". 2-ER-29.

Although the District Court concluded that such communications exclusively support a finding of bad faith intent to profit, this is just one possible conclusion that a reasonable factfinder could reach. Blair presented sufficient, specific evidence from which a reasonable fact finder could conclude that he was not trying to exact an extortionate price from Lamborghini and that he was not attempting to part with <lambo.com> for a price at all. That Blair listed <lambo.com> for sale at a ridiculously high price is susceptible to competing, reasonable interpretations, and summary judgment was therefore inappropriate. *Collision Chiropractors LLC v. Collision Injury Chiropractic PLLC,* 2022 WL 16793363, at *3 (D. Ariz. Nov. 8, 2022) (citing *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002)).

29

iv.   Blair's lack of cybersquatting history despite his extensive
domain name portfolio raised a fact question for the jury

Although the District Court correctly concluded that Blair's lack of cybersquatting history is a factor that weighs in his favor, it ultimately erred in this respect by failing to recognize that Blair's lack of cybersquatting history, particularly in the context of his ownership of a sizeable domain name portfolio, raised a question of fact for the jury. *Cf. Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.*, 89 F. Supp. 2d 464, 474 (S.D.N.Y. 2000) ("bad faith" was a jury question where the defendant submitted evidence that the registered the disputed domain "cello.com" along with "the names of approximately twenty musical instruments.").

Despite the many improper credibility determinations it made in Lamborghini's favor, the District Court failed to recognize that Blair's portfolio of 130 domain names, all of which are comprised of common words, letters, and phrases, and none of which target known trademarks, is compelling evidence of Blair's lack of bad faith with respect to the Domain Name. Instead, the District Court summarily concluded that Blair's unblemished domain ownership history "is not in itself enough to absolve him of an ill-intent to profit from Lamborghini's mark," thereby resolving a fact question best reserved for trial. 1-ER-15. This was error, in part because the District Court was obligated to construe the evidence in the light most favorable to the nonmovant, and this factor bears on several of the other factors considered by the Court, by bolstering Blair's credibility. *Rearden*, 683 F.3d at 1202.

30

Accordingly, the Court should find that Blair's lack of cybersquatting history raises a fact question for the jury.

### B. The Statutory Factors Demonstrated A Triable Issue of Fact As to Blair's Lack of Bad Faith Intent to Profit

As discussed above, the unique circumstances of this case alone demonstrate that summary judgment should not have been granted. *Interstellar Starhip Servs.*, 304 F.3d at 946-947. The District Court, however, placed undue reliance on the non-exclusive statutory factors, concluding that most of them pointed to bad-faith intent. *See* 1-ER-3–17.  This was error, as the District Court not only misapplied the factors individually, without consideration of the unique circumstances of the case, but in so doing, resolved factual disputes against Blair.

#### i. Factor II – "Lambo" is Commonly Used to Identify Blair

The District Court erroneously concluded that Factor II, the extent to which the domain name is commonly used to identify Blair, favors Lamborghini because Blair's adoption of "Lambo" as a moniker post-dated his acquisition of <lambo.com>. But this holding is not warranted by the ACPA's text, its legislative history, nor the Second Circuit's decision in *Sporty's Farm L.L.C. v. Sportsman's Mar., Inc.*, 202 F.3d 489 (2d Cir. 2000), upon which the District Court relied to arrive at this erroneous conclusion. Simply put, the law does not limit the Court's analysis under this factor to nicknames that were adopted after one acquired the disputed domain.

Rather, Factor II simply directs courts to consider "the extent to which the domain name consists of the legal name of the person *or a name that is otherwise commonly used to identify that person*." 15 U.S.C. § 1125(d)(1)(B)(i)(II) (emphasis added). Notably, Factor II "recognizes that with the growing use of personal web sites, a person should be permitted to register their legal name or widely recognized nickname as the domain name of their web site." 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:55 (5th ed. 2020). Thus, a domain name owner's use of a domain name consisting of a name that is commonly used to identify him is indicative of an absence of bad faith. *Shetel Indus.*, 493 F. Supp. 3d at 131. The cautionary statement found within the ACPA's legislative history – "[t]his factor is not intended to suggest that domain name registrants may evade the application of this act by merely adopting Exxon, Ford, Bugs Bunny or other well-known marks as their nicknames" – does not contain the timing requirement that the District Court seeks to impose on Blair. H.R. Rep. No. 106-412, at 10 (October 25, 1999). Instead, the legislative history simply forewarns courts of domain name owners who may adopt nicknames as a pretext to justify their acquisition of a domain name containing that nickname. Such a pretextual adoption may indeed arise before *or* after one's acquisition of a disputed domain name, and the ACPA's legislative history should not be read to give Factor II the unduly narrow construction adopted by the District Court.

32

Similarly, the Second Circuit found unconvincing the ACPA defendant's use of the name "Sporty's Farm" due to the blatantly pretextual nature of defendant's adoption of that name, where defendant planned to enter into direct competition with plaintiff in the pilot and aviation consumer market and it created an entity in an unrelated business that received the name "Sporty's Farm" to protect itself in the event that that the ACPA plaintiff brought a trademark infringement claim alleging a "likelihood of confusion." *See Sporty's Farm L.L.C. v. Sportsman's Mar.*, Inc. 202 F.3d 489, 499 (2d Cir. 2000). While the Second Circuit noted the fact that "the entity did not exist at the time the domain name was registered," it also found noteworthy that "it did not begin operations or obtain the domain name from [its parent company] until after this lawsuit was filed." *Id.* at 498-99. But most significantly, the Second Circuit correctly evaluated the "unique circumstances" of that case as the "most important grounds" for its holding, and found most noteworthy that defendant "planned to enter into direct competition with" plaintiff and was aware that "*sporty's* was a very strong mark for consumers of those products," and thus adopted the name "Sporty's Farm" as a pretext to prevent plaintiff from using that domain name. *Id.* at 499. Accordingly, the Court should not read *Sporty's Farm* as limiting the consideration of Factor II to situations in which the adoption of a nickname predates one's acquisition of the disputed domain.

Additionally, the District Court's analysis under Factor II suffers from its

repeated tendency to make credibility determinations, rather than deciding whether the lack of genuine disputes of fact preclude trial. For example, the District Court opined that it deemed Blair's explanation that he was drawn to the name "Lambo" as a play on the word "Lamb" with an outlier generic aptitude and intelligence as "[s]omewhat perplexing." 1-ER-9. Blair's explanation was supported by his adoption of a lamb icon with a bulging blue brain – evocative to Blair of outlier intelligence – which corroborates that his adoption of the "Lambo" moniker had nothing to do with Lamborghini or the automotive industry, and therefore was not a pretextual justification for his acquisition of <lambo.com>. Rather than credit this evidence, however, the District Court overstepped its role on summary judgment and sidestepped this evidence as "perplexing," deciding instead that no genuine issues of material fact existed. This was error, and the District Court should have concluded that Factor II weighs in Blair's favor.

   ii. <u>Factor V – Blair had no intent to and did not divert consumers from Lamborghini</u>

The District Court also erred in concluding that this factor, which analyzes the domain owner's intent to divert consumers, "marginally weighs in Lamborghini's favor." 1-ER-11. In support of this conclusion, the District Court considered Blair's blog post on a third-party website in which Blair made the following assertions and included a link to the parties' UDRP proceedings:

 (1) I AM LAMBO of LAMBO.com and I will defend, defeat and humiliate

34

> those endeavouring to steal any of my domain name brands – including my moniker;
>
> (2) Automobili Lamborghini S.p.A. is attempting THEFT of my asset, nomenclature, and taxonomy they possess ZERO rights to,
>
> (3) Countermeasures to humiliate such endeavours are afoot. Unlawful theft will be duly punished through legal and commensurate counter efforts including any coerced and submissive accomplices.

1-ER-10. While the District Court correctly noted that "Blair's conduct here does not conclusively project a primary motivation to harass Lamborghini, but rather to voice his grievances regarding the ongoing dispute," it nevertheless opted to "constru[e] this factor liberally," and find that "any disparagement of a mark by an alleged cybersquatter carries inherent negative commercial consequences." 1-ER-11. This conclusion lacked legal support and was reached in error because the District Court was obligated to view the evidence in the light most favorable to the non-moving party, *Rearden*, 683 F.3d at 1202, not to "liberally construe" in movant's favor.

Factor V of the ACPA calls for courts to consider:

> the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

15 U.S.C. § 1125(d)(1)(B)(i)(V). Blair's blog post did not run afoul of either prong of Factor V. Blair's statements that he would "defend, defeat, and humiliate" Lamborghini, made in connection with the UDRP proceedings between the parties,

were free speech that show no "intent to profit" whatsoever on Blair's part. More importantly, Blair's conduct is not emblematic of the "essence of the wrong" that the ACPA was enacted to combat. For example, none of the evidence in the record suggested that Blair has "ever sought to mislead consumers with regard to the site's sponsorship." *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004) (finding an "intent to profit" lacking where ACPA defendant's "web site explicitly stated that the site was established by [defendant] for the purposes of relaying her experience with [plaintiff]"). Nor is there any evidence that Blair obtained any revenue or other pecuniary benefits from traffic on the website located at www.lambo.com. *See, e.g., Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research*, 527 F.3d 1045, 1048 (10th Cir. 2008) (affirming grant of summary judgment for ACPA defendants where there was no evidence, *inter alia*, that defendants intended "to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's"); *cf. Ricks v. BMEzine.com, LLC*, 727 F. Supp. 2d 936, 964 (D. Nev. 2010) (finding diversionary intent where the website at the domain name included "pay-per-click" links that produced revenue for the domain owner).

The District Court's unsupported assertion that "any disparagement of a mark by an alleged cybersquatter carries inherent negative commercial consequences" is

speculative, not supported by the record, and most importantly, misconstrues the import of Factor V. Factor V is not concerned with the "negative commercial consequences" faced by the trademark holder from free speech, but rather the domain owner's "intent to divert consumers . . . *for commercial gain* or with the intent to tarnish or disparage the mark, *by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site*." 15 U.S.C. § 1125(d)(1)(B)(i)(V) (emphasis added). There is no evidence in the record that Blair (1) intended to divert Lamborghini's consumers, (2) derived any commercial or pecuniary gain through his blog post, or (3) created any likelihood of confusion as to the site's source, sponsorship, affiliation, or endorsement. Plainly, Blair did not use the domain name to divert users searching for Lamborghini to a website with pay-per-click ads, or to create the false impression that the website is affiliated with Lamborghini in any way. That is, Blair's actions in publishing the blog post did not show any indication that he was intending or attempting to profit from the goodwill of Lamborghini's mark. Accordingly, the District Court should have found that Factor V heavily weighs in Blair's favor.

### iii.   Factor VI – Blair's Listing of \<lambo.com\> for Sale did not indicate a bad faith intent to profit

The District Court erred in holding that Factor VI favors Lamborghini. As an initial matter, the ACPA was not intended to preclude the sale of domain names. *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264 (4th Cir. 2001)

37

(ultimately finding bad faith because Plaintiff never identified itself by the initials "vw"). Merely offering a domain name for sale, on its own, does not weigh in favor of a bad faith finding. *Interstellar Starship Services, Ltd. v. Epix Inc.*, 304 F.3d 936, 947 (9th Cir. 2002); *see also Wagner v. lindawagner.com*, 202 F. Supp. 3d 574, 583 (E.D. Va. 2016) (explaining that "legislative history of the ACPA specifically cautions that this factor does not suggest that a court should consider the mere offer to sell a domain name to a mark owner or the failure to use a name in the bona fide offering of goods or services as sufficient to indicate bad faith.").

Blair's listing <lambo.com> for $75,000,000 was not made with the intent to exact an extortionate price from Lamborghini – the type of conduct that the ACPA was designed to prohibit. *See, e.g.*, *Gioconda Law Group PLLC v. Kenzie*, 941 F. Supp. 2d 424, 437 (S.D.N.Y. 2013) (noting that "[t]he ACPA is designed principally for cases where a defendant either forces a markholder to purchase a domain name at an extortionate price or diverts customers from the markholder's website to the defendant's own website."). Further, Blair attested to the facts that he did not register the domain name with the intent to sell it to Lamborghini, and has never offered to sell the domain name to Lamborghini. 2-ER-31. *See Wagner*, 202 F. Supp. 3d at 577 (finding noteworthy for bad faith determination that domain owner "never approached plaintiff to sell her the domain name").

As discussed at Section I.A.iii., *supra*, Blair listed <lambo.com> for sale for

an exorbitant price for precisely the opposite purpose – to discourage prospective purchasers. *See Nu Pagamentos S.A. – Instituicao de Pagamento v. Hudson*, 2023 WL 2377641, at *13 (N.D. Ga. Feb. 22, 2023) (finding genuine dispute of material fact where domain owner "quoted an exorbitant price because he thought himself the rightful owner of the domain and he wanted to make Plaintiff "go away."). Despite this hotly disputed issue of material fact, the District Court concluded that "Blair indisputably offered to sell [<lambo.com>] . . . for his own financial gain," basing its conclusion on its impermissible determination that Blair's explanation on this issue was not "credible."[3]   1-ER-13.   Accordingly, the District Court's conclusion was error, and this Court should find that Factor VI favors Blair or at least that it presents a genuine issue of material fact.

  iv. Factor IX – While "Lamborghini" is a famous and distinctive mark, "Lambo" is not

   Finally, the District Court erred in holding that the distinctiveness factor favors Lamborghini. While the District Court correctly noted that "the general public may not exclusively associate LAMBO with Lamborghini," it nonetheless permitted

---

[3] The District Court implicitly concluded that the prices for which Blair listed the Domain Name for sale were *serious,* but that is one of the core factual issues in this case. If it was not a domain name, but his house that was at issue, and Blair had tired of fielding unsolicited offers and listed his $1 million house for $100 million, few would take him seriously, or question his right to do so. Real estate brokers and speculators might rightly conclude that he had no interest in selling and leave him alone.

Lamborghini to bootstrap the distinctiveness of the LAMBORGHINI trademark to the common term "lambo." 1-ER-16.  As discussed above, Blair understood the term "lambo" to be colloquially "generic" due to its widespread use across numerous contexts and diverse industries. The commonplace and widespread usage of "lambo" by hundreds of businesses, worldwide, supports Blair's claim that his registration of <lambo.com> had nothing to do with Lamborghini and was not undertaken with the intention to profit from Lamborghini's goodwill in its ***LAMBORGHINI*** mark.

The District Court relied on the ACPA's legislative history with respect to this factor, which states that "[t]he more distinctive or famous a mark has become, the more likely the owner of that mark is deserving of the relief available under this act." H.R. Rep. No. 106-412, at 13 (October 25, 1999). This general proposition, however, does not account for the circumstances here where the mark holder Lamborghini is attempting to bootstrap the fame and distinctiveness of its LAMBORGHINI trademark, which is not under dispute, to the common and widely used term and surname, "lambo." While the fame and distinctiveness of the LAMBORGHINI trademark may make it more likely that some consumers will associate "lambo" with Lamborghini, this case is about <lambo.com>, not <lamborghini.com> – they are not the same mark. A genuine issue of material fact continues to exist with respect to Blair's acquisition of a domain name bearing a name that also happens to be used in a multitude of other contexts and industries, precluding summary judgment.

40

In sum, to the extent the statutory factors are considered along with the unique circumstances of this case, a fact issue exists as to Blair's lack of bad-faith intent to profit from the goodwill of Lamborghini's mark.

## **CONCLUSION**

For the foregoing reasons, the District Court's grant of summary judgment against Blair should be reversed, and the case remanded for trial.


Dated: March 3, 2025                    Respectfully submitted,


                                        */s/Brett E. Lewis*
                                        Brett E. Lewis
                                        Anna Iskikian
                                        **LEWIS & LIN, LLC**
                                        77 Sands Street, 6th Floor
                                        Brooklyn, NY 11201
                                        Tel: (718) 243-9323
                                        Brett@iLawco.com
                                        Anna@iLawco.com

                                        *Attorneys for Appellant Richard Blair*

41

## <u>STATEMENT OF RELATED CASES</u>

**9th Cir. Case Number: 24-6839**

I am the attorney for Appellant Richard Blair.

I state that:

[X] I am unaware of any related cases currently pending in this court.

Dated: March 3, 2025                    Respectfully submitted,

*/s/Brett E. Lewis*
Brett E. Lewis
Anna Iskikian
**LEWIS & LIN, LLC**
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Tel: (718) 243-9323
Brett@iLawco.com
Anna@iLawco.com

*Attorneys for Appellant Richard Blair*

42

## <u>CERTIFICATE OF COMPLIANCE</u>

**9th Cir. Case Number: 24-6839**

I am the attorney for Appellant Richard Blair.

**This brief contains 9,940 words**, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief:

[X] complies with the word limit of Cir. R. 32-1.

Dated: March 3, 2025                     Respectfully submitted,

                                         */s/Brett E. Lewis*
                                         Brett E. Lewis
                                         Anna Iskikian
                                         **LEWIS & LIN, LLC**
                                         77 Sands Street, 6th Floor
                                         Brooklyn, NY 11201
                                         Tel: (718) 243-9323
                                         Brett@iLawco.com
                                         Anna@iLawco.com

                                         *Attorneys for Appellant Richard Blair*