Case No. 24-6839

# United States Court of Appeals
# for the Ninth Circuit

RICHARD BLAIR,

*Plaintiff-Appellant,*

*v.*

AUTOMOBILI LAMBORGHINI SpA,

*Defendant-Appellee.*

On Appeal from
The United States District Court
for the District of Arizona
Case No. 2:22-cv-01439-ROS
The Honorable Judge Roslyn O. Silver

## Defendant-Appellee's Supplemental Excerpts of Record

### Volume 1 of 1

Lauren Watt
Nicholas Nowak
STERNE KESSLER GOLDSTEIN & FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Defendant-Appellee*
*Automobili Lamborghini SpA.*

May 2, 2025

# Exhibit 1

**Generated on:** This page was generated by TSDR on 2024-06-13 13:16:58 EDT

**Mark:** PHARMACORE

PHARMACORE

| | | | |
|---|---|---|---|
| **US Serial Number:** | 76383698 | **Application Filing Date:** | Mar. 19, 2002 |
| **US Registration Number:** | 2842219 | **Registration Date:** | May 18, 2004 |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |

**TM5 Common Status Descriptor:**

LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** The registration has been renewed.

**Status Date:** Nov. 29, 2014

**Publication Date:** Oct. 22, 2002

## Mark Information

**Mark Literal Elements:** PHARMACORE

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 1 - TYPESET WORD(S) /LETTER(S) /NUMBER(S)

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Chemical synthesis services, namely, custom synthesis of chemicals for others

| | | | |
|---|---|---|---|
| **International Class(es):** | 040 - Primary Class | **U.S Class(es):** | 100, 103, 106 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Sep. 01, 2000 | **Use in Commerce:** | Sep. 01, 2000 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## Current Owner(s) Information

**Owner Name:** Pharmacore, Inc.

**Owner Address:** 4180 Mendenhall Oak Parkway
High Point, NORTH CAROLINA UNITED STATES 27265

SER-003

| Legal Entity Type: | CORPORATION | State or Country Where Organized: | DELAWARE |

## Attorney/Correspondence Information

### Attorney of Record

| Attorney Name: | William M. Bryner | Docket Number: | 46395-247165 |
| Attorney Primary Email Address: | wstrademarks@kilpatricktownsend.com | Attorney Email Authorized: | Yes |

### Correspondent

| Correspondent Name/Address: | William M. Bryner | | |
| | KILPATRICK TOWNSEND & STOCKTON LLP | | |
| | 1001 WEST FOURTH STREET | | |
| | WINSTON-SALEM, NORTH CAROLINA UNITED STATES 27101-2400 | | |
| Phone: | (336) 607-7300 | Fax: | (336) 607-7500 |
| Correspondent e-mail: | wstrademarks@kilpatricktownsend.com | Correspondent e-mail Authorized: | Yes |

### Domestic Representative - Not Found

## Prosecution History

| Date | Description | Proceeding Number |
| --- | --- | --- |
| May 18, 2023 | COURTESY REMINDER - SEC. 8 (10-YR)/SEC. 9 E-MAILED | |
| Nov. 29, 2014 | NOTICE OF ACCEPTANCE OF SEC. 8 & 9 - E-MAILED | |
| Nov. 29, 2014 | REGISTERED AND RENEWED (FIRST RENEWAL - 10 YRS) | |
| Nov. 29, 2014 | REGISTERED - SEC. 8 (10-YR) ACCEPTED/SEC. 9 GRANTED | |
| Nov. 26, 2014 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | |
| Nov. 07, 2014 | TEAS SECTION 8 & 9 RECEIVED | |
| Dec. 08, 2009 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | |
| Dec. 05, 2009 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | |
| Nov. 23, 2009 | TEAS SECTION 8 & 15 RECEIVED | |
| Nov. 23, 2009 | APPLICANT/CORRESPONDENCE CHANGES (NON-RESPONSIVE) ENTERED | |
| Nov. 23, 2009 | TEAS CHANGE OF OWNER ADDRESS RECEIVED | |
| May 31, 2007 | CASE FILE IN TICRS | |
| May 18, 2004 | REGISTERED-PRINCIPAL REGISTER | |
| Dec. 04, 2002 | EXTENSION OF TIME TO OPPOSE RECEIVED | |
| Oct. 22, 2002 | PUBLISHED FOR OPPOSITION | |
| Oct. 02, 2002 | NOTICE OF PUBLICATION | |
| Jul. 30, 2002 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Jul. 22, 2002 | ASSIGNED TO EXAMINER | |
| Jul. 16, 2002 | ASSIGNED TO EXAMINER | |

## TM Staff and Location Information

### TM Staff Information - None

### File Location

| Current Location: | GENERIC WEB UPDATE | Date in Location: | Nov. 29, 2014 |

## Proceedings

### Summary

| Number of Proceedings: | 1 |

### Type of Proceeding: Extension of Time

| Proceeding Number: | 76383698 | Filing Date: | Dec 24, 2002 |
| Status: | Terminated | Status Date: | Apr 04, 2003 |

**Interlocutory Attorney:**

| Defendant | | |
|---|---|---|
| **Name:** | Pharmacore, Inc. | |
| **Correspondent Address:** | ANDREW ROPPEL<br>KILPATRICK STOCKTON LLP<br>1001 WEST FOURTH STREET<br>WINSTON-SALEM NC UNITED STATES , 27101-2400 | |

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
|---|---|---|---|
| PHARMACORE | | 76383698 | |

**Potential Opposer(s)**

| | | |
|---|---|---|
| **Name:** | DECISION RESOURCES, INC. | |
| **Correspondent Address:** | SUSAN G L GLOVSKY<br>HAMILTON BROOK SMITH & REYNOLDS PC<br>530 VIRGINIA ROAD PO BOX 9133<br>CONCORD MA UNITED STATES , 01742-9133 | |

**Prosecution History**

| Entry Number | History Text | Date | Due Date |
|---|---|---|---|
| 28 | REQ. TO EXT. TIME TO OPPOSE DENIED | Dec 10, 2003 | |
| 27 | INCOMING - EXT TIME TO OPPOSE FILED | Nov 20, 2003 | |
| 26 | INCOMING - EXT TIME TO OPPOSE FILED | Nov 20, 2003 | |
| 25 | INCOMING - EXT TIME TO OPPOSE FILED | Oct 20, 2003 | |
| 24 | EXTENSION OF TIME GRANTED | Sep 30, 2003 | |
| 23 | INCOMING - EXT TIME TO OPPOSE FILED | Sep 22, 2003 | |
| 22 | CORRECTION LETTER | Aug 29, 2003 | |
| 21 | EXTENSION OF TIME GRANTED | Aug 29, 2003 | |
| 20 | INCOMING - EXT TIME TO OPPOSE FILED | Aug 19, 2003 | |
| 19 | EXTENSION OF TIME GRANTED | Jul 29, 2003 | |
| 18 | DELETE ENTRY | Jul 29, 2003 | |
| 17 | INCOMING - EXT TIME TO OPPOSE FILED | Jul 22, 2003 | |
| 16 | EXTENSION OF TIME GRANTED | Jul 11, 2003 | |
| 15 | INCOMING - EXT TIME TO OPPOSE FILED | Jun 23, 2003 | |
| 14 | EXTENSION OF TIME GRANTED | Jun 09, 2003 | |
| 13 | INCOMING - EXT TIME TO OPPOSE FILED | May 22, 2003 | |
| 12 | EXTENSION OF TIME GRANTED | May 09, 2003 | |
| 11 | INCOMING - EXT TIME TO OPPOSE FILED | Apr 21, 2003 | |
| 10 | EXTENSION OF TIME GRANTED | Apr 04, 2003 | |
| 9 | INCOMING - EXT TIME TO OPPOSE FILED | Mar 24, 2003 | |
| 8 | EXTENSION OF TIME GRANTED | Feb 25, 2003 | |
| 7 | INCOMING - EXT TIME TO OPPOSE FILED | Feb 19, 2003 | |
| 6 | EXTENSION OF TIME GRANTED | Jan 24, 2003 | |
| 5 | INCOMING - EXT TIME TO OPPOSE FILED | Jan 17, 2003 | |
| 4 | EXTENSION OF TIME GRANTED | Dec 31, 2002 | |
| 3 | INCOMING - EXT TIME TO OPPOSE FILED | Dec 23, 2002 | |
| 2 | EXTENSION OF TIME GRANTED | Dec 24, 2002 | |
| 1 | INCOMING - EXT TIME TO OPPOSE FILED | Nov 21, 2002 | |

# Exhibit 2

**Generated on:** This page was generated by TSDR on 2024-06-13 13:16:39 EDT

**Mark:** DNAS

# Dnas

| | | | |
|---|---|---|---|
| **US Serial Number:** | 90164020 | **Application Filing Date:** | Sep. 07, 2020 |
| **US Registration Number:** | 6341051 | **Registration Date:** | May 04, 2021 |
| **Filed as TEAS Plus:** | Yes | **Currently TEAS Plus:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** May 04, 2021

**Publication Date:** Feb. 16, 2021

## Mark Information

**Mark Literal Elements:** DNAS

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

**Translation:** The wording "Dnas" has no meaning in a foreign language.

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Downlights; Lamps; Air purifiers for automobiles; Bicycle lights; Electric fans; Electric night lights; Electric stoves; Headlights for automobiles; Lamps for festive decoration; Lamps for tents; LED luminaires; Lighting apparatus for vehicles; Lighting fixtures; Lights for vehicles; Motorcycle lights

| | | | |
|---|---|---|---|
| **International Class(es):** | 011 - Primary Class | **U.S Class(es):** | 013, 021, 023, 031, 034 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Aug. 10, 2020 | **Use in Commerce:** | Aug. 10, 2020 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## Current Owner(s) Information

**Owner Name:** Xia, Xiaoming

**Owner Address:** 311, Building 3, Lanyuan Apartment
Wuzhong District, Suzhou
Jiangsu Province CHINA 215000

**Legal Entity Type:** INDIVIDUAL                    **Citizenship:** CHINA

## Attorney/Correspondence Information

**Attorney of Record - None**

**Correspondent**

**Correspondent Name/Address:** Xia, Xiaoming
311, Building 3, Lanyuan Apartment
Wuzhong District, Suzhou
Jiangsu Province CHINA 215000

**Correspondent e-mail:** 3161247783@qq.com          **Correspondent e-mail Authorized:** Yes

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|------|-------------|-------------------|
| Apr. 11, 2024 | AMENDMENT CORRESPONDENCE ENTERED | |
| May 04, 2021 | REGISTERED-PRINCIPAL REGISTER | |
| Feb. 16, 2021 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Feb. 16, 2021 | PUBLISHED FOR OPPOSITION | |
| Jan. 27, 2021 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Jan. 13, 2021 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Jan. 13, 2021 | ASSIGNED TO EXAMINER | |
| Oct. 13, 2020 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Sep. 10, 2020 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

**TM Staff Information - None**

**File Location**

**Current Location:** PUBLICATION AND ISSUE SECTION          **Date in Location:** May 04, 2021

Nicholas J. Nowak (*pro hac vice*)
Lauren A. Watt (*pro hac vice*)
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1101 K St. NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 371-2600
Facsimile: (202) 371-2540
nnowak@sternekessler.com
lwatt@sternekessler.com

*Attorneys for Defendant Automobili*
*Lamborghini S.p.A.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Blair,<br><br>            *Plaintiff*,<br><br>     v.<br><br>Automobili Lamborghini S.p.A.,<br><br>            *Defendant*. | No: CV-22-1439-PHX-ROS<br><br>**DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Defendant Automobili Lamborghini S.p.A. ("Lamborghini") submits the following separate statement of facts in support of its motion for summary judgment pursuant to L.R. Civ. 56.1(a).

1.     On January 16, 1990, Lamborghini filed an application, Serial No. 74019105, with the United States Patent and Trademark Office ("USPTO") to register the LAMBORGHINI mark. Ex. A, Lamborghini_0000002.

1

2.    On November 13, 1990, the USPTO granted Lamborghini's application and the LAMBORGHINI mark received its federal registration, U.S. Registration No. 1622382. Ex. A, Lamborghini_0000002.

3.    The domain <lambo.com> was registered on March 5, 2000. Ex. U, Pl_000010.

4.    On February 16, 2018, Blair purchased the disputed domain name for $10,000. *See* Ex. B, Plaintiff's Interrogatory Response to Interrogatory No. 4.

5.    LAMBORGHINI is a well-known, world-famous mark that has been used for over fifty years. *See Automobili Lamborghini S.p.A v. Garcia*, No. 1:18-cv-62 (TSE/TCB), 2020 WL 2048165, at *5 (E.D. Va. Apr. 20, 2020) ("Lamborghini has used the Marks exclusively and continuously for over fifty years, has never abandoned them, and has spent millions of dollars in advertising and promoting the Marks throughout the United States and the world. As a result, the Marks are world famous and the consuming public exclusively associates the Marks with Lamborghini."); *Audi AG v. Posh Clothing, LLC*, No. 18-14254, 2019 WL 1951166, at *4 (D.N.J. May 2, 2019); *Volkswagen Grp. of Am., Inc. v. Unincorporated Associations Identified in Schedule A*, No. 1:20-cv-01437-LO-MSN, 2021 WL 8444641, at *2 (E.D. Va. July 21, 2021), report and recommendation adopted, No. 1:20-cv-1437, 2021 WL 8445261 (E.D. Va. Aug. 23, 2021). "Lambo" is nothing more than a shortened version of LAMBORGINI that merely "delete[s] . . . letters in the mark." *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1097 (N.D. Cal. Oct. 1, 2014).

6.    "Lambo" is also a well-known shorthand for Lamborghini. *See Automobili Lamborghini SpA v. Lamboshop, Inc.*, 2008 WL 2743647, at *4 (M.D. Fla. June 5, 2008) (finding "Lambo" was a "well-known shorthand for Lamborghini").

7.    Mr. Blair has no trademark rights in the word LAMBO. Ex. B, Plaintiff's Response to Interrogatory No. 3.

8.    It is undisputed that Lambo is not Richard Blair's legal name. *See* ECF No. 21 (First Amended Complaint), ¶ 2 ("Plaintiff Richard Blair is a citizen of the United Kingdom with a residence at 8 West St., San Rafael, CA 94901.").

2

9.    "Lambo" is not a name "commonly used to identify [Mr. Blair]." Ex. C, Pl_000594 (referring to the plaintiff as "Richard"); Ex. D, Pl_000598 (signing email with the name "Richard"); Ex. E, Pl_000600 (signing email with the name "Richard").

10.    Mr. Blair has not used the disputed domain. ECF No. 21, ¶ 11.

11.    Mr. Blair has admitted that he "initially planned on developing a website at [<lambo.com>]" but "[t]hose plans were subsequently delayed and abandoned." ECF No. 21, ¶ 11.

12.    On April 29, 2022, Lamborghini filed a Complaint with the WIPO Arbitration and Mediation Center (the "Center") seeking a transfer of domain name <lambo.com> under the Uniform Domain Name Dispute Resolution Policy. *See* Ex. F, WIPO Decision.

13.    On August 3, 2022, the panel determined that the <lambo.com> domain was confusingly similar to the LAMBORGHINI mark and that Blair was using the mark in bad faith. The panel ordered Blair to transfer the domain to Lamborghini. *See* Ex. F, WIPO Decision.

14.    After Lamborghini filed its WIPO complaint, Mr. Blair redirected visitors to <lambo.com> domain to a third-party website wherein Mr. Blair stated, among other things, that he would "defend, defeat, and humiliate" Lamborghini, accused Lamborghini of "theft," and provided a link to the UDRP proceedings. Ex. G (showing the redirection page); Ex. H (showing the page that <lambo.com> redirected to).

15.    Mr. Blair has and continues to offer to sell the disputed domain to third parties for financial gain. Ex. E, Pl_000600; Ex. I, Pl_000609.

16.    At least as early as August 6, 2020, Mr. Blair listed the disputed domain for sale for a price of $1,129,298.00. Ex. J.

17.    At least as early as December 23, 2020, Mr. Blair listed the disputed domain for sale for a price of $1.5 million. Ex. K, Pl_000589.

18.    At least as early as January 27, 2021, Mr. Blair listed the disputed domain for sale for a price of $3.3 million. Ex. L, Pl_000590.

3

19. At least as early as September 23, 2021, Mr. Blair listed the disputed domain for sale for a price of $12 million. Ex. M.

20. At least as early as August 11, 2022, Mr. Blair listed the disputed domain for sale for a price of €50 million. Ex. N.

21. At least as early as September 7, 2023, Mr. Blair listed the disputed domain for sale for a price of $75 million. Ex. O.

22. The disputed domain is currently listed for sale for $75 million. Ex. P.

23. Mr. Blair has received offers from others seeking to buy <lambo.com>. Ex. Q, Pl_000571; Ex. R, Pl_000583.

24. In an email dated January 6, 2021 in response to an opening offer of $100,000, Mr. Blair notes that the "reserve" price for <lambo.com> is $888,888. Ex. S, Pl_000595.

25. In email correspondence from September 20, 2021, Mr. Blair tells a prospective buyer that the "asking price for Lambo.com is USD $12m."  Ex. E, Pl_000600.

26. On April 17, 2023, in responding to an offer to buy the domain for $50,000,000, Mr. Blair tells the prospective buyer that he "would be agreeable to a near all cash offer if ready to close."  Ex. I, Pl_000609 at 2.

27. The LAMBORGHINI mark is distinctive and famous. Ex. A, Lamborghini_0000002

28. The term "lambo" is confusingly similar to the LAMBORGHINI mark. *See* Ex. T, April 9, 2024 Status Conference Transcript 18:2-7 (conceding that "lambo" "is a term that is commonly associated with the Lamborghini car; and so from the context of an ACPA claim, I tend to agree with Mr. Nowak that it is likely that the confusing similarity threshold would be met.").

4

Dated: May 2, 2024

Respectfully submitted,

By: /s/ *Nicholas J. Nowak*
Nicholas J. Nowak (*pro hac vice*)
Lauren A. Watt (*pro hac vice*)
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1101 K St. NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 371-2600
Facsimile: (202) 371-2540
nnowak@sternekessler.com
lwatt@sternekessler.com

*Attorneys for Defendant Automobili
Lamborghini S.p.A.*

5

## CERTIFICATE OF SERVICE

This is to certify that on May 2, 2024, a true and correct copy of the foregoing was filed electronically using the Clerk of Court's CM/ECF system, which will provide notice to all counsel of record. It was also served by electronic mail on the following counsel of record:

> Brett E. Lewis
> LEWIS & LIN LLC
> 77 Sands Street, 6th Floor
> Brooklyn, NY 11201
> Telephone: (718) 243-9323
> Facsimile: (718) 243-9326
> brett@iLawco.com
>
> *Attorney for Plaintiff Richard Blair*

Dated: May 2, 2024                    By: /s/ *Nicholas J. Nowak*
                                      Nicholas J. Nowak (*pro hac vice*)
                                      STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
                                      1101 K St. NW, 10th Floor
                                      Washington, DC 20005
                                      Telephone: (202) 371-2600
                                      Facsimile: (202) 371-2540
                                      nnowak@sternekessler.com

                                      *Attorney for Defendant Automobili Lamborghini S.p.A.*

6

# Exhibit C

Int. Cl.: 12

Prior U.S. Cl.: 19

## United States Patent and Trademark Office

Reg. No. 1,622,382
Registered Nov. 13, 1990

## TRADEMARK
### PRINCIPAL REGISTER

## LAMBORGHINI

AUTOMOBILI LAMBORGHINI SPA (ITALY
 CORPORATION)
BOLOGNA, ITALY

 FOR: AUTOMOBILES AND THEIR STRUC-
TURAL PARTS, IN CLASS 12 (U.S. CL. 19).
 FIRST USE 10-0-1963; IN COMMERCE
1-0-1965.

OWNER OF U.S. REG. NOS. 1,375,514, 1,428,933
AND OTHERS.
 SEC. 2(F).

 SER. NO. 74-019,105, FILED 1-16-1990.

R. G. COLE, EXAMINING ATTORNEY

LAMBORGHINI_0000002

# Exhibit D

1  Brett E. Lewis (*pro hac vice*)
2  Shuyu Wang (*pro hac vice*)
   **LEWIS & LIN LLC**
3  77 Sands Street, 6th Floor
   Brooklyn, NY 11201
4  Tel: (718) 243-9323
5  Fax: (718) 243-9326
   Email: Brett@iLawco.com
6
7  *Attorneys for Plaintiff Richard Blair*

8

9                    **UNITED STATES DISTRICT COURT**
10
11                         **DISTRICT OF ARIZONA**

12

13  Richard Blair,                          | Case No.: 2:22-cv-01439-ROS
14
15                    Plaintiff,
16                                          **PLAINTIFF RICHARD BLAIR'S**
        vs.                                 **RESPONSES TO DEFENDANT**
17                                          **AUTOMOBILI LAMBORGHINI**
   Automobili Lamborghini S.p.A.,           **S.P.A.'S FIRST SET OF REQUESTS**
18                                          **FOR INTERROGATORIES**
                    Defendant.
19

20         Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local

21  Civil Rules for the United States District Court for the District of Arizona, Plaintiff

22  Richard Blair ("Plaintiff" or "Blair"), by and through the undersigned counsel, hereby

23  responds and objects to the First Set of Interrogatories of Defendant Automobili

24  Lamborghini S.p.A. ("Defendant" or "Lamborghini").

25                          **GENERAL OBJECTIONS**

26         Specific responses and objections to each interrogatory are made on an individual

27  basis below.  In addition to such specific objections, Plaintiff makes the following

28
                                      1

General Objections that may be incorporated into each specific response, whether or not they are set forth specifically below.

1.      Plaintiff objects to the interrogatories as unduly burdensome and/or overly broad to the extent they purport to impose burdens, requirements or obligations that exceed or differ from those permitted by, *inter alia*, any applicable Federal Rules of Civil Procedure, Local Civil Rules of the United States District Court for the District of Arizona, and/or the Civil Case Discovery Plan and Scheduling Order (the "Scheduling Order," Dkt. # 38), as that Scheduling Order may be amended in the course of this action.

2.      Plaintiff objects to the interrogatories to the extent that they seek information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privileges and protections.  Such information will not be provided, and any inadvertent disclosure of such information shall not constitute a waiver of any privilege, right, and/or ground for objecting to providing such information and shall not waive Plaintiff's right to object to the use of such information or the right to claw back such information.

3.      Plaintiff objects to the interrogatories as unduly burdensome and overly broad to the extent that they call for the production of information that is not in the possession, custody or control of Plaintiff.

4.      Plaintiff objects to the interrogatories as premature and unduly burdensome to the extent they seek information that is properly the subject of expert discovery and/or damages discovery.  Plaintiff will supplement responses to document requests as needed in accordance with the applicable deadlines, including those in the Scheduling Order, as it may be amended.

5.       Plaintiff objects to the interrogatories to the extent that they call for the disclosure of private, proprietary or other confidential information.  Plaintiff will only provide such information subject to and in reliance upon the parties ultimately agreeing upon an appropriate confidentiality order that is so ordered by the Court.

6.      Plaintiff objects to the interrogatories as overly broad and/or unduly

2

burdensome to the extent that they call for information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

7.    Plaintiff objects to the interrogatories to the extent that they require Plaintiff to draw legal conclusions regarding any issue in this Action.  Any response shall not be construed as providing a legal conclusion regarding the meaning or application of any terms or phrases used in these interrogatories.

8.    Plaintiff's responses to each interrogatory are based on a reasonable investigation to date. Plaintiff reserves the right to supplement, amend, modify, or correct the responses, if necessary and in accordance with the Scheduling Order and/or any applicable Court order or agreement among the parties. Any objection or response by Plaintiff does not constitute a representation or admission that such information does in fact exist or is known or available to Plaintiff.  Moreover, no response shall be construed as an admission by Plaintiff regarding the admissibility of any characterization contained in these interrogatories.  Any response to these interrogatories is not a concession that the subject matter of the particular interrogatory is discoverable, relevant to this action, or admissible as evidence in any way.

## SPECIFIC RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 1:**

Identify all domain names You have purchased, registered, acquired, invested in, sold, built or developed.

**RESPONSE TO INTERROGATORY NO. 1:**

See Attachment 1.

**INTERROGATORY NO. 2:**

For any domain names either purchased by You or sold or otherwise transferred by You to someone else, identify the dates of any such purchases or sales, the individuals or entities from whom or to whom any such purchases, sales or transfers were made, and the purchase price and/or sales price.

3

**RESPONSE TO INTERROGATORY NO. 2:**

See Attachment 1.

**INTERROGATORY NO. 3:**

Identify any trademark rights You have in the word LAMBO.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff claims no trademark rights in the word LAMBO.

**INTERROGATORY NO. 4:**

Identify the exact date You purchased the Domain Name, including the full name and address of the individual You purchased the Domain Name from, the price You paid for the Domain Name and identify all documents and things related to the purchase of the Domain Name by You.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff purchased the Domain Name on February 16, 2018 from John Lambeth, 15 Northampton Close, CM7 9FG Braintree, United Kingdom for $10,000 U.S. Dollars. Documents and things related to the purchase of the Domain Name by Plaintiff were produced in response to Document Request No. 1, Bates Nos. Pl_000001-Pl_000008.

**INTERROGATORY NO. 5:**

Identify the exact date that You allegedly started going by the nickname Lambo and identify any and all documents that support Your assertion that "Plaintiff Richard Blair is a domain name investor who uses the nickname 'Lambo'".

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to this Interrogatory to the extent that it is duplicative of Defendant's Request for Documents No. 7, and/or it would require Plaintiff to summarize his own documents for Defendant.

4

Subject to the foregoing Specific and General objections, Plaintiff started using the nickname "Lambo" at least as early as October 8, 2019, and started using the nickname "Lambo" in association with domain name investment at least as early as December 8, 2019. Plaintiff has made thousands of posts under the "Lambo" moniker since its adoption, many of these in connection with domain names. Plaintiff further refers for his response to Documents and things produced in response to Document Request No. 7, Bates Nos. Pl_000086-Pl_000550, Pl_000638-Pl_000650.

**INTERROGATORY NO. 6:**

Identify every date on which You listed or otherwise offered the Domain Name for sale, including the prices for which the Domain Name was listed or offered for sale, any offers made by others to buy the Domain Name including the person or entity who made the offer, the price offered, the date the offer was made, any counteroffers that were made by You and the amount of those counteroffers, and the dates of any counteroffers.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff objects to this Interrogatory as unduly burdensome. Plaintiff further objects to this Interrogatory to the extent that it is duplicative of Defendant's Request for Documents No. 8, and/or it would require Plaintiff to summarize his own documents for Defendant.

Subject to the foregoing Specific and General objections, Plaintiff refers for his response to the Documents produced by Plaintiff in response to Document Request No. 8, Bates Nos. Pl_000551-Pl_000637.

**INTERROGATORY NO. 7:**

Identify the date and substance of every change You have made to the domain page <lambo.com> from the date You acquired the Domain Name up until the present.

5

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff objects to this Interrogatory as unduly burdensome. Plaintiff further objects to this Interrogatory to the extent that it is duplicative of Defendant's Request for Documents No. 3, and/or it would require Plaintiff to summarize his own documents for Defendant.

Subject to the foregoing Specific and General objections, Plaintiff refers for his response to the Documents produced in response to Document Request No. 3, Bates Nos. Pl_000009-Pl_000085.

**INTERROGATORY NO. 8:**

Identify all prior usernames on all Your social media platforms on which You are allegedly known as "Lambo" and provide the dates You changed Your username on those social media platforms to include the word "Lambo."

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff objects to this Interrogatory to the extent that it is duplicative of Defendant's Interrogatory No. 5, and Defendant's Request for Documents No. 7, and/or it would require Plaintiff to summarize its own documents for Defendant.

Subject to the foregoing Specific and General objections, Plaintiff refers for his response to Plaintiff's response to Defendant's Interrogatory No. 5, and the Documents produced in response to Document Request No. 7, Bates Nos. Pl_000086-Pl_000550, Pl_000638-Pl_000650. Plaintiff further responds, below:

> Telegram username(s): @lambodotcom (Lambo < bss.org >) (start date between 2019 and 2020);

> Twitter username(s): @lambo_com (active), @lambodotcom (suspended) (start date between 2019 and 2020);

> WhatsApp username(s): Lambo (start date between 2019 and 2020);

> Namepros.com username(s): Lambo.com (start date: December 8, 2019); Richard Blair (start date: March 19, 2015);

6

1         > Lichess.org username(s): LAMBOdotcom (start date: October 8, 2019).

2

3 Dated: January 15, 2024

4      Brooklyn, NY

5

6                           By: */s/Brett E. Lewis*

7                           Brett E. Lewis, Esq. (*pro hac vice*)

8                           **LEWIS & LIN LLC**

                          77 Sands Street, 6th Floor

9                           Brooklyn, NY 11201

                          Tel: (718) 243-9323

10                           Fax: (718) 243-9326

11                           Email: Brett@iLawco.com

12                           *Attorneys for Plaintiff Richard Blair*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

# Attachment 1

| Domain | Type | Status | Acquisition Cost | Currency | Vendor | Purchaser | Date |
|---|---|---|---|---|---|---|---|
| ceec.com | Developed | Active, soft launch imminent | | | | | |
| chinesecoins.com | Developed | Dormant, inactive | | | | | |
| coinex.com | Developed | Domain sold | | | | | |
| pandacoins.com | Developed | Dormant, inactive | | | | | |
| sociology.com | Developed | Domain sold | | | | | |
| 1017.com | Purchase | | 9800 | USD | James Ayala | | 11-22-17 |
| 06498.com | Purchase | | 450 | USD | Phil Viger | | 12-2-15 |
| 09115.com | Purchase | | 349 | USD | Oleg Pavlov | | 2-25-16 |
| 11215.com | Purchase | | 2000 | USD | Alvin Townsend | | 4-20-18 |
| 30188.com | Purchase | | 600 | USD | Andrew Armer | | 8-27-17 |
| 88287.com | Purchase | | 3362 | USD | Udo Kibele | | 11-18-17 |
| aku.com | Purchase | | 13070 | USD | Alejandro Garcia | | 7-25-13 |
| algar.com | Purchase | | 250 | USD | Finance Department C/O Heart Internet Ltd Pete Osmond | | 2-8-16 |
| almi.com | Purchase | | 3475 | USD | BuyDomains.com Keith Murphy | | 9-5-18 |
| artville.com | Purchase | | 2000 | USD | CSC Spurr Jack | | 4-6-15 |
| asbestoslitigation.com | Purchase | | 1250 | USD | DMusic, LLC Tracy Feldman | | 1-17-13 |
| babywalker.com | Purchase | | 2165 | USD | John Middlemas | | 4-6-15 |
| blackthumbs.com | Purchase | | 200 | USD | John Babu | | 9-13-16 |
| buybuy.com | Purchase | | 2577 | USD | SnapNames web.com | | 7-21-18 |
| castleconstruction.com | Purchase | | 100 | USD | Lease Domains, Inc Anthos Chrysanthou | | 7-10-14 |
| ceec.com | Purchase | | 7117 | USD | DE GRUYTER OPEN | | 3-2-17 |
| cheek.com | Purchase | | 7500 | USD | CheekDotCom Software Joseph Cheek | | 1-28-16 |
| chinaflights.net | Purchase | | 218 | USD | Amy Updegrave | | 6-10-09 |
| chinagold.net | Purchase | | 303 | USD | Site HQ Hampton Howe | | 5-14-09 |
| chinese-coins.com | Purchase | | 120 | USD | Kelley Enterprises Edward Kelley | | 11-22-09 |
| chinesecoin.com | Purchase | | 900 | USD | Bart Croughs | | 5-22-10 |
| chinesecoins.com | Purchase | | 16000 | USD | Name Admin Inc. | | 7-11-11 |
| chinesecoins.net | Purchase | | 325 | USD | Kanchana Wattana | | 5-22-09 |
| cigarroller.com | Purchase | | 725 | USD | | | 10-6-14 |
| cleanser.com | Purchase | | 1277 | USD | New Venture Services | | 1-10-14 |
| coinex.com | Purchase | | 2017 | USD | NEPO INC David Nepo | | 8-6-19 |
| computercase.com | Purchase | | 2077 | USD | New Venture Services | | 1-29-14 |
| datafeed.com | Purchase | | 5000 | USD | Portofino Asset Management Murray Priestley | | 5-25-13 |
| dnas.com | Purchase | | 1999 | GBP | AC ONLINE | | 6-12-18 |

1

Case 2:22-cv-01439-ROS     Document 57-2     Filed 05/02/24     Page 11 of 15

| Domain | Type | Status | Acquisition Cost | Currency | Vendor | Purchaser | Date |
|---|---|---|---|---|---|---|---|
| doir.com | Purchase | | 2500 | USD | Clutter Media LTD Saidul Chowdhury | | 2-8-17 |
| eese.com | Purchase | | 3600 | USD | | | 1-11-16 |
| ephonenumbers.com | Purchase | | 1177 | USD | Jaccind Corporation Rod Aries | | 8-3-13 |
| fdhc.com | Purchase | | 1600 | USD | | | |
| flyerdesign.com | Purchase | | 2077 | USD | New Venture Services | | 1-29-14 |
| flyertemplates.com | Purchase | | 2077 | USD | New Venture Services | | 1-29-14 |
| gax.com | Purchase | | 6606 | USD | Alex Kampa | | 6-23-11 |
| goldprice.us | Purchase | | 4750 | USD | Better Deals Dave Wright | | 1-19-12 |
| gymea.com | Purchase | | 175 | USD | Ronald Boulton | | 7-16-13 |
| hairgrowth.co.uk | Purchase | | 1287 | GBP | Andrew Bryant | | 2-15-13 |
| hairgrowth.com | Purchase | | 12000 | USD | Andrew Bryant | | 1-30-13 |
| hdax.com | Purchase | | 399 | USD | Domaincracy Leo Angelo | | 12-27-17 |
| helloyou.com | Purchase | | 250 | USD | Finance Department C/O Heart Internet Ltd Pete Osmond | | 5-5-16 |
| hfh.com | Purchase | | 39000 | USD | DNS Admin | | 2-6-16 |
| hjtf.com | Purchase | | 800 | USD | | | 2-7-16 |
| hmrf.com | Purchase | | 677 | USD | New Venture Services | | 7-18-17 |
| internetfilter.com | Purchase | | 1999 | USD | J.D. Koftinoff Software, Ltd. Jeffrey Koftinoff | | 8-9-15 |
| iojo.com | Purchase | | 1000 | USD | Techfield LTD Missipsa Benoukaci | | 2-21-15 |
| jin888.cn | Purchase | | 350 | USD | Hangzhou Chuanyehulian Kejiyouxiangongsi Yuandong Xu | | 7-13-09 |
| jtnw.com | Purchase | | 677 | USD | New Venture Services | | 5-25-18 |
| jybi.com | Purchase | | 750 | USD | steve@dyyo.com | | 1-11-16 |
| kton.com | Purchase | | 2000 | USD | AskMySite.com LLC | | 9-9-20 |
| lambo.com | Purchase | | 10000 | USD | John Lambeth | | 2-16-18 |
| londonshows.com | Purchase | | 2077 | USD | New Venture Services | | 2-28-14 |
| londontutors.com | Purchase | | 250 | USD | Mesh Digital Limited Matt Mansell | | 12-20-12 |
| lr2.com | Purchase | | 989 | USD | Anton Olsen | | 9-29-17 |
| lunarcoins.com | Purchase | | 1400 | USD | Cardigan River LLC Timothy Knight | | 5-2-14 |
| marketingstrategies.com | Purchase | | 2999 | USD | Dennis Ryan | | 2-14-15 |
| mdis.com | Purchase | | 750 | GBP | Tim Preston | | 2-22-15 |
| menstrousers.com | Purchase | | 280 | USD | Lease Domains, Inc Anthos Chrysanthou | | 8-8-14 |

2

| Domain | Type | Status | Acquisition Cost | Currency | Vendor | Purchaser | Date |
|---|---|---|---|---|---|---|---|
| mftt.com | Purchase | | 800 | USD | Lunabyte, Inc Randall Ache | | 11-7-17 |
| mgnh.com | Purchase | | 577 | USD | New Venture Services | | 1-13-16 |
| mkkm.com | Purchase | | 2000 | USD | Ken MacKenzie | | 2-6-16 |
| moccasin.com | Purchase | | 3077 | USD | New Venture Services | | 1-13-14 |
| muscleaches.com | Purchase | | 495 | USD | Jack Myers | | 1-10-13 |
| newsmedia.com | Purchase | | 5000 | USD | GSY / operations@celestra.net | | 8-19-14 |
| nvl.com, fzv.com | Purchase | | 40178 | USD | Walid El Khoury | | 12-7-15 |
| nvl.com | Purchase | | 7531 | USD | NVL Research Corp. Paul Rieger | | 2-20-15 |
| pictar.com | Purchase | | 297 | USD | Latona's LLC Rick Latona | | 6-17-16 |
| ptzcamera.com | Purchase | | 123 | GBP | Heng Zhong | | 7-19-14 |
| qtds.com | Purchase | | 483 | USD | Ivan D'Souza | | 2-10-18 |
| rrxm.com | Purchase | | 1067 | USD | HUMAN BEATS EIRL Patricia Matta | | 4-5-17 |
| seoman.com | Purchase | | 999 | USD | Joe Safai | | 12-19-13 |
| severedepression.com | Purchase | | 2077 | USD | New Venture Services | | 1-29-14 |
| skincaretips.com | Purchase | | 4999 | USD | SecondEffort Jim Phillips | | 1-19-13 |
| soccerhighlights.com | Purchase | | 95 | USD | Austin Durban | | 2-12-18 |
| squarefoot | Purchase | | 4500 | USD | James Comerford | | 10-31-13 |
| stillwaters.com | Purchase | | 1099 | USD | Dotster, Inc. Darcy Enyeart | | 8-4-13 |
| sxrs.com | Purchase | | 877 | USD | New Venture Services | | 4-20-17 |
| tablefootball.com | Purchase | | 899 | EUR | John Middlemas | | 2-27-15 |
| tennesseecredit.com | Purchase | | 350 | USD | Nick Brates | | 12-9-13 |
| toygroup.com | Purchase | | 150 | USD | My Name Ltd Luigi Marruso | | 3-24-15 |
| ufosightings.com | Purchase | | 2077 | USD | New Venture Services | | 1-29-14 |
| umdnj.com | Purchase | | 349 | USD | Latona's LLC Rick Latona | | 4-14-17 |
| weddinggarter.com | Purchase | | 777 | USD | New Venture Services | | 8-17-14 |
| womensdresses.com | Purchase | | 5077 | USD | New Venture Services | | 1-29-14 |
| wydc.com | Purchase | | 977 | USD | New Venture Services | | 5-11-17 |
| xrnd.com | Purchase | | 449 | USD | Tensyr Niall Dalton | | 2-25-18 |
| 321.cc | Sale | | 800 | USD | | | |
| 1017.com | Sale | | 34000 | USD | | domainnamesales.com | 6-15-18 |
| 06498.com | Sale | | 700 | USD | | Divan Sharma | 1-24-16 |
| 09115.com | Sale | | 649 | USD | | | 3-31-16 |

3

| Domain | Type | Status | Acquisition Cost | Currency | Vendor | Purchaser | Date |
|---|---|---|---|---|---|---|---|
| **30188.com, hmrf.com, sxrs.com, u-o.com, goingon.com, rrxm.com** | Sale | | 14263 | USD | | Namejet Auction | 10-30-17 |
| **aku.com** | Sale | | 18000 | USD | | | 3-5-14 |
| **almi.com** | Sale | | 117500 | USD | | Domain Agents | 8-13-20 |
| **asz.com** | Sale | | 18888 | USD | | DC Business Consultants LTD | 8-7-23 |
| **buybuy.com** | Sale | | 95000 | USD | | Domain Agents | 8-17-20 |
| **castleconstruction.com** | Sale | | 2574 | USD | | Shazad Berenjian | 4-13-16 |
| **cleanser.com, fdhc.com, hjtf.com, severedepression.com, ufosightings.com, tablefootball.com, womensdresses.com** | Sale | | 12033 | USD | | Namejet Auction | 3-30-17 |
| **coinex.com** | Sale | | 64.2005 | BTC | | ViaBTC | 10-24-17 |
| **fzv.com** | Sale | | 23500 | EUR | | | 3-3-16 |
| **gax.com** | Sale | | 45000 | USD | | DomainBooth FZE LLC | 12-21-22 |
| **hairgrowth.com** | Sale | | 12750 | USD | | | 8-18-15 |
| **hdax.com** | Sale | | 25500 | USD | | | 2-18-18 |
| **helloyou.com** | Sale | | 29740 | USD | | Michael Poignant | 9-15-16 |
| **hfh.com** | Sale | | 41247 | USD | | | 12-31-16 |
| **iojo.com** | Sale | | 979 | USD | | Namejet Auction | 12-15-15 |
| **kfx.com** | Sale | | 9500 | USD | | | 2-26-14 |
| **mdis.com** | Sale | | 6000 | USD | | | 3-28-15 |
| **menstrousers.com** | Sale | | 511 | USD | | Namejet Auction | 12-15-15 |
| **mkkm.com, mgnh.com** | Sale | | 4355 | USD | | Namejet Auction | 4-14-16 |
| moccasin | Sale | | 14000 | USD | | | 11-23-15 |
| **muscleaches.com** | Sale | | 130 | USD | | Namejet Auction | |
| **nkgd.com** | Sale | | 900 | USD | | Yang Yicheng | 2-22-18 |
| **nvl.com** | Sale | | 25000 | USD | | Namejet Auction | 12-31-16 |
| **sociology.com** | Sale | | 50000 | USD | | Walid Khoury | 8-2-14 |
| **squarefoot.com** | Sale | | 50600 | USD | | Nik Papic | 9-7-16 |
| **wydc.com** | Sale | | 1700 | USD | | Shane Cultra | 5-17-17 |
| **xrnd.com** | Sale | | 1050 | USD | | Yang Yicheng | 3-5-19 |

4

## VERIFICATION OF INTERROGATORY ANSWERS

I, Richard Blair, verify under oath that I have read the foregoing Responses to

Defendant's First Set of Interrogatories and the facts stated therein are true and correct.

Executed on January 15, 2024
London, United Kingdom

Richard Blair ( Jan 15, 2024 22:29 GMT)

Richard Blair

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2024, a true and correct copy of the foregoing

Plaintiff's Responses to Defendant's First Set of Interrogatories was served via electronic

mail pursuant to Fed. R. Civ. P. 5 upon:

Lauren A. Watt
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
1101 K St., 10th Fl.
Washington, DC 20005
202-771-2600
Email: lwatt@sternekessler.com

Nicholas J Nowak
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
1101 K St., 10th Fl.
Washington, DC 20005
202-771-2600
Email: nnowak@sternekessler.com

Dated: January 15, 2024
        Brooklyn, New York

By:    */s/Shuyu Wang*
       Shuyu Wang (*pro hac vice*)
       **LEWIS & LIN LLC**
       77 Sands Street, 6th Floor
       Brooklyn, NY 11201
       Tel: (718) 243-9323
       Fax: (718) 243-9326
       Email: Brett@iLawco.com

       *Attorneys for Plaintiff Richard Blair*

# Exhibit E

PI_000594

**DOCUMENT PRODUCED NATIVELY**

PI_000594

**From:** Rob Monster <rob@epik.com>
**Sent:** Tuesday, January 5, 2021 6:38 PM
**To:** r.blair@gax.com
**Cc:** Robert Davis
**Subject:** Re: Interested in the domain: lambo.com

Hi Richard,

Happy New Year!

Nice opening offer here. What is the reserve?

Regards,
Rob



**Rob Monster | Founder and CEO**

**Epik Holdings Inc.**
Telegram: robmonster | Website:http://www.epik.com/
Mobile: 1.425-765-0077 | WeChat: robmonster
Skype: robertmonster | Twitter: robmonster

On January 5, 2021 at 3:20:38 PM, Epik Registrar (support@epik.com) wrote:


Solutions for Digital Empowerment

Legendary Customer Support:
Tel: (888) 894-9026 | (425) 366-8810
Email: support@epik.com

To ensure delivery to your inbox, please add newsletter@epik.com to your address book.


Solutions for Digital Empowerment

**Epik.com | Terms of Use | Privacy Policy | Contact Us**

Epik LLC, PO Box 742, Bellevue, WA 98009, USA

**Interested in the domain: [lambo.com](lambo.com)**

Dear Richard,

A new offer has been made for your domain name: **lambo.com**

### Amount Offered For Sale: $100000.00

**Respond to Offer**

### Buyer Information:

Name: daniel

Email: [danielpreformante@gmail.com](mailto:danielpreformante@gmail.com)

Phone: 910-736-7263

IP: [73.152.96.216](73.152.96.216)

Comments: why is it so expensive 100k take it or leave it

To view your offer details **Click Here**

Sincerely,

Epik.com

Email: [support@epik.com](mailto:support@epik.com)

Tel: 425-366-8810

# Exhibit F

PI_000598

**DOCUMENT PRODUCED NATIVELY**

PI_000598

| | |
|---|---|
| **From:** | Richard Blair <rb@ceec.com> |
| **Sent:** | Monday, April 17, 2023 5:05 AM |
| **To:** | rudy@rudybekker.com |
| **Subject:** | Lambo.com |
| **Attachments:** | publickey - EmailAddress(s=rb@ceec.com) - 0xACE46E04.asc |

Hello,
I am responding to your inquiry. Price as shown, if you are interested you can use the buy now button and checkout via escrow.com. If you have any questions let me know.

Regards,
Richard


Sent from Proton Mail mobile

# Exhibit G

PI_000600

**DOCUMENT PRODUCED NATIVELY**

PI_000600

**From:**               r.blair@gax.com
**Sent:**               Thursday, September 30, 2021 12:04 PM
**To:**                 sidzgandhi@gmail.com
**Subject:**            Re: lambo.com
**Attachments:**        publickey - EmailAddress(s=r.blair@gax.com) - 0x86811FBC.asc

Hello, asking price for Lambo.com is USD $12m.


Richard



Sent from ProtonMail mobile




-------- Original Message --------
On Sep 30, 2021, 3:09 AM, Siddharth Gandhi < sidzgandhi@gmail.com> wrote:


    Hi,

    Would you be interested in selling lambo.com domain, if so what would be the price?

    Regards,
    Siddharth

# Exhibit F



**ARBITRATION
AND
MEDIATION CENTER**

# ADMINISTRATIVE PANEL DECISION
Automobili Lamborghini S.p.A. v. Domain Administrator, See
PrivacyGuardian.org / Richard Blair
Case No. D2022-1570

## 1. The Parties

The Complainant is Automobili Lamborghini S.p.A., Italy, represented by HK2 Rechtsanwälte, Germany.

The Respondent is Domain Administrator, See PrivacyGuardian.org, United States of America ("United States") / Richard Blair, United States, self-represented.

## 2. The Domain Name and Registrar

The disputed domain name <lambo.com> is registered with NameSilo, LLC (the "Registrar").

## 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on April 29, 2022. On April 29, 2022, the Center transmitted by email to the Registrar a request for registrar verification in connection with the disputed domain name. On May 2, 2022, the Registrar transmitted by email to the Center its verification response disclosing registrant and contact information for the disputed domain name which differed from the named Respondent and contact information in the Complaint. The Center sent an email communication to the Complainant on May 3, 2022, providing the registrant and contact information disclosed by the Registrar, and inviting the Complainant to submit an amendment to the Complaint. The Center received an email communication from the Respondent on May 6, 2022. The Complainant filed an amendment to the Complaint on May 8, 2022.

The Center verified that the Complaint together with the amendment to the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2 and 4, the Center formally notified the Respondent of the Complaint, and the proceedings commenced on May 10, 2022. In accordance with the Rules, paragraph 5, the due date for Response was May 30, 2022. The Response was filed with the Center on May 30, 2022.

page 2

On May 31, 2022, the Respondent sent an email to the Center, requesting that his name was not released when any press release was issued and seeking assurances of confidentiality.

The Complainant filed a supplemental filing on June 10, 2022.

The Center appointed Antony Gold, Matthew S. Harris, and The Hon Neil Brown Q.C. as panelists in this matter on July 2, 2022.  The Panel finds that it was properly constituted.  Each member of the Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.


## 4. Factual Background

The Complainant is a manufacturer of high-performance sports cars.  It was founded in 1963 and is based in Sant Agata Bolognese, Italy.  In 2021, it manufactured 8,405 vehicles.

The Complainant trades as LAMBORGHINI and it is the owner of a number of trade marks for this trading style as well as the domain name <lamborghini.com>.

A well-known and commonly used abbreviation of the Complainant's LAMBORGHINI mark, namely "Lambo", has also been registered by the Complainant and its current registrations for LAMBO include European Union Trade Mark, registration number 006113451, registered on April 28, 2008 in classes 7, 9, and 12.

The disputed domain name was first registered on March 5, 2000, by a John F Lambeth.  It was acquired by the Respondent on or after February 28, 2018.  The disputed domain has, until recently, resolved to a web page at which it has been offered for sale at a price of EUR 25,0000,000 or to lease at a monthly price of EUR 541,667.  A third party platform has offered the disputed domain name for sale at a price of EUR 56,671 and it has been offered for sale on another platform at a price of USD 12,000,000.

At present, the disputed domain name redirects to a discussion group on the NamePros website, which contains content in which the Respondent protests the Complainant's action in bringing the Complaint.


## 5. Parties' Contentions

### A. Complainant

The Complainant says that the disputed domain name is identical or confusingly similar to a trade mark in which it has rights.  It refers to its marks for LAMBORGHINI and LAMBO and says that, as the ".com" prefix is generally disregarded for the purpose of the test under the first element, the disputed domain name is confusingly similar to its LAMBORGHINI mark and identical to its LAMBO mark.  Moreover, the Complainant's rights in LAMBO have been recognized in a decision of an earlier UDRP panel, namely *Automobili Lamborghini Holding S.p.A., Audi AG, Volkswagen AG v. Joey Walt, globebizImports, Groupo Gold*, WIPO Case No. D2011-1269.

The Complainant says also that the Respondent has no rights or legitimate interests in respect of the disputed domain name.  The Respondent has not offered or made demonstrable preparations to use the disputed domain name in connection with a *bona fide* offering of goods and services in that it has never resolved to an active website, but only to a web page at which it is offered for sale at a very high price, as well as for substantial prices on third party domain purchase platforms.  Nor, in the light of the Respondent's offering for sale of the disputed domain name, is he making a noncommercial or fair use of it.  Additionally, the disputed domain name is identical to the Complainant's LAMBO mark and carries with it a high risk of implied affiliation.  Moreover, to the best of the Complainant's knowledge, the Respondent is not commonly known by the name "Lambo".

page 3

Lastly, the Complainant says that the disputed domain name was registered and is being used in bad faith.

The mere registration of a domain name identical or confusingly similar to a famous or widely-known trade mark by an unaffiliated entity can create a presumption of bad faith. The Complainant's marks including its LAMBO mark, are famous and have a strong reputation around the world, including in the United States, and it is inconceivable that the Respondent was not aware of its marks. In fact, the Respondent obviously had actual knowledge of the Complainant's LAMBO mark when acquiring the disputed domain name and it was acquired primarily for the purpose of selling, renting or otherwise transferring it to a competitor of the Complainant for valuable consideration far in excess of the Respondent's documented out of pocket costs.

There is no conceivable plausible actual or contemplated use for the disputed domain name. The fact that the Respondent has not made any use of the disputed domain name other than to offer it for sale indicates that it has never had a legitimate interest in its actual use.

Lastly, the fact that the disputed domain name does not resolve to an active website, but only to a page where it is offered for sale via a third party domain name purchase platform, does not prevent a finding of bad faith use under the doctrine of passive holding.

**B. Respondent**

The Respondent claims that disputed domain name is not confusingly similar to the Complainant's LAMBORGHINI mark in that it only has in common the first five letters of that mark.

The Respondent is known as "Lambo" on the Internet and in real life and has a history of dealing in, and developing, domain names. The Respondent has an established online footprint as "Lambo" and is known in online communities and in a personal capacity as "Lambo". Specifically, "Lambo" is of repute and regard in NamePros, which is a million member online community, as well as on other online platforms, including the Darwinia Network and Evolution Land. The Respondent is a "Lamb of outlier generic aptitude and intelligence" and this is apparent from a logo and iconography for his online footprint.

In support of his contention that he is commonly known by the disputed domain name, the Respondent refers to "unsolicited organic testimonials". These take the form of two posts from participants to an online chat on the NamePros platform which assert, in response to what appears to be a comment in relation to the Complaint, that the Respondent has been known as "Lambo" on the forum, for some time.

The Respondent also claims that other "Lambos" exist as names, nicknames and companies and that it is a generic term with myriad applications across both commercial and noncommercial fields in a number of different jurisdictions. The results of a LinkedIn search show 2,400 results for other persons known as "Lambo", there is a commercial enterprise operating within Italy using the domain name <lambo.it> and an entity operates in the United States using the domain name <lamboshp.com>. Indeed, there are other owners of trade marks for "Lambo" including in the United States[1]. Furthermore, "Lambo" has a meaning in other contexts including, by way of example, as a Sicilian family name, as meaning "shine" in Greek, and as a merchant boat.

The Complainant cannot have greater rights to "Lambo" than the other users of this term or than another trade mark holder of LAMBO. Such users include the Respondent and he should be considered to have registered it legitimately, having regard to the underlying principle that, where there are multiple users of a term, generic domain names have been found by earlier UDRP panels to be acquired on a first-come, first-served basis; see *Enterprise Rent-A-Car Company v. Michael Ruddell*, NAF Claim Number:

---

[1] The two LAMBO marks referenced by the Respondent are design plus word marks. The first of these marks is for teleconferencing and video conferencing services and is owed by a company located in California, United States, Lambo Communications, LLC. The second mark is registered for a variety of goods, including hair clippers and apparatus for tattooing, and is owned by a Chinese company, Shenzhen Lambo Electronical Co., Ltd.

page 4

FA0209000125371, *Target Brands, Inc. v. Eastwind Group*, NAF Claim Number:  FA0405000267475 and *The Coca-Cola Company v. Mr. Goran Inge Svensson*, NAF Claim Number:  FA0201000103933.

The Respondent is in the business of domain name investing, which is a legitimate business model.  Moreover, the resale of generic domain names is not in bad faith as the domaining business has become a prevalent enterprise that is widely accepted.

Further, the Respondent has spent 6,441 man hours and USD 143,458 in expenditure on the development of myriad domain names, such as the disputed domain name, on top of which he has incurred monthly server maintenance and operations costs.

The disputed domain name has not been registered or used in bad faith;  ""Lambo" is my name and "I am Lambo"".  Whilst the Complainant has sought to draw inferences from the fact that the disputed domain name has been offered for sale on third party platforms at varying prices, prospective buyers would have been unable to acquire the disputed domain name at those prices.  "The beauty is in the eye of the beholder and as the outlier Lamb par excellence, <lambo.com> is all but priceless to me. And that is all that matters".

Lastly, the Complainant has waited 22 years from the original registration date to try and claim the disputed domain name.

In all the circumstances, the Respondent seeks a declaration that the Complainant has engaged in Reverse Domain Name Hijacking.

## 6. Discussion and Findings

Paragraph 4(a) of the Policy provides that the Complainant must prove each of the following three elements in order to succeed in its Complaint:

(i) the disputed domain name is identical or confusingly similar to a trade mark or service mark in which the Complainant has rights;

(ii) the Respondent has no rights or legitimate interests in respect of the disputed domain name;  and

(iii) the disputed domain name has been registered and is being used in bad faith.

### A. The Complainant's Supplemental Filing and the Respondent's request for anonymity

Whilst the Rules make no express provision for supplemental filings by the parties to a complaint, paragraph 10 of the Rules provides that the Panel shall conduct the administrative proceeding in such manner as it considers appropriate, provided that the parties are treated with equality and that each party is given a fair opportunity to present its case.  Section 4.6 of the WIPO Overview of WIPO Panel Views on Selected UDRP Questions, Third Edition ("WIPO Overview 3.0") explains that "Unsolicited supplemental filings are generally discouraged, unless specifically requested by the panel" and  "panels have repeatedly affirmed that the party submitting or requesting to submit an unsolicited supplemental filing should clearly show its relevance to the case and why it was unable to provide the information contained therein in its complaint or response (*e.g.*, owing to some "exceptional" circumstance)".

The Panel subscribes to the view that unsolicited supplemental filings are to be discouraged.  Accordingly, save for noting the most recent change of ownership details of the disputed domain name (discussed below), the Panel does not admit the Complainant's supplemental filing, which mainly comprises submissions, which the Panel does not require, together with the results of a Google search against the term "Lambo" which the Complainant could (and should) have considered appending to its original Complaint.  The value of a Google search in the context of the issues the Panel is required to determine is, however, considered further below.

page 5

The Domain Report attached to the Complainant's supplemental filing does, in fact, establish from historical WhoIs data, that, until February 28, 2018, the disputed domain name was registered in the name of a John F Lambeth. The date that the Respondent acquired the disputed domain name is relevant to his allegation of delay on the part of the Complainant in bringing these proceedings against him. As the change of registrant details in 2018, from the original registrant, was not evident from either the WhoIs search appended to the Complaint nor the registrant verification information provided by the Registrar and communicated to the Complainant by the Center on May 3, 2022, the Complainant could not have anticipated that the Respondent would make such an assertion. It is therefore helpful for the factual position in this respect to be clarified, particularly when the Respondent has not stated in his Response the date on which he acquired the disputed domain name.

So far as the Respondent's request that his identity be hidden is concerned, the Center does not generally issue press releases in relation to decisions under the Policy. Instead, they are made publicly available on the Internet, in accordance with paragraph 4(j) of the Policy, which states that: "All decisions under this Policy will be published in full over the Internet, except when an Administrative Panel determines in an exceptional case to redact portions of its decision". It is for a respondent to show why this is necessary and why it has an exceptional case that would justify such a redaction. The Respondent has not put forward argument or evidence to support his request, nor does the Panel consider this case to be exceptional. The unanimous view of the Panel therefore, is to decline to direct that the Respondent's name be redacted from this Decision.

## B. Identical or Confusingly Similar

The Complainant has provided evidence of its trade mark registrations for LAMBO, details of one of these registrations having been set out above.

The generic Top-Level Domain, that is ".com" in the case of the disputed domain name, is typically disregarded for the purposes of the comparison made under the first element, as it is a technical requirement of registration. The disputed domain name contains the Complainant's LAMBO mark in full and without alteration or added content. The Panel accordingly finds that the disputed domain name is identical, or at least confusingly similar, to the Complainant's LAMBO trade mark.

Additionally, in circumstances where it is undisputed that "Lambo" is a well-known and common abbreviation of the mark LAMBORGHINI, and bearing in mind the test for confusing similarity under the Policy is whether the mark is "recognizable" in the relevant domain name (as to which see section 1.7 of the WIPO Overview 3.0), at least one member of the majority of the Panel also considers that the disputed domain name is confusingly similar to that mark. Further, such a finding would be consistent with the finding of the panel in *Automobili Lamborghini Holding S.p.A., Audi AG, Volkswagen AG v. Joey Walt, globebizImports, Groupo Gold*, WIPO Case No. D2011-1269.

## C. Rights or Legitimate Interests

Paragraph 4(c) of the Policy provides, in summary, that a respondent may demonstrate that it may have rights or legitimate interests in a disputed domain name by demonstrating either that, before any notice to it of the dispute, it has been using or has made demonstrable preparations to use, the domain name in connection with a *bona fide* offering of goods or services or that it has been commonly known by the domain name or that it has been making a legitimate noncommercial or fair use of the domain name.

The only known use of the disputed domain name has been to offer it for sale at a price of EUR 25,0000,000 with a correspondingly high leasing alternative, and, more recently, to redirect to a third party website at which the Respondent has protested about the Complainant's action in bringing the Complaint. Neither of these uses amounts to use in connection with a *bona fide* offering of goods and services. Nor, save for a generalized assertion that the Respondent has developed domain names which he has owned, has the Respondent claimed that his intention has been to develop a website using the disputed domain name, let

page 6

alone provided any evidence to support such a claim.  Nor, as is discussed further below, does the offering for sale of the disputed domain name amount to a legitimate noncommercial or fair use of it.

Before dealing with the Respondent's assertions in relation to the final means whereby he might establish rights or legitimate interests in respect of the disputed domain name, it may be helpful to clarify that the Complainant has not asserted that it is making direct use of its LAMBO mark as a brand name for any of its goods or services.  It is therefore helpful to understand what third party use is being made of LAMBO.  As explained at section 4.8 of the WIPO Overview 3.0, a panel may undertake limited factual research into matters of public record if it would consider such information useful to assessing the case merits and reaching a decision.  Therefore, and notwithstanding that one member of the majority does not consider it necessary to undertake further searches to determine how the term "Lambo" is commonly understood, the Panel has conducted a Google search against the term "Lambo".  This establishes that "Lambo" is widely used by enthusiasts and fans of the Complainant's products, as well as by car dealerships, as an abbreviation for the Complainant's vehicles.  Additionally, the search results include questions generated by Internet users which are clearly referable to the Complainant, including "How much is the cheapest Lambo?" and "Is a Lambo cheaper than a Ferrari?" which reaffirms the extensive use of "Lambo" to denote the Complainant's vehicles.  The search results also suggest that the Complainant, as well as third parties, are using "lambo" within their website content in such a way as to ensure that an Internet search for this term will produce results which are associated with the Complainant's vehicles.  Moreover, save for one result, which relates to a documentary about a man called "Aarron Lambert", and another result in which an urban dictionary states that "lambo" is a large apelike, monkeyish, creature, all the results on the first two pages relate to the Complainant.  Accordingly, notwithstanding that the Complainant itself does not appear to be using "Lambo" as a brand for its vehicles, there is clearly widespread third party use of this term to refer to those vehicles.

In considering the Respondent's claim that he is commonly known by the disputed domain name, it is helpful to have regard to section 2.3 of the WIPO Overview 3.0, which discusses the nature of the evidence that a respondent should be required to produce in these circumstances and explains that:

"Insofar as a respondent's being commonly known by a domain name would give rise to a legitimate interest under the Policy, panels will carefully consider whether a respondent's claim to be commonly known by the domain name – independent of the domain name – is legitimate. Mere assertions that a respondent is commonly known by the domain name will not suffice; respondents are expected to produce concrete credible evidence. Absent genuine trademark or service mark rights, evidence showing that a respondent is commonly known by the domain name may include: a birth certificate, driver's license, or other government-issued ID; independent and sustained examples of secondary material such as websites or blogs, news articles, correspondence with independent third parties; sports or hobby club publications referring to the respondent being commonly known by the relevant name; bills/invoices; or articles of incorporation. Panels will additionally typically assess whether there is a general lack of other indicia of cybersquatting".

See also, by way of example;  *Cracker Barrel Old Country Store, Inc., CBOCS Properties, Inc. v. Domain Administrator, See PrivacyGuardian.org / CB OCS*, WIPO Case No. D2022-0627.  Such evidence is particularly apposite when, as here, it is not readily apparent as to why the Respondent, Richard Blair, would have become known as "Lambo" and no explanation has been proffered by him.

The only evidence the Respondent has produced in this respect comprises extracts from a blog connected with the NamePros community of domainers, in which the Respondent has evidently discussed, with other members of the community, the Complaint and the best approach which he might take in his Response.  In the extracts provided, two participants assert that the Respondent has been calling himself "Lambo" on the forum for some time.  Although the Respondent has not provided examples of any posts which would substantiate these assertions, that the Respondent is presently referring to himself as "Lambo" on the NamePros discussion forum is, in fact, evident from the section of the forum to which the disputed domain name currently redirects.  Accordingly, the Panel proceeds on the basis that for, at least, some period of time, the Respondent has referred to himself as "Lambo" on this forum.

page 7

The Respondent's evidence, however, does not shed any light on the specific period of time for which the Respondent has referred to himself as "Lambo" on the forum and, in particular on whether he did so prior to his acquisition of the disputed domain name or only after he acquired it.  This is an important consideration because if, as the Complainant alleges, the Respondent had the Complainant in mind as a prospective purchaser of the disputed domain name as at the date of his acquisition of it, then calling himself "Lambo" on the forum may have been part of a strategy intended to suggest an interest on his part in the disputed domain name in the event of challenge by the Complainant.  Furthermore, the Respondent has not provided any evidence at all to support his contentions that he is known by the name "Lambo" both in other online communities and "in real life".

The Respondent has asserted also that he is a "Lamb of outlier generic aptitude and intelligence".  What this means, is unclear but, whatever meaning is intended by this contention, it is a statement made without any evidential support.

The evidence to support the assertion that the Respondent is commonly known as Lambo is therefore confined to the Respondent having called himself "Lambo" for an unknown period of time on the NamePros online community, with nothing to suggest that he had been calling himself "Lambo" on the forum prior to his acquisition of the disputed domain name, nor, in fact, does the Respondent even specifically assert that this was the case.  It follows that, when matched against the standard of concrete and credible evidence required of a respondent seeking to establish that it is commonly known by a domain name, as set out at section 2.3 of the WIPO Overview 3.0, the Respondent's evidence falls a very long way short.

Having regard to the fact that paragraph 12 of the UDRP Rules enables a panel, in its sole discretion, to request any further statements or documents from the parties that it deems necessary, the Panel considered whether it was appropriate to issue a procedural order inviting the Respondent to file further evidence in support of his claim.  A procedural order might be made, for example, in circumstances where a party makes a *prima facie* credible assertion the confirmation of which would benefit from additional supporting evidence; see section 4.7 of the WIPO Overview 3.0.  However, in these proceedings, the Respondent has explained that he is a professional domainer and his Response has shown familiarity with the terms of the Policy and its application and therefore, there are no persuasive reasons for granting him the considerable leeway of, in effect, having another bite at the cherry.  This is particularly the case as the shortcomings in the Response on this issue do not amount to a minor lacuna in otherwise satisfactory evidence which, for clarity, the Panel wishes to have filled, but are appreciably more extensive.

In these circumstances, the majority of the Panel has concluded that it would be inappropriate to invite the Respondent to file additional evidence and that the Respondent has not established that he is commonly known by the disputed domain name.  The Panel is mindful of its duty under paragraph 10 of the Rules to ensure that each party is treated equally and has had a fair opportunity to present its case and the majority considers its obligations have been adhered to in these proceedings.  The majority do not think it makes a difference to the assessment of this case that the Respondent appears to be legally unrepresented.  There is no suggestion that the Respondent did not have an opportunity to get such representation, had he so wished, and to treat him more favourably in proceedings because he chose to represent himself, itself risks offending the principle of equality.

The Respondent has additionally asserted that the term "lambo" should be considered a generic term, that is a term descriptive of a general class of goods or services.  There is no evidence to support this claim, and the term "lambo" has no known meaning in the English language or, indeed any other language[2] as a dictionary word or phrase.  The fact that "Lambo" may have been used as, for example, a surname, the name for a character in a Manga series and the name of a music album is insufficient for these purposes.

---

[2] The Respondent has suggested that the equivalent word, in Greek script, means "shine" but no evidence is offered in this respect and Google's translate function suggests that the Greek word for "shine" is, in fact, λάμπω (or "lámpo" in Roman script).

page 8

However, even if "Lambo" were such a term, this would not have the consequence that a party would have unfettered rights to register it as a domain name where a third party is using that term as a trade mark.  As explained at section 2.10.1 of the WIPO Overview 3.0;  "Panels have recognized that merely registering a domain name comprised of a dictionary word or phrase does not by itself automatically confer rights or legitimate interests on the respondent;  panels have held that mere arguments that a domain name corresponds to a dictionary term/phrase will not necessarily suffice.  In order to find rights or legitimate interests in a domain name based on its dictionary meaning, the domain name should be genuinely used, or at least demonstrably intended for such use, in connection with the relied-upon dictionary meaning and not to trade off third-party trademark rights."

In this respect, the factual matrices of the earlier panel decisions cited by the Respondent are such as to establish that they do not support the Respondent in the manner he has contended.  In *Enterprise Rent-A-Car Company v. Michael Ruddell* (which related to the domain name <enterprise-e.org>), the respondent had not been offering the domain name for sale and the panel accepted the respondent's submission that he was not using the generic word "enterprise" in the domain name because it was the complainant's trademark, but because of the non-trademarked, generic value of the word "enterprise".  In *The Coca-Cola Company v. Mr. Goran Inge Svensson*, (which related to the domain name <sprite.nu>) the panel accepted the respondent's contention that he had acquired the domain name for use by his son, that the word 'sprite' was used in the domain name as a reference to the scientific term "sprite" and that the respondent had created a web site called Internet Sprite Magazine, to offer children a means of retrieving information on scientific subjects.  In *Target Brands, Inc. v. Eastwind Group* (which concerned the domain name <target.org>) the panel found that the links on the respondent's website related to the dictionary meaning of the term, such as target practice, hunting, archery and goal setting.  The circumstances of the Respondent's registration and use of the disputed domain name, which are considered further below, are materially different from these cases and other panel decisions under the Policy including, by way of example, *Oravel Stays Private Limited v. Perfect Privacy, LLC / Kannan, Vijayakumar*, WIPO Case No. D2019-1979 are more apposite.  In circumstances where the Complainant has made out a *prima facie* case that the disputed domain name is identical to its LAMBO trade mark, it is insufficient for the Respondent merely to assert that the term "Lambo" may have some generic or descriptive meaning without providing credible evidence of a *bona fide* intention to use the disputed domain name for its generic or descriptive attributes.  The Respondent has not provided any such evidence.

The majority of the Panel, therefore, finds that the Complainant has made out a *prima facie* case that the Respondent lacks rights or legitimate interests in the disputed domain name and that the Respondent has failed to satisfy his burden of establishing that he does.

The majority of the Panel therefore finds that the Respondent has no rights or legitimate interests with respect to the disputed domain name.

**D. Registered and Used in Bad Faith**

Paragraph 4(b)(i) of the Policy provides a further circumstance which evidences bad faith registration and use, namely (in summary) if a respondent has acquired a domain name primarily for the purpose of selling, renting, or otherwise transferring it to the complainant or a competitor of the complainant, for valuable consideration in excess of its documented out-of-pocket costs directly related to the domain name.

Domain name investing can, as the Respondent asserts, be a legitimate business activity and registering a domain name for resale does not, in itself amount to bad faith registration.  Whether bad faith registration will be found is fact-specific and factors which have been found by prior UDRP panels to point towards bad faith registration (see section 3.1.1 of the WIPO Overview 3.0) include a respondent's likely knowledge of a complainant's rights and the failure of a respondent to present a credible, evidence-backed rationale for registration of the disputed domain name.  Section 3.1.1 adds that;  "Particularly where the domain name at issue is identical or confusingly similar to a highly distinctive or famous mark, panels have tended to view with a degree of skepticism a respondent defense that the domain name was merely registered for legitimate speculation (based for example on any claimed dictionary meaning) as opposed to targeting a specific brand

page 9

owner". In this respect, see also *Klarna Bank AB v. Whois Privacy Protection Service by Z.com SG / ubaidah nugroho, safuer*, WIPO Case No. D2022-0539.

The majority of the Panel having not accepted the Respondent's claim to be commonly known by the disputed domain name, there is no credible explanation on the record for the Respondent's registration of it and the Panel necessarily has to seek to infer the Respondent's likely motive from the circumstances. In considering the Respondent's intentions in registering the disputed domain name the Panel takes into account the following. First, other than claiming that he generally develops domain names he owns, the Respondent has not suggested that he intended to use the disputed domain name himself, nor is there any evidence that he has done so. Second, the Respondent does not actually dispute that the term "Lambo" is a well-known common abbreviation of the term "Lamborghini" and he has not claimed that he was unaware of either the Complainant or its use of "Lambo" to denote its vehicles as at the date of registration of the disputed domain name.

Third, the very high prices at which the disputed domain name has been offered for sale on the website to which it has resolved (particularly bearing in mind the Respondent's assertion that prospective purchasers would not have been able to acquire the disputed domain name at the lower prices at which it was offered for sale on the third party platforms) are clearly indicative of the Respondent's belief that a company might be willing to pay a sum approximating or approaching the exceptionally high sum sought by the Respondent and the very high asking price for the disputed domain name tends to affirm the likelihood of targeting by the Respondent; see *Klarna Bank AB v. Whois Privacy Protection Service by Z.com SG / ubaidah nugroho, safuer*, (*supra*). None of the other commercial users of "Lambo" identified by the Respondent in the Response are plausible candidates as prospective purchasers at the price sought by the Respondent. The owner of <lambo.it>, for example, sells trees and shrubs from a nursery in Italy. The owner of <lambosbp.com>, by way of further example, operates 4 filling stations, with annexed stores, in Chicago, Illinois. Prior UDRP panels have found that it is not necessary for a complainant to identify that it is the sole object of targeting by a respondent; see, for example, *Victron Energy B.V. v. Privacy Administrator, Anonymize Inc. / SARVIX, INC.*, WIPO Case No. D2022-1186. However, having regard to the very widespread use of the word "Lambo" to denote the Complainant's vehicles and the likely value of this term to the Complainant, the only conceivable buyer of the disputed domain name at the level of consideration sought by the Respondent is the Complainant or, conceivably, a competitor of it.

Whilst the Respondent has provided information as to what he says are the overall costs of running his business, no specific costs have been provided in relation to the costs of acquiring and potentially developing the disputed domain name and the information therefore falls far short of establishing that his documented out-of-pocket costs directly related to the disputed domain name might approach the price at which he has offered it for sale. The majority of the Panel therefore concludes that, on the evidence before it, the Respondent registered the disputed domain name with a view to its sale to the Complainant or a competitor of it, at a price substantially in excess of its documented out-of-pocket costs directly related to the disputed domain name and that this therefore falls within the circumstance of bad faith registration and use set out at paragraph 4(b)(i) of the Policy.

The fact that the Respondent is currently using the disputed domain name in order to resolve to a third party website at which he is protesting the Complainant's actions in bringing the Complaint does not preclude a finding of bad faith use on the grounds set out above.

The majority of the Panel therefore finds that the disputed domain name was registered and is being used in bad faith. It is not therefore necessary to consider the Respondent's claim that the Complainant has engaged in Reverse Domain Name Hijacking.

**7.Decision**

For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the disputed domain name, <lambo.com> be transferred to the Complainant.


*/Antony Gold/*
**Antony Gold**
Presiding Panelist


*/Matthew S. Harris/*
**Matthew S. Harris**
Panelist


Date:  August 3, 2022


**DISSENT**
Automobili Lamborghini S.p.A. v. Domain Administrator, See Privacy Guardian.org/ Richard Blair.
Case No. D2022-1570.
Dissent:  The Hon Neil Anthony Brown QC


**Introduction and Summary**

This panelist would dismiss the Complaint for the following reasons.  The Complainant has a trademark for LAMBO and the disputed domain name is identical to that trademark.  The LAMBO mark is the Complainant's orphan child:  the Complainant does not use LAMBO to identify its motor vehicles and is clearly not interested in using it for that purpose.  Why would the Complainant want its prestigious and expensive motor vehicles referred to by the down-market name "Lambo"? It clearly would not.  It should be noted that the LAMBO trademark was abandoned in the United States before the Respondent, also in the United States, registered the disputed domain name.  A domain name should not be transferred to a complainant who does not have a relevant trademark that is in practical use.  The Respondent also has presented an arguable case that he is commonly known by the domain name and he therefore has a right or legitimate interest in the domain name.  Nor has he committed any act that amounts to bad faith in either the registration or the use of the domain name.

The Complainant also has trademarks for LAMBORGHINI. The domain name is not identical to that trademark.  Nor is it confusingly similar to the trademark because, although some Internet users may think it invokes the Lamborghini name, the domain could and in numerous cases already does, invoke a wide range of goods and services other than Lamborghini.  It therefore cannot be said that Internet users would on the balance of probabilities be confused in any way by the domain name.  The Complaint therefore fails with respect to the LAMBORGHINI trademark.  The Respondent also has a right or legitimate interest in the domain name and did not register it in bad faith.  Advertising a domain name for sale to the public generally is not an offer to sell to the Complainant or a competitor.  It is unwise and inappropriate for panels to enter into the question of whether the price asked for a domain name is high, low, reasonable or otherwise appropriate or inappropriate.  A panel should confine itself to the jurisdiction conferred by the actual wording of the UDRP. That jurisdiction is confined to out-of-pocket costs and does not extend to the value of a domain name.

These questions will be dealt with in turn, but several preliminary issues have arisen which will be examined first.

page 11

**The Complainant's Supplementary Filing and the Respondent's request for anonymity**
**The Complainant's Supplementary Filing**

This panelist would allow the Complainant's supplementary filing.  The Complainant has asked for leave to file a further submission in reply to the Response and the majority of the panel has rejected that request.  The Complainant had set out in the supplementary statement its opposition to there being a finding of reverse domain name hijacking;  the criteria for making such a finding;  an argument that the complaint had been brought in good faith and the public offer by the Respondent that the domain name was for sale.  The statement went on to deal with whether the word "lambo" was generic, whether the Respondent was commonly known as Lambo, the expiration of its US trademarks for LAMBO, the use made by other parties of the word "lambo" and the Complainant's trademarks.

All of those issues are clearly relevant to this proceeding and the Complainant should be permitted to have its say on them.  It could scarcely have done so before the Response was delivered.  No harm would be done by allowing the further statement covering those matters.  The proposed further statement was no longer than two pages.  This panellist does not agree with the Complainant on those issues, but it was entitled to put to the panel everything it had to say on them.  Moreover, the UDRP and its rules make it clear that it establishes a process which the Panel exercises judicially and with regard to the parties' due process rights.  Obviously, panels must exercise restraint on what additional material they allow, but to prevent a party from putting clearly relevant, concise and limited material to the panel as the Complainant wanted to do in this case would be a substantial departure from proper practice.  This panelist therefore urges the Panel not to take that course.

The same principle applies to another, and a major, issue that arose concerning the Respondent's case and which will also be referred to later.  The Respondent submitted that he was commonly known as "lambo" and that this established his right or legitimate interest to the domain name.  The submission was supported by some, although limited, evidence.  It therefore seemed sensible to issue a procedural order under Rule 12 to see what further evidence there was of the Respondent's being known as "Lambo." The Respondent is unrepresented and is up against a substantial firm of lawyers that represents the Complainant.  Panels can help unrepresented parties by ensuring at least that they have a fair opportunity to present their case in full and there is a strong case for giving them some leeway in presenting evidence, especially if it can be done reasonably quickly and concisely.  In this particular case, the Complainant had submitted that the Respondent's evidence had come from "just three (rather unknown)" Internet communities" and it therefore seemed to this panellist that no harm would be done or delay incurred if the Respondent could provide some further information that might persuade the panel one way or the other whether he was commonly known by the nickname Lambo, as he alleged.  This panellist is therefore of the view that if the procedural order is not issued the Respondent would be denied a proper opportunity to present his case and to be heard.

**Respondent's request for anonymity**

This panelist would not accede to the Respondent's request for anonymity.  There is no doubt that there is power to redact the name of a party from the decision of a panel.  This panelist has made several such orders.  It is usually done in cases where someone has registered a domain name but has misleadingly given the name of a third party as the holder of the domain name in question, whereas the person named has had nothing to do with the registration or use of the domain name.  The domain name has then been used for a fraud, but when the name of the innocent bystander is exposed in the panel's decision, it would naturally be assumed that he or she was the wrongdoer.  To avoid this slur, a panel will, in an appropriate case, redact the innocent bystander's name and anything else that might identify him or her, such as an address.  But there must be at least a demonstrated reason for doing so.  That is because one of the bases of the UDRP regime is that it is public and that the public have a right to be told what is happening in the domain name world.  This is because the Internet is now one of the major forms of human communication and the public is entitled to know how it is being used.

There is nothing particularly magical about that approach.  The UDRP process is governed by its Policy and Rules and all domain name holders are contractually bound by them from the time they acquire their domain name.  The Policy itself, at paragraph 4 (j), provides that "All decisions under this Policy will be published in full over the Internet, except where an Administrative Panel determines in an exceptional case to redact portions of its decision."

Those who drafted the UDRP must have thought this power was significant, as it is included in the Policy itself and then in effect repeated in Rule 16 (b) which says that "Except if the Panel determines otherwise (see Paragraph 4 (j) of the Policy), the Provider shall publish the full decision and the date of its implementation on a publicly accessible web site." They must also have intended that the principal question for the Panel is whether there are circumstances that justify departing from the default position of full disclosure.  So, the question of whether or not to redact part of a decision such as the name of a party must be exercised judicially and in the light of all the surrounding circumstances and having regard to the purpose of the provision and general notions of justice and fair play.  Thus, in the present case, the threshold question must be:  is this an exceptional case? The answer is no, it is not exceptional.  No case has been made out to show that it is exceptional, and it does not seem to be so.  Nor has any other case been made out to justify departing from the obviously intended requirement of publication of "the full decision".  It should also be remembered that beside the understandable interest of the Respondent in privacy, there is also a significant interest in the public in knowing what is going on in the domain name world and who is doing it.

Accordingly, putting all of the above considerations in balance, this panelist finds no case has been made out for redacting the name or any other information that could identify the Respondent.

**Identical or Confusingly Similar**
**The Complainant's trademarks**

On the evidence, the Complainant has shown, first, that it has two registered trademarks for LAMBO, one issued by the European Union Intellectual Property Office (EUIPO) and a Swiss one.  They are virtually the same.  The European trademark is registered with respect to "Vehicles", among other classifications, and it clearly applies in the present case.  The Swiss trademark also applies to "Vehicles." It is, however, notable that the Complainant does not have a registered trademark for LAMBO in the United States, where the Respondent is domiciled.  Nor did it have one when the Respondent registered the domain name, so how he was expected to know that it had two European trademarks for LAMBO is something of a mystery, especially when the LAMBO trademark in the country where he lived had been abandoned before he decided to buy the domain name.

It should also be added for completeness that there is no evidence that the LAMBO trademark is used by the Complainant or has ever been used by it to sell its motor vehicles or anything else.  In the Complainant's family of trademarks, it is clearly the orphan child, not registered in the Complainant's biggest market and, although registered in Europe, not used there.  And so indifferent is the Complainant to its orphan child that it abandoned the trademark and has not sought to replace it with a new trademark for LAMBO.

The Complainant also has several registered trademarks for LAMBORGHINI, not surprisingly, because that is the name of its well-known and expensive motor car.  Nor is it surprising that for the same reason, the Complainant has many more trademarks for LAMBORGHINI than it has for LAMBO.  One of the US trademarks the Complainant relies on is No. 74019105 for LAMBORGHINI with respect to "Automobiles and their Structural Parts" so it clearly covers the Complainant's Lamborghini motor cars.  As well as the single trademark for LAMBORGHINI that the Complainant relies on, it also has the US registered trademark for LAMBORGHINI No. 1622382 with respect to "vehicles", and the registered trademark No. 1622382 for "cars".  It is clear therefore that the Complainant wants its cars to be known as LAMBORGHINI and not LAMBO in which it seems to be completely indifferent.

That view is re-enforced by the Complainant's conduct since the new regime of generic top level domains was introduced.  The Trademark Clearing House was established to deal with the very situation that has arisen in this case, namely how to alert the commercial world to the fact that companies like the present

Complainant own verified trademarks that should not be compromised by new domain names that trespass on them.  As the ICANN website is in evidence, it is appropriate to look at ICANN's Trademark Clearing House to see how the Complainant has handled its trademarks.  The Complainant has registered LAMBORGHINI but not LAMBO as its trademark[3].  A search for LAMBO produces the result:"Your search yielded no results."[4]It is clear that the Complainant has little if any interest in the word "lambo" when it comes to registering domain names.  There is, for instance, no warning or embargo when one registers domain names like <lambo.auto>, <lambo.car> or <lambo.cars>.

Moreover, the Complaint does not reveal that the Complainant once had a USPTO trademark for LAMBO in the United States, the country where the Respondent was and is domiciled, but it abandoned that trademark on August 11, 2017, five months before the Respondent acquired the disputed domain name.  This shows a distinct lack of enthusiasm on the part of the Complainant in having its prestige motor vehicles identified as LAMBO, which is hardly surprising.

Moreover, the evidence does not show that the Complainant tried to undo this state of affairs or rectify it by registering another trademark for LAMBO in the United States.  Thus, when the Respondent bought the domain name[5], the Complainant had abandoned its LAMBO trademark in the United States where the Respondent lived and put no other LAMBO trademark in its place.  As noted, the United States is the largest market for the Lamborghini[6] although the Complainant allowed its LAMBO trademark in the USA to expire and for no reason that has been given.  In other words, it sells more vehicles in a market *without* the LAMBO trademark, namely the US, than it does in markets *with* the LAMBO trademark.  No explanation has been given as to how or why its trademark for LAMBO came to expire.  Whatever this proceeding is about, it is therefore not about the need or desire of the Complainant to recover a domain name that is transgressing on its LAMBO trademark because the Complainant is obviously completely indifferent to the use of its LAMBO trademark, even in its largest market.

**Identical or Confusingly Similar**

The Complainant must then show that the domain name is identical to one or other of its trademarks.

The Complainant argues that the domain name is identical to the LAMBO trademark.  It clearly is.

The domain name is not identical to the LAMBORGHINI mark and the Complainant does not argue that it is. It cannot be identical because it consists of different letters from the trademark and therefore does not sound or look the same as LAMBORGHINI.

But is it nevertheless confusingly similar to LAMBORGHINI? The Complainant argues that it is.  This panelist is of the view that the domain name is not confusingly similar to the LAMBORGHINI trademark.  It is similar, as there are enough letters in the domain name that are also in the trademark, and in the same order, to make it similar to the trademark.  But is it confusingly similar?

There are three points here that must be understood.  First, the test is whether Internet users in general would probably find them confusingly similar, not whether that conclusion is possible.  The test is the balance of probabilities, as it is in all such proceedings and the Panel should not depart from that test.
Secondly, it is possible that some users would find them confusingly similar and it would be naïve to deny that this is so.  No doubt there are some people who use the word "lambo" as a slang word or common patois to refer to LAMBORGHINI, in the same way that they might use the expression "Rolls" to refer to a Rolls-Royce, or "merc" to refer to a Mercedes-Benz.  That does not mean that such a belief is widespread or

---

[3] https://www.trademark-clearinghouse.com/search/node/lamborghini%20language%3Aen

[4] https://www.trademark-clearinghouse.com/search/node/LAMBO%20language%3Aen

[5] On 28 February 2018

[6] https://www.best-selling-cars.com/brands/2021-full-year-global-lamborghini-worldwide-sale-by-model-and-country/and page 13/24 of Complainant's Annex 04.

page 14

that it is popular or so common that a panel should regard it as the way Internet users in general see the word "lambo". The Complainant itself certainly does not encourage them to do so.

Thirdly, whether Internet users in general would probably find them confusingly similar is a far more doubtful proposition. This panelist is not persuaded that they would. The main reason why he doubts this is because there is a lot of evidence that the word "lambo" is recognized as standing for goods and services that have nothing to do with the Lamborghini motor car and that it is actually used in those other uses of the word to mean any of that variety of other goods and services.

This can be seen from the original owner whose name was Lambert and it is entirely legitimate that the name would appeal to anyone of that name or anyone who had the name "Lambo" as a nickname or who is engaged in any activity that could attract that word. The Respondent was "first come, first served" and is entitled to the benefit of acquiring the name, particularly if there is a legitimate use to which it could be put, as is so in the present case.

The evidence shows that the word can legitimately refer to and is actually being used in the following proven uses, none of them being Lamborghini: it is used as a popular nickname, the name of a film[7], a cartoon character [8], an Australian wool product[9], a word derived from the verb lamber[10], the US footballer Josh Lambo[11], a model[12], a given name[13], a nickname[14], lambswool products[15], a variation of lamber[16], a Greek recorded album[17], the brand name of an allegedly rejuvenating cream[18], Lambo vegetarian capsules[19], and a collection of cult figures[20] as well as the use by the original registrant John Lambert which may well attract others with the same name. There is also a current USPTO trademark registered on May 28, 2019 for use of the word for electric razors and a USPTO trademark application filed as recently as April 21, 2021 to use the name for teleconferencing. Thus, there is plenty of evidence to show that the word is used for a variety of goods and services that do not involve Lamborghini at all.

Part of the difficulty of being certain on this issue is that some Internet users would probably see the word as being pronounced as "lamb-o", meaning that it is derived from the word "lamb". Clearly some of the registrants who have registered "lambo" as a trademark or domain name interpret the word in that way and not as an abbreviation or slang word to invoke the notion of the Lamborghini motor vehicle.

In any event, and this is the main factor that has persuaded the present panelist to his conclusion, the Complainant could have at least attempted to prove its proposition by evidence on which the Panel could act, instead of the assertions made by the Complainant's lawyers. Every day of the week, trademark owners in litigation prove the association of names by evidence, properly tested and scrutinized, of how the relevant public see the name of a particular brand. This is done by focus groups and survey evidence and is often accepted by the courts. But the Complainant has made no attempt to assemble such evidence in the present case.

---

[7] https://www.imdb.com/title/tt7496048/

[8] https://reborn.fandom.com/wiki/Lambo

[9] https://www.tamboteddies.com.au/product/tambo-lambo/

[10] https://en.wiktionary.org/wiki/lambo

[11] *https://www.cbssports.com* › nfl › players › playerpage

[12] https://www.deviantart.com/1shinigami1/art/MMD-model-DL-Lambo-Katekyo-Hitma-Reborn-843592965

[13] https://au.linkedin.com/in/lambo-kanagaratnam-419b346

[14] https://liquipedia.net/starcraft2/Lambo

[15] https://www.littlelambo.com/

[16] https://www.thefreedictionary.com/Lambo

[17] https://www.definitions.net/definition/LAMBO

[18] https://oceanking.com.au/product/lambo-sheep-placenta-cream-24-hour-time-release/

[19] https://labo-lambo.be/

[20] https://opensea.io/collection/thelonelyfroglamboclub

page 15

Taking all of these facts into account, it therefore seems to this panellist that the Complainant has established that the domain name is identical to the LAMBO trademark, although the Complainant has no interest in the mark and does not use it. It is therefore inappropriate to order transfer of a domain name to a party that does not have a trademark that it actually uses to identify and protect its goods and services.

The Complainant, however, has not established that the domain name is either identical or confusingly similar to the LAMBORGHINI trademark, so as to show a breach by the Respondent of that element.

**Rights and Legitimate Interests**

The Panel should not find that the Respondent has no right or legitimate interest in the domain name.

The case against him seems to be that he has bought a domain name and has put it up for sale at a high price. None of that is a ground for denying his right to the domain name. He has a very clear right to the domain name and a legitimate interest in owning it. In substance, he acquired the domain name legitimately by buying it, which the Complainant could have done but did not.

The Respondent has kept the domain name and has used it only to develop it for later use until it is sold. In particular, he has certainly done nothing at all that would negate his right to acquire and own the domain name, for he has not pretended he is the trademark owner, passed himself off as such, mislead any Internet users, sold counterfeit goods, engaged in typosquatting to confuse the market, gone off on a phishing expedition or used the domain name for pay-per-click income or in any other way improperly.

As has been seen, the word "lambo" admits of many meanings and uses, some of them generic and /or as a common word used for a variety of goods and services other than the Lamborghini. The Respondent therefore has a substantial right to register any such word as a domain name and to take advantage of whatever he or anyone else sees in the name, at whatever price he can obtain, provided of course that he does not pretend to be the Complainant, copy its name or trademark or engage in any other impropriety, none of which the Respondent has done.

There being many such legitimate uses of the word "lambo", the Respondent or anyone who got in before him clearly has the right to acquire such a domain name simply because it can be used for so many different, and legitimate, purposes. Such a person also has a legitimate interest in retaining it and making it available for that purpose at whatever price can be obtained.

In those circumstances the Respondent had a right to acquire the domain name and he has a legitimate interest in keeping it for sale.

**The offer to sell the domain name**

The Complainant has become agitated at the fact that the Respondent has put his domain name up for sale and at the high price he has been asking. The domain name is the property of the Respondent and his ownership should be respected. He has every right to sell it, at the price he is asking and at the price he thinks he can obtain. Panelists have frequently declined the opportunity to enter into the market and make judgments on what a domain name is worth and that position should be maintained. It is certainly not for the Complainant's counsel to submit, as it does, that the price being asked is excessive or unreasonable and there is no authority for taking the view that such an intrusion is legitimate. The Respondent has not tried to sell the domain name to the Complainant or a competitor, but to the public at large, which he and every other domain name owner has the right to do. He is therefore not in breach of the UDRP Policy.

**No active website**

The Complainant is also wrong in suggesting that there is anything untoward in the domain name not resolving to an active website. The Complainant has submitted that Internet users will expect a website of

the Complainant under the disputed domain name because the domain name is the well-known and popular abbreviation of the Lamborghini website. That argument has no merit and is not borne out by the evidence. Indeed, the Respondent has given evidence that he is a developer of domain names and that his practice is to develop domain names and then sell them, which he is entitled to do and that this is what he has been engaged on with respect to the domain name in the present case. Again, that is wholly legitimate.

It would be a very bold decision to declare in effect that a person who has bought a domain name and not engaged in any conduct that has ever been seen as a breach of the UDRP, should be deprived of its own property simply for retaining a domain name.

In particular, the Respondent says that he has a history of "engaging, outsourcing and contracting work to freelancers…" and that some of his work is "in an ongoing development stage pre-launch". He has tendered an exhibit showing actual work having been done on such projects. That evidence therefore tends to suggest that the Respondent is truthful in stating that his plan is to develop the domain name for sale, which is itself legitimate. Moreover, that point is supported by the fact that the evidence is that the Respondent has "an established record as a builder and developer of domain names and …( has had) success as a domain name investor too".

The Respondent has certified that all of the information he has provided is correct and the Panel should accept his evidence as such.

The Complainant appears to have has contributed nothing from its own knowledge. Its submission therefore is of limited value.

**Commonly known**

This panelist is also concerned about the way in which the major defence of the Respondent has been dealt with. The Respondent submitted that he has "an established online footprint and is known in communities and in a personal capacity by" the name Lambo, the same as the domain name. In other words, he raises the defence that he is commonly known by the domain name, which is a complete defence to the second element of the UDRP and hence to the entire claim, so it is important.

In support, the Respondent has tendered in evidence some testimonials[21] from acquaintances to the effect that he was known as Lambo, which go some way, but only some way, to verifying his position and although they are limited in number, he has certified that his submission is "complete and accurate." His evidence was not entirely clear, as it did not have the professional gloss that was apparent from the Complainant's case that was clearly prepared by a lawyer, which puts the Respondent at an obvious disadvantage. It therefore should be remembered that the Respondent is not represented by counsel and is opposed by obviously significant professional representation. There is an obligation on panels under Rule 10 to "ensure" that the parties are treated with equality and that each party has a fair opportunity to present its case, and this must be particularly so when a party is not represented.

The Complainant replied with an unsigned supplementary submission from its lawyer that asserted that "The Respondent is not commonly known by "lambo"". How the Complainant's counsel would know this, one way or the other, or what was the basis of its assertion, was not disclosed and is a completely unsupported by any evidence. It then took umbrage at the fact that it showed only that the name had been used as a nickname "in just three (rather unknown) Internet communities…". Three witnesses seemed to the Complainant not to be enough and it presumably wanted more.

There was therefore a direct dispute on the evidence, generated mainly by the Complainant. On the other hand, the Respondent had said clearly enough and with some, although limited evidence in support, that he was known as Lambo, probably pronounced as "Lam-o".

---

[21] Annex 8 to the Response

page 17

It seemed therefore to this panelist that in the state of the evidence as it was, it was appropriate to issue a procedural order to enable the Panel to test the assertions of the Respondent and elicit in the Panel's own way and under its own supervision, whatever evidence there was to show, one way or the other, whether the Respondent was commonly known as Lambo.

It also seemed to this panelist that to give equal opportunity to both parties it would be probative to invite the Respondent to clarify some of his evidence.  If this were not done, there was a real risk that the parties would, in the case of the Respondent, not be treated equally and would not have a fair opportunity to present its case.  The majority of the Panel was not able to see its way clear to agree to this proposal which is a serious barrier to finding that the Respondent has "**no**" rights or legitimate interest in the domain name, when clearly he had some rights and may well have more.  He may have some rights that could come to light only as a result of the procedural order.

The result is that the evidence has been left in an unsatisfactory state which is prejudicial to the Respondent but could so easily be rectified.  It also potentially runs foul of the duty of the panel to ensure that the parties are treated equally and that each party is given a fair opportunity to present its case.  The Respondent seems to this panelist to have been denied that opportunity, which compromises his due process rights.

This panelist would therefore not agree to order the transfer of the domain name to the Complainant while that issue remains unresolved and yet could be resolved by a procedural order that would clarify and expand the evidence.

That not being done, this panelist is unable to find that the Respondent has no rights or legitimate interests in the disputed domain name.

**Bad Faith**
**Registration in bad faith**

The Complainant must first show that the Respondent registered the domain name in bad faith.  It has not shown that the Respondent did this or anything remotely like it.

The Complainant claims, first, that by buying the domain name the Respondent broke paragraph 4(b)(i) because he acquired it primarily to sell it "**to a competitor of Complainant**" (emphasis added).  It does not allege that the Respondent acquired the domain name to sell it to the Complainant itself and it would be a very bold complainant who would claim that intention when there is no evidence to that effect.  The Complainant therefore seems to have acknowledged that it is not arguing that the domain name was bought with the intention of selling it to the Complainant.

However, the Complainant has alleged that the Respondent bought the domain name to sell it to a competitor of Lamborghini.  The Panel should reject this allegation.  Why would the Respondent buy a domain name which the Complainant has submitted in effect means "Lamborghini", but intending to sell it not to Lamborghini but to a buyer that does **not** sell Lamborghini?

Apart from being non-sensical, there is no evidence to support this allegation.  There is also no clue as to who such an eccentric purchaser might be who would want to buy a name carrying not its own brand but the brand of a rival.

Secondly, the evidence and the only evidence, is that the Respondent advertised the domain name for sale, not to Lamborghini, or to a competitor of Lamborghini, but to the world at large on the general market.  That is not prohibited and is not proscribed by any provision of the UDRP.  Nor does it show that the Respondent intended to sell it either to Lamborghini or to a competitor.  If merely offering a domain name for sale to the public is held to be bad faith, virtually all sales of domain names would be prohibited, which was clearly not intended.

page 18

Accordingly, the Complainant has not shown that the Respondent wanted to sell the domain name to the Complainant or to one of its competitors or that it tried to do so.  It has already been conceded that some users will understand <lambo.com> as invoking.

Thirdly, the Complainant says that registering the domain name is in bad faith because it is identical or confusingly similar to a "famous or widely known trademark." If the Complainant means that the trademark is LAMBO, then that trademark is not by any stretch of the imagination either famous or well-known and many users clearly use it when they are specifically not referring to the Lamborghini motor vehicle.  If the Complainant means LAMBORGHINI, the domain name is certainly not identical to that trademark and, as already shown, the public uses the word "lambo" to describe generic objects and a wide variety of uses that refer to all sorts of goods and services that have nothing to do with the Lamborghini motor vehicle.

Fourthly, the Complainant says that the Respondent knew or should have known of the "use" of its "trademarks.  Again, if the Complainant means LAMBO, the Respondent could only have been aware in the United States, not of the use of that trademark, but of its non-use and the indifference that the Complainant had to its use.  If the Complainant means the LAMBORGHNI, there is no evidence that the public in general would probably see "lambo" as necessarily referring to Lamborghini motor vehicles.  But there is evidence that those involved in the many uses of the word "lambo" as a name or description of an object would probably see it within those meanings and not as referring to the Lamborghini motor vehicle.

Fifthly, the Complainant relies on the proposition that "(t)here is no conceivable legitimate interest for the use of the disputed domain name by the Respondent or the underlying registrant." That is not so, it has been shown that there is a wide variety of actual legitimate uses that are made of the domain name which have no connection at all with Lamborghini.  Offering a domain name with such wide legitimate potential to a wide potential market can hardly be described as being in bad faith.

The Complainant has thus not shown that the domain name was registered in bad faith.

**Use in bad faith**

The Complainant's case is strangely silent on the issue of use in bad faith which it must prove.  Offering a domain name for sale, at any price, is not in bad faith when the domain name may be of interest and value to a wide variety of potential purchasers within any of its many meanings of which evidence has been given. That is the only use in question, as the Respondent has not used the domain name for anything else. Putting the domain name up for sale is the only use to which he has put the domain name and that use is entirely lawful, no matter what the price the seller asks.

The Complainant has thus not made out the case that the domain name was registered and/or used in bad faith.

The Complaint should be dismissed for that reason in addition to the other reasons already given.

*/The Honorable Neil Anthony Brown QC/*
**The Honorable Neil Anthony Brown QC**
Dissenting Panelist
Date:  August 2, 2022

# Exhibit G

Page 1
https://web.archive.org/web/20220723024014/http://www.lambo.com/



# Exhibit H







**Page 4**
https://web.archive.org/web/20220723024635/https://www.namepros.com/threads/iam-lambo.1272956/#NEWSMEDIA.COM-BREAKING-NEWS:RDNH-THEFT-ATTEMPT-BY-Automob...

Impact: 9,855

---

**Joe123**
Established Member
Impact: 322

⏱ Later today at 2:01 AM                                                                ⟨ #14

> bmugford said: ⊕
>
> This is like Nissan 2.0.
>
> If they were smart they would just withdraw the UDRP and **make a substantial offer** if interested.
> Nissan came out of that looking like real assholes, and they still don't own the domain.
>
> Brad

Perhaps the equivalent of a new Countach @lambo.com?

∧  1  ∨     ⟪          Like    1   Thanks

---

**jhm**
Top Contributor
VIP
Impact: 9,943

⏱ Later today at 11:37 AM                                                               ⟨ #15

> bmugford said: ⊕
>
> This is like nissan 2.0.
>
> If they were smart they would just withdraw the UDRP and make a substantial offer if interested.
> Nissan came out of that looking like real assholes, and they still don't own the domain.
>
> Brad

A company like Lamborghini could easily make a substantial offer if they wanted to, you're right. For some reason, they'd rather flex their muscles

∧  4  ∨     ⟪          Like    2   Thanks

---

**OwnedWords**
Established Member
Impact:    51

⏱ Later today at 2:28 PM                                                                ⟨ #16

How do you justify your price if not related to the well known sport car brand?
How would you defend not just being a domain squatter if you've done nothing with the domain?

∧  -8  ∨     ⟪          Like    1   Thanks    1. Agree    3   Disagree

---

**noneisnone**
444
VIP
Gold Account
Impact: 2,420

⏱ Later today at 2:31 PM                                                                ⟨ #17

> OwnedWords said: ⊕
>
> How do you justify your price if not related to the well known sport car brand?
> How would you defend not just being a domain squatter if you've done nothing with the domain?

not how things work in the real world innocent until proven guilty ^^

∧  1  ∨     ⟪          Like    1   Thanks

---

**Millionaire**
Top Contributor
VIP
Impact: 1,688

⏱ Later today at 2:48 PM                                                                ⟨ #18

I'm so excited for this. Feel like the right person is found who can teach these m*fkers a good lesson who resort to these cheap & dirty ways to steal a domain. Good luck my man!

∧  3  ∨     ⟪          Like    1   Thanks

---

**Joe N**
Top Member
PRO
VIP
Impact: 7,804

⏱ Later today at 6:15 PM                                                                ⟨ #19

> OwnedWords said: ⊕
>
> How do you justify your price if not related to the well known sport car brand?
> How would you defend not just being a domain squatter if you've done nothing with the domain?

Asking prices don't require justification.

Squatting requires more than simply owning an undeveloped domain name. Otherwise there would be thousands of companies, sitting on unused domain names right now, who would be in huge trouble just for preparing for potential future projects.

                                                                    Last edited: Later today at 6:15 PM

∧  13  ∨     ⟪          Like    3   Thanks    2   Agree

---

**AEProgram**
Top Contributor
VIP
Blue Account
Impact: 5,600

⏱ Later today at 7:15 PM                                                                ⟨ #20

> OwnedWords said: ⊕
>
> How do you justify your price if not related to the well known sport car brand?
> How would you defend not just being a domain squatter if you've done nothing with the domain?

If I plan on developing a name I will set a high price. There are names I own that the only reason the price is high is because I might want to develop it but will sell it if someone pays that price.

∧  7  ∨     ⟪          Like    2   Thanks    2   Agree

---

**Intop**
Established Member

⏱ Later today at 10:45 PM                                                               ⟨ #21

all the luck in the world !!

I hope you will defend it as it deserves and hire the best lawyers.
In premium domains ESQwire are well known.

---

May 01, 2024: 10:10:22



# Exhibit I

PI_000609

**DOCUMENT PRODUCED NATIVELY**

PI_000609

**From:**          Rudy Bekker <rudy@rudybekker.com>
**Sent:**          Monday, April 17, 2023 8:05 AM
**To:**            Richard Blair
**Subject:**       Re: Lambo.com

What's your best price?

I am super interested

On Mon 17. Apr 2023 at 14:00, Richard Blair <rb@ceec.com> wrote:

I understand. Thanks anyway for your interest and best wishes.

Sent from Proton Mail mobile

-------- Original Message --------
On Apr 17, 2023, 12:57 PM, Rudy Bekker < rudy@rudybekker.com> wrote:

Sure thing!

This is a personal acquisition for my portfolio

https://www.linkedin.com/in/rudybekker

I am a software entrepreneur and investor

What sort of price are you looking for?

I am liquid but 50m is super crazy haha

Rudy

On Mon 17. Apr 2023 at 13:33, Richard Blair <rb@ceec.com> wrote:

> Tell me about the nature of your inquiry, is this a domain name you seek for personal acquisition or do you represent a third party?
>
> Regarding price, I would be agreeable to a near all cash offer if ready to close.
>
>
> Sent from Proton Mail mobile
>
>
>
> -------- Original Message --------
> On Apr 17, 2023, 12:21 PM, Rudy Bekker < rudy@rudybekker.com> wrote:
>
>> Are you negotiable at all?
>>
>>
>> On Mon, Apr 17, 2023 at 1:08 PM Richard Blair <rb@ceec.com> wrote:
>>
>>> my domain
>>>
>>>
>>> Sent from Proton Mail mobile
>>>
>>>
>>>
>>> -------- Original Message --------
>>> On Apr 17, 2023, 10:32 AM, Rudy Bekker < rudy@rudybekker.com> wrote:
>>>
>>>> Is this your domain or are you a broker?
>>>>
>>>>
>>>> On Mon 17. Apr 2023 at 11:05, Richard Blair <rb@ceec.com> wrote:
>>>>
>>>>> Hello,
>>>>> I am responding to your inquiry. Price as shown, if you are interested you can use the buy now button and checkout via escrow.com. If you have any questions let me know.

2

Regards,
Richard


Sent from Proton Mail mobile

# Exhibit J



# Exhibit K

PI_000589

**DOCUMENT PRODUCED NATIVELY**

PI_000589

---

| **From:** | Epik Registrar <support@epik.com> |
|---|---|
| **Sent:** | Wednesday, December 23, 2020 3:45 PM |
| **To:** | r.blair@gax.com |
| **Subject:** | Confirmation for Epik Marketplace listing of lambo.com |

Epik.com   |   Domains   |   Products   |   Services   |   Marketplace

Legendary Customer Support: +1.425-366-8810



# Building Domains. Building Markets.

Dear Richard,

Your marketplace listing for lambo.com is now confirmed. The settings for the listing are as follows:

Selling Price: $1,500,000.00

Financing Price: Not Applicable

Offers allowed: YES

Persons who are interested in your domain  can now see your domain listing here:
LAMBO.COM

Inquiries about your domain will be routed directly to your email for review. Upon a successful transaction, funds will be immediately deposited into your Masterbucks account.

Masterbucks are transferable and never expire. You can also withdraw MasterBucks as cash, though processing fees may apply.

To maximize visibility of your new Marketplace listing, here are some ways that you can promote your marketplace listing to prospective buyers

## Share Your Marketplace Listing Link

## https://www.epik.com/buy/LAMBO.COM

Sincerely,
Marketplace Operations
Epik.com

Email: support@epik.com
Tel: +1.425-366-8810

epik

Email: info@epik.com
Website: www.epik.com
Tel: +1.425-366-8810

Epik LLC
PO Box 742
Bellevue, WA 98009, USA

**Domains:** Search for a Domain    Registration    Transfers    Backorders    Auctions    WHOIS

**Products:** epik | eCommerce    epik | Directory    epik | Lead Gen    epik | Recipe    epik | Video    epik | Hosting

**Services:** Web site design    Custom Development    Monetization    SEO    Content Creation    Payment Processing

To ensure delivery to your inbox, please add newsletter@epik.com to your address book. Don't want this?

2

# Exhibit L

PI_000590

**DOCUMENT PRODUCED NATIVELY**

PI_000590

| | |
|---|---|
| **From:** | Epik Registrar <support@epik.com> |
| **Sent:** | Wednesday, January 27, 2021 12:14 PM |
| **To:** | r.blair@gax.com |
| **Subject:** | Confirmation for Epik Marketplace listing of lambo.com |

Epik.com   |   Domains   |   Products   |   Services   |   Marketplace

Legendary Customer Support: +1.425-366-8810

# epik.

## Building Domains. Building Markets.

Dear Richard,

Your marketplace listing for lambo.com is now confirmed. The settings for the listing are as follows:

Selling Price: $3,300,000.00

Financing Price: Not Applicable

Offers allowed: YES

Persons who are interested in your domain  can now see your domain listing here:
LAMBO.COM

Inquiries about your domain will be routed directly to your email for review. Upon a successful transaction, funds will be immediately deposited into your Masterbucks account.

Masterbucks are transferable and never expire. You can also withdraw MasterBucks as cash, though processing fees may apply.

To maximize visibility of your new Marketplace listing, here are some ways that you can promote your marketplace listing to prospective buyers

## Share Your Marketplace Listing Link

## https://www.epik.com/buy/LAMBO.COM

Sincerely,
Marketplace Operations
Epik.com

Email: support@epik.com
Tel: +1.425-366-8810

epik.

Email: info@epik.com
Website: www.epik.com
Tel: +1.425-366-8810

Epik LLC
PO Box 742
Bellevue, WA 98009, USA

**Domains:** Search for a Domain    Registration    Transfers    Backorders    Auctions    WHOIS

**Products:** epik | eCommerce    epik | Directory    epik | Lead Gen    epik | Recipe    epik | Video    epik | Hosting

**Services:** Web site design    Custom Development    Monetization    SEO    Content Creation    Payment Processing

To ensure delivery to your inbox, please add newsletter@epik.com to your address book. Don't want this?

2

# Exhibit M



# Exhibit N



**Page 1**
**https://web.archive.org/web/20220811215042/https://lambo.com/**



Page 2
https://web.archive.org/web/20220811215042/https://lambo.com/

# Exhibit O





# Exhibit P

# The Domain Name
# lambo.com
## Is For Sale!

This premium domain name may be available for purchase!



### Buy safely and securely with Escrow.com

When buying lambo.com, your transaction is securely processed by Escrow.com, a licensed escrow company.

**lambo.com - USD 75,000,000**

 Buy now    ❯ Or make an offer

# Exhibit Q

PI_000571

**DOCUMENT PRODUCED NATIVELY**

PI_000571

| | |
|---|---|
| **From:** | Efty.com <no-reply@efty.com> |
| **Sent:** | Thursday, November 10, 2022 3:00 PM |
| **To:** | RB |
| **Subject:** | New inquiry for Lambo.com |



Hi RB,

We are pleased to inform you that a potential buyer has made an offer for Lambo.com.

**Domain**

Lambo.com

**Name**

jimmy lamborghini

**Email**

coollambo@gmail.com

**Phone**

4086767678

**IP Address**

143.254.201.243

**Location (IP)**

San Jose - US

**Offer**

100000000000

**Message**

*i would love for my new compartment for lamborghini. this will be to see designs and vote on for new lambos. Thanks bro😄*

1

You can reach out to the interested party by phone or email. This inquiry will also be saved in your Efty account as well as the individual domain name record.

You can send this inquiry to your broker from your inquiry overview. You can also initiate an escrow transaction from within your Efty account for the domain as soon as both parties have agreed on the final sales price.

Here's to more sales,

Team Efty

**Sign in**

# Exhibit R

PI_000583

**DOCUMENT PRODUCED NATIVELY**

PI_000583

| | |
|---|---|
| **From:** | Efty.com <no-reply@efty.com> |
| **Sent:** | Monday, April 17, 2023 2:18 AM |
| **To:** | RB |
| **Subject:** | New inquiry for Lambo.com |



Hi RB,

We are pleased to inform you that a potential buyer has made an offer for Lambo.com.

**Domain**

Lambo.com

**Name**

Rudy Bekker

**Email**

rudy@rudybekker.com

**Phone**

+31611291172

**IP Address**

84.28.171.113

**Location (IP)**

Geleen - NL

**Offer**

50000000.00

**Message**

*How much do you want for the domain? very interested*

You can reach out to the interested party by phone or email. This inquiry will also be saved in your Efty account as well as the individual domain name record.

You can send this inquiry to your broker from your inquiry overview. You can also initiate an escrow transaction from within your Efty account for the domain as soon as both parties have agreed on the final sales price.

Here's to more sales,

Team Efty

**Sign in**

# Exhibit S

PI_000595

**DOCUMENT PRODUCED NATIVELY**

PI_000595

| | |
|---|---|
| **From:** | r.blair@gax.com |
| **Sent:** | Wednesday, January 6, 2021 8:06 PM |
| **To:** | rob@epik.com |
| **Subject:** | Re: Interested in the domain: lambo.com |
| **Attachments:** | publickey - EmailAddress(s=r.blair@gax.com) - 0x86811FBC.asc |

$888,888

Sent from ProtonMail mobile

-------- Original Message --------
On Jan 5, 2021, 3:37 PM, Rob Monster < rob@epik.com> wrote:

> Hi Richard,
>
> Happy New Year!
>
> Nice opening offer here. What is the reserve?
>
> Regards,
> Rob



**Rob Monster | Founder and CEO**

**Epik Holdings Inc.**
Telegram: robmonster | Website:http://www.epik.com/
Mobile: 1.425-765-0077 | WeChat: robmonster
Skype: robertmonster | Twitter: robmonster

On January 5, 2021 at 3:20:38 PM, Epik Registrar (support@epik.com) wrote:


Solutions for Digital Empowerment

**Legendary Customer Support:**
Tel: (888) 894-9026 | (425) 366-8810
Email: support@epik.com

---

To ensure delivery to your inbox, please add newsletter@epik.com to your address book.

---

**Epik.com | Terms of Use | Privacy Policy | Contact Us**

Epik LLC, PO Box 742, Bellevue, WA 98009, USA

### Interested in the domain: lambo.com

Dear Richard,

A new offer has been made for your domain name: **lambo.com**

### Amount Offered For Sale: $100000.00

**Respond to Offer**

### Buyer Information:

Name: daniel
Email: danielpreformante@gmail.com
Phone: 910-736-7263
IP: 73.152.96.216
Comments: why is it so expensive 100k take it or leave it

2



To view your offer details **Click Here**

Sincerely,

Epik.com

Email: support@epik.com

Tel: 425-366-8810

# Exhibit T

```
                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF ARIZONA

                  _____


Richard Blair,                   )
                                 )
               Plaintiff,        )   2:22-cv-01439-ROS
v.                               )
                                 )   Phoenix, Arizona
Automobili Lamborghini S.p.A.,   )   April 9, 2024
                                 )   11:03 a.m.
               Defendants.       )
_____  )
```

**BEFORE:  THE HONORABLE ROSLYN O. SILVER, SENIOR JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**


**<u>TELEPHONIC INTERIM STATUS CONFERENCE</u>**

```
Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251
```

```
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
```

2

```
 1                    A P P E A R A N C E S

 2                             ***

 3   ON BEHALF OF PLAINTIFF:

 4       LEWIS & LIN, LLC
         BY:  Brett Evan Lewis, Esq.
 5            Shuyu Want, Esq.
         77 Sands Street, 6th Floor
 6       Brooklyn, New York 11201

 7
     ON BEHALF OF DEFENDANT:
 8
         STERNE KESSLER GOLDSTEIN & FOX, PLLC
 9       BY:  Nicolas J. Nowak, Esq.
         110 K Street, 10th Floor
10       Washington, D.C.  20005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | *(Proceedings begin at 11:03 a.m.)* |
| 3 | COURTROOM DEPUTY:  We're on the record in civil case |
| 4 | No. CV22-1439, Richard Blair versus Automobili Lamborghini |
| 5 | S.p.A. set before the Court for an intern status conference. |
| 6 | Counsel, please announce your appearances beginning |
| 7 | with plaintiff. |
| 8 | MR. LEWIS:  This is Brett Lewis from Lewis & Lin, |
| 9 | LLC, for plaintiff Richard Blair, Your Honor, and also with me |
| 10 | is... |
| 11 | MS. WANG:  This is Shuyu Wang of Lewis & Lin also |
| 12 | for plaintiff Richard Blair. |
| 13 | THE COURT:  Thank you. |
| 14 | MR. NOWAK:  And -- oop, I'm sorry. |
| 15 | THE COURT:  Okay, defendant? |
| 16 | MR. NOWAK:  Nicholas Nowak with Sterne, Kessler, |
| 17 | Goldstein & Fox for the defendant Lamborghini. |
| 18 | THE COURT:  All right, counsel.  I received your -- |
| 19 | your memorandum and the status report for the purpose of this |
| 20 | hearing.  Let me give you a little background. |
| 21 | I'm not sure that any of you have been before me, |
| 22 | but I hold these conferences in advance of filing -- any |
| 23 | filing of a Motion for Summary Judgment for us to discuss |
| 24 | whether it's appropriate for a motion to be filed and, if not, |
| 25 | then one shouldn't be filed.  If it is appropriate to file it, |

1  then I welcome your filing it.

2          I don't preclude anyone from filing summary

3  judgment, but after our conversation if it appears to me --

4  and I hopefully have persuaded you -- that a summary judgment

5  is not appropriate, then it would be well deserved not to file

6  a Motion for Summary Judgment because then it would appear to

7  be a not well-received motion by the Court.

8          So we have a number of things to decide here.  I'm

9  looking for evidence since it is the defendants who wish to

10  file a summary judgement motion, and that would be based on

11  filing a summary judgment motion in your favor and against the

12  plaintiff on his claims and then a summary judgment motion

13  based on your claims.

14          So this is what I understand this to be is that it's

15  really, more than anything else, a question of whether or not

16  there is cybersquatting; and I understand the facts to be

17  this, and please correct me if I'm wrong:  That in about 2000

18  that the plaintiff registered the name Lambo and has held that

19  registration to today, and in about 2005 Lamborghini filed a

20  -- or registered the name Lambo with the World Intellectual, I

21  think, Property Organization, and I may have that wrong.

22  WIPO, I believe.

23          And so the dispute is then -- the plaintiff claims

24  that the -- although the defendant does also have a trademark

25  for Lamborghini and that has been held for over 30 years, as I

5

```
 1   understand it, and it is certainly a well-known trademark for
 2   a luxury car.
 3        So as I -- as I understand it, the question is
 4   whether Lamborghini can show the right to Lambo, that is, the
 5   registrated name -- registered name is confusingly similar or
 6   a well-known nickname for Lamborghini, and that has to be
 7   established as a matter of law.
 8        So maybe it can be.  Maybe there's case law that
 9   would persuade me that there are no factual issues, but I
10   would like to hear from defense counsel to tell me what you
11   have to show that.
12        MR. NOWAK:  Well, Your Honor, we do have case that
13   for that particular point.  This is Nick Nowak again for --
14   for the defendants.
15        For that particular point, you're right, we think it
16   comes down to it's a question of law and you look at -- under
17   the ACPA, confusingly similar is actually a narrower
18   determination than under other trademark law.
19        So it's a narrower determination, and if you look at
20   the trademark and you look at the domain and domain does
21   nothing more than add or subtract some letters off of the
22   trademark.  So then you're confusingly similar, particularly
23   in a case like this, as you've already pointed out, Your
24   Honor, where the trademark is famous, like the Lamborghini
25   mark.
```

6

```
 1            THE COURT:  Okay.  So when you say you have case law
 2   that establishes it, as I said, you know, this is an issue --
 3   are you starting with evidence to start?
 4            So, in other words, what do you have to show that
 5   it's confusingly similar to the well-known Lamborghini
 6   protected name?
 7            MR. NOWAK:  Your Honor, the law is just that you
 8   look at and make a comparison.  So you look -- you look at the
 9   -- at the -- at the trademark.  You look at the domain name
10   and if they're close enough, in your estimation, with regard
11   to -- particularly with regarding case law and the case law --
12   once you take a look at the case law, Your Honor -- and we'll
13   obviously submit that with our briefing.
14            If you look at case law, you don't even have to be
15   that close, Your Honor, but here we think it's a pretty close
16   case.  All the domain name does is lop off the end of
17   Lamborghini and it's Lambo, and so that in and of itself makes
18   it similarly confusing and therefore -- and that's -- that's
19   really -- we don't even need to go farther than that, Your
20   Honor.
21            THE COURT:  So, you know, I have to say to both and,
22   in particular, counsel Mr. Lewis, that the name Lambo is often
23   thought -- I'm not going to say as a matter of law -- as
24   pertaining to Lamborghini and not anything else.
25            As a matter of fact, as I understand the facts here,
```

7

```
 1   I believe Mr. Blair is a -- he claims that this is a moniker
 2   he uses on-line, but I don't know what that means; and he's
 3   never attempted to sell it, but he has 150 of these registered
 4   names.
 5           So what does Mr. Blair -- what does he mean,
 6   Mr. Nowak or Ms. Watt, by a "moniker" and why would that
 7   protect him?  I mean, he's --
 8           MR. NOWAK:  Your Honor, did you --
 9           THE COURT:  Am I correct that there's something of
10   150 different known domain names he's registered, and are any
11   of them being used by him for business purposes?
12           MR. LEWIS:  Your Honor, did you intend -- this is
13   Mr. Lewis.  Did you intend that question for the plaintiff to
14   explain?
15           THE COURT:  No, I'm asking the defendant.
16           MR. LEWIS:  Okay.  Fair enough, I apologize.
17           MR. NOWAK:  Yeah, so -- so let me back up.  This is
18   Nick Nowak again.  Let me back up, Your Honor, a little bit.
19           So -- so under the ACPA, for Lamborghini to prevail,
20   right, under the ACPA we have to show -- we have to show,
21   essentially, three things.
22           One -- and you may know this, but I just want to
23   make sure that we're all on the same page.
24           We have to show, one, that the domain name was owner
25   registered, trafficked in or used in the disputed domain.
```

1   That's the first element that we have to prove.

2       We don't think there's any question with regard to

3   that.  He's clearly -- he's clearly registered -- Mr. Blair

4   has registered the domain.  We've already gone through that

5   particular exercise with our Motion to Dismiss.  So that's

6   established.

7       The second thing we have to establish is that the

8   domain name is confusingly similar.  In this case it's not

9   identical, but it's confusingly similar to a protected mark.

10  That's what we're -- obviously, we were just talking about,

11  right, whether Lamborghini, the protected mark, is -- well, or

12  whether Lambo is confusingly similar to the protected mark

13  Lamborghini.

14      We think that it is, and that's really just the

15  question of law, Your Honor, and we don't think it's even a

16  close question in this case that it is, in fact, confusingly

17  similar.

18      The third element that we then have to show, Your

19  Honor, is that the domain name owner acted in bad faith with

20  intent to profit.

21      Now, there are a whole bunch of factors under that

22  the Court and fact finders look at --

23          THE COURT:  Yeah, I am aware --

24          MR. NOWAK:  -- and so --

25          THE COURT:  -- of a whole list of those factors --

```
 1              MR. NOWAK:  Right.
 2              THE COURT:  -- that I am aware of.
 3         So where are you going with all of this?
 4              MR. NOWAK:  Well, so that one -- that factor -- that
 5    issue of whether it's a moniker or a name that Mr. Blair goes
 6    by goes to whether or not there's bad faith.  That's one of
 7    the sort of sub element that courts can look at to determine
 8    whether or not there's been bad faith.
 9              THE COURT:  Okay.  Let me --
10              MR. NOWAK:  So that -- that is one --
11              THE COURT:  Let me explore that for a minute.
12         So the word "moniker," does that have a particular
13    use or understanding in the context of this type of case?
14         Is it -- is it protected somehow if somebody --
15              MR. NOWAK:  Not that I'm aware --
16              THE COURT:  Go ahead.
17              MR. NOWAK:  So the -- so the element as it's spelled
18    out under the ACPA, that I believe this would fall under said
19    that to the extent the domain name consists of the legal name
20    of the person who owns the domain or a name that is otherwise
21    commonly used to identify that person.
22         So it's clearly not Mr. Blair's legal name.  I don't
23    think Mr. Blair's asserting that.  He may be asserting that it
24    is a -- sort of a -- something that people call him at some
25    point in time.  We -- we have -- we don't agree that that's
```

```
 1  the case.  We don't agree that the way he alleges to use the
 2  name Lambo for himself meets the element under the bad faith
 3  analysis --
 4          THE COURT:  Okay, let me stop --
 5          MR. NOWAK:  -- to win the day for him.
 6          THE COURT:  You're helping me, Mr. Nowak.  I did not
 7  understand, as I mentioned, what a "moniker" is.
 8          So a moniker can be a name that he goes by.  In
 9  other words, people call him Mr. Lambo or he uses it as a
10  nickname, I take it, right?
11          Is there a definition of a "moniker"?
12          MR. NOWAK:  That's what he -- that's what he
13  alleged.
14          THE COURT:  Okay.
15          MR. NOWAK:  It's not my definition so I -- I don't
16  know what --
17          THE COURT:  But the law is -- and that's how he's
18  attempting to get by your argument that this is being used in
19  bad faith, correct, Mr. Nowak?
20          MR. NOWAK:  That's right.  That's right, Your Honor.
21  Yes, as far as I understand -- as far as I understand it.
22          We actually don't agree that he's even known by that
23  name, and we don't think that that's -- we don't think that
24  that's -- we don't think that that's an undisputed fact.  We
25  obviously dispute that fact, but I will let you know, Your
```

 1   Honor, that even if it's an undisputed fact, I think the

 2   factors still weigh in favor of a finding of bad faith even if

 3   you were to assume that he sort of wins under that particular

 4   element or that he, in fact, goes by the name Lambo even

 5   though we dispute -- we dispute that.

 6           I will point out, too, Your Honor, that allegedly he

 7   started going by Lambo to some degree only after he acquired

 8   the domain name --

 9           THE COURT:  Okay.  So --

10           MR. NOWAK:  -- which we think also has some bearing

11   on the inquiry.

12           THE COURT:  Okay.  You obviously have attempted to

13   settle this case.  So each of you know what the -- what your

14   counterpart's position is, but let me turn back to the central

15   first issue -- I should say the preliminary issue, which is

16   whether or not it is confusingly similar, and you have -- I

17   think you said in your -- and I'm looking to see that there's

18   evidence to show that it's confusingly similar and that if

19   that evidence, I ask you first, is admissible, what's the

20   nature of that evidence and could I make a finding?  'Cuz

21   that's what you want me to do before I get to the issue of bad

22   faith, correct?

23           MR. NOWAK:  That's right -- that's right, your

24   Honor, you'd have to find that it is, in fact, confusingly

25   similar and courts do that -- do that routinely on summary

```
 1   judgment, find that -- find that the names are confusingly
 2   similar to trademarks on summary judgment and it's -- and we
 3   don't -- we don't -- honestly, Your Honor, we can't -- we have
 4   evidence -- I mean, you have -- you can look -- you can look
 5   on-line -- you can do a Google search and -- for "Lambo" and
 6   all of the -- all of the -- all of the -- the results that
 7   turn up are all related to Lamborghini the auto maker.
 8              THE COURT:  Okay.
 9              MR. NOWAK:  But we don't even think that we have to
10   show that evidence, Your Honor.  It's really a legal
11   determination.  It's quite straightforward under the case law,
12   and I'll point out to Your Honor that neither party here has
13   requested a jury trial.  So Your Honor would be making the
14   determination in any event --
15              THE COURT:  Okay.
16              MR. NOWAK:  -- if we got there.
17              THE COURT:  That's interesting.  Okay, but would I
18   need to hear evidence?  Would I need to have testimony?
19              MR. NOWAK:  No, Your Honor, we -- we don't think so.
20   All you need to know -- we have the -- we have the
21   registration and we submit a declaration with -- you know,
22   with the registration and that's pretty much all you need.
23              You need the registration.  We have case law -- we
24   have other case law that's already found that Lamborghini is a
25   famous and well-known trademark, and then you make the
```

```
 1   determination that it's confusingly similar or not.
 2          THE COURT:  Okay.  So what would you offer --
 3   because you've used the word "evidence," and I will tell you I
 4   have definitely heard the term "Lambo" with respect to
 5   Lamborghini.
 6          So what would you argue to me is that it is
 7   confusingly similar?  You have to have something to persuade
 8   me that it's not just that I have heard it before, but that it
 9   is confusingly similar.  What do you have?
10          MR. NOWAK:  Well, we have Google results that we
11   could submit.  We have -- and that's generally -- that's the
12   extent of our evidence, Your Honor, other than the fact that
13   the Lamborghini mark because it's -- because of its status as
14   a famous mark is -- is given preferential treatment over other
15   marks that aren't -- that aren't so famous, Your Honor; and,
16   in fact, all you then have to do under the ACPA -- the inquiry
17   is very narrow.
18          All you have to do is look to see whether the famous
19   mark as it's in the domain is identical or confusingly
20   similar.  Again, it can be confusingly similar only if it's
21   added some letters or taken some letters off of the trademark.
22          For instance, there's case law, Your Honor -- I
23   think -- this is sort of opposite of what we have, but there's
24   case law that says, for instance, the domain name
25   Trumpdubai.com is confusingly similar to Trump, the trademark.
```

```
 1            So that's sort of the opposite situation we have.
 2   We have a situation in which letters have been lopped off the
 3   end of the trademark --
 4            THE COURT:  Okay.
 5            MR. NOWAK:  -- but it's similar in the sense that
 6   the domains don't have to be identical to be confusingly
 7   similar, obviously.
 8            THE COURT:  Okay.  So far they don't have to be
 9   identical.  I agree with that, and you said that you would
10   offer something from Google.  I presume that that would be
11   admissible.
12            In other words, there wouldn't be issues as to
13   whether or not foundation could be laid, but you would offer
14   information or evidence that comes from Google that shows that
15   the name Lambo or the word "Lambo" is often, if not very
16   often, associated with Lamborghini?
17            Is that what I understand you to say?
18            MR. NOWAK:  You're right.  You're right, Your Honor.
19            I'd like to point out one other piece here that
20   really -- really, if you look at the case law, the case law --
21   the focus of the case law is really whether there's been bad
22   faith here.
23            I mean, what is confusingly similar, we think it is,
24   but really when you look at -- under the -- in the case law --
25   we'll cite case law that says essentially that the inquiry
```

 1   really isn't -- part of the inquiry is whether it's

 2   confusingly similar, but the over-arching inquiry under the

 3   ACPA is really the bad faith inquiry, and we think there's

 4   very strong evidence on -- overall with regard to bad faith

 5   here as well and --

 6              THE COURT:  Yeah, I -- we're -- Mr. Nowak, we're

 7   going to get there in a minute.  I just want to get across the

 8   first line because we're dealing with summary judgment here,

 9   and I presume you'll have plenty of cases that are similar

10   that are going to -- where the Court took some evidence and

11   they were so substantially similar and I have -- I'm

12   understanding you to mean -- well, first of all, Lamborghini

13   has been a well-known -- well, it's a trademark for 30 years

14   and that the name Lambo has been used commonly in connection

15   with Lamborghini and not anything else.

16              Is that what you're saying?

17              I don't know of anything -- any other association

18   with the name Lambo other than Lamborghini, and then I'll ask

19   the plaintiffs in a moment.  Is that what you're going to say?

20              MR. NOWAK:  That -- that is -- this is what we

21   are --

22              THE COURT:  Yeah, I don't -- Mr. Lewis, what other

23   product or person, you know, place, like a noun, what other --

24   what other individual has been ever associated with the name

25   Lambo or product or something?

```
 1            MR. LEWIS:  Your Honor, we anticipated your question
 2   about 30 seconds to a minute ago.  So we had actually listed
 3   these somewhere, I believe in either some of our production or
 4   in our -- it might have been in prior papers that were filed
 5   in connection with the EDRP, but there are a number.
 6            It's not an exclusive association with Lamborghini.
 7   It may be that Lamborghini is more widely referred to by the
 8   nickname Lambo than some of the other uses, but there most
 9   certainly are other uses.
10            THE COURT:  Well, give me an example.  That's what
11   I'm asking for.  I've never heard any before.
12            MR. LEWIS:  I understand --
13            THE COURT:  And we can talk about this just because,
14   as Mr. Nowak said, I'm going to be the finder of fact on this.
15   So, you know, it seems to me that we're talking about this
16   issue as if I am the jury.
17            What are you going to offer that makes it -- that
18   makes it not confusingly similar?
19            MR. LEWIS:  Well, Your Honor, just -- just doing a
20   little Google search here, there was a film under the name
21   Lambo in 2017.  There's another individual who's known by Ben,
22   quote, "Lambo" Lambert with an Instagram handle @lambolambo.
23            We had a number of them.  We could find more.  We
24   have a list somewhere.  I wasn't necessarily prepared for this
25   exact question today, but we could provide the Court with a
```

```
 1   list and perhaps by the end of this call we'll have more of
 2   them.
 3           THE COURT:  Well, of course, this is all facts; and
 4   I know none of you have appeared before me before on a status
 5   conference, which is it's designed to say what is a Federal
 6   Rule of Civil Procedure to make sure we don't waste any time,
 7   and that's why we're going through all of this right now so
 8   you understand and I'm -- I don't mean to be dragging this out
 9   of you, but I want to save time.
10           I don't want a Motion for Summary Judgment to be
11   filed if there are issues of fact, if I can't make the finding
12   that it is confusingly similar.
13           Even if, Mr. Lewis, you can pull things out of,
14   let's say, Google, just as Mr. Nowak can, what is there that
15   is going to lead me to say it's not confusingly similar?
16           MR. LEWIS:  Now, Your Honor, are you speaking of the
17   first inquiry Lambo --
18           THE COURT:  Absolutely, the first inquiry.  I want
19   to get past that, and it seems to me that Mr. Nowak has a very
20   good case for summary judgment on whether or not it's
21   confusingly similar, and I'm waiting for you to offer me
22   anything that would persuade me otherwise.
23           MR. LEWIS:  Well, Your Honor, I might -- I might
24   surprise the Court.  I believe in being straight with the
25   Court, whether Your Honor or other judges, and I'm not going
```

18

```
 1    to make an argument for the sake of making it.
 2              Lambo is not a registered trademark of Lamborghini.
 3    However, it is a term that is commonly associated with the
 4    Lamborghini car; and so from the context of an ACPA claim, I
 5    tend to agree with Mr. Nowak that it is likely that the
 6    confusing similarity threshold would be met.
 7              THE COURT:  Okay.
 8              MR. LEWIS:  Just by the fact of Lambo v.
 9    Lamborghini --
10              THE COURT:  Okay.
11              MR. LEWIS:  -- I'm not going to argue that's not the
12    case.  I believe this case rises and falls on the question of
13    intent --
14              THE COURT:  Okay, so there's --
15              MR. LEWIS:  -- and bad faith.
16              THE COURT:  Okay, that's excellent.  I guess that is
17    where I was going and just wanting to make clear.
18              So that issue is out of the way, it seems, and you
19    don't have to -- you don't have to stipulate to that now.  It
20    seems to me you both agree that it is confusingly similar.
21              Then the next question is bad faith.  There, I know
22    there was a whole number of different criteria for the Court
23    to judge whether or not it's in bad faith.  So let's start.
24              Mr. Nowak, why is it in bad faith?  Why was it in
25    bad faith?
```

| 1 | MR. NOWAK:  Well, so I'm not -- I'm not going to go |
|---|---|

1    MR. NOWAK:  Well, so I'm not -- I'm not going to go

2  -- I'll just highlight the factors -- the bad faith factors as

3  enumerated in the statute, although Your Honor should be aware

4  that that's not an exhaustive list.  You can look outside of

5  that, but I'll just enumerate at least the three most

6  important ones that we think under bad faith are undisputed.

7    It's undisputed that Mr. Blair has no trademark or

8  other intellectual property rights in the domain name, unlike

9  -- unlike Lamborghini.

10    THE COURT:  And so what is that -- and that is one

11  of the first factors, right?  So that he's using it --

12    MR. NOWAK:  That's right, and we think it's --

13    THE COURT:  So he's using this for a commercial

14  purpose, not as a personal --

15    MR. NOWAK:  Well, so -- one of -- yeah, one of the

16  first factors is whether he has or has not intellectual

17  property rights in the domain, and he doesn't.  He has no

18  trademark and no other intellectual property rights in the

19  domain name.

20    So then there are other -- there are two other

21  factors that I'm going to combine, but we think it's

22  undisputed he has made no commercial or non-commercial use of

23  the domain name.  So he's not -- he's not using it, Your

24  Honor.  There's no fair use here.  It's essentially if you go

25  on his -- if you go to the domain's name, you'll see that it's

```
 1   for sale.

 2            And the other factor that we think weighs heavily in

 3   favor of a finding of bad faith is that, in fact, as soon as

 4   he acquired it he listed it for sale, and it's still listed

 5   for sale if you go to the web website.

 6            There's a period of time where it wasn't listed for

 7   sale and he put up some threads about the -- you know, the

 8   EDRP, the WIPO CASE onto the website but it -- for the most --

 9   for the most part it's been listed for sale the entire time

10   starting, I think -- if I have my numbers correct, he starting

11   listing it for sale for 1.2 million dollars some time ago.

12            He essentially increased that price over time up to

13   now 75 million dollars, which may sound outrageous, Your

14   Honor, and it certainly is outrageous, 75 million dollars for

15   the domain name, to buy it, but he has, in fact, and he's

16   produced documents and he has, in fact, listened to offers and

17   entertained offers to buy the domain very -- up until very

18   recently, I think into late 2023.  Last year he's still

19   offering -- he's still entertaining offers from third parties

20   to buy it.

21            So those are -- he's never offered it -- he's never

22   offered it to -- to Lamborghini.  He doesn't have to.  He

23   doesn't even have to offer it to a competitor for a finding of

24   bad faith.  All he has to do is offer it for sale to a third

25   party, and we think those three factors --
```

```
 1              THE COURT:  I'm sorry to break your stride here.
 2              Did you say that he has offered it to a third party
 3    for something in the nature of a million dollars?
 4              MR. NOWAK:  Well, if I have my numbers correctly,
 5    it's based on the information that Mr. Blair's produced in the
 6    case to us.  At the very -- when he first offered it for sale,
 7    it was for sale for about a million two, a million -- 1.2
 8    million dollars or something like that.
 9              He has steadily increased it over time, the asking
10    price, at least as it's listed on-line; and now I think if you
11    go to the website it says for sale for 75 million dollars or
12    something like that, but he has entertained offers to buy from
13    third parties the domain name and he had -- continues to do
14    that.
15              THE COURT:  Okay.
16              MR. NOWAK:  And that, Your Honor, is -- that is --
17    that is actually a strong factor, we believe, in a finding of
18    bad faith, Your Honor.
19              THE COURT:  And I understand that, all right.
20              So, Mr. Lewis, what is your response to these facts?
21              Are they undisputed?  And if they are not
22    undisputed, tell me.  And if they are -- you know, if they're
23    disputed, let me know.  If they're not -- if they are
24    undisputed, tell me what your response is.
25              MR. LEWIS:  Yes, of course, Your Honor.
```

22

1    So they're all disputed to varying degrees, and then

2    there are other facts that Mr. Nowak did not address; but

3    starting with the claim that our client has no trademark or

4    other rights in the domain name.

5    Our client acquired the domain name -- Mr. Blair

6    acquired the domain name in February of 2018 from a prior

7    owner.  Starting shortly after he acquired the domain name, he

8    began using it as his on-line name.

9    So when we referred to "moniker," we were talking

10   about it's an on-line identity.  He created a logo of a lamb

11   with bull's horns and started saying that, "My name is Lambo,"

12   and he used it on various different forums, on the Internet.

13   He used it in a chess forum.  He used it on a domain name

14   forum, and it became his on-line identity.

15   So when we're talking about a moniker and when

16   Mr. Nowak says that Mr. Blair hasn't used the name and has no

17   legitimate rights to it, he actually used it as his name.

18   After he acquired it, he liked the sound of it and he decided

19   that this is what he wanted to be known as on-line.

20   So that point about not having rights in the name is

21   totally disputed, and our client began using it shortly after

22   he acquired it and so it wasn't until --

23   THE COURT:  Let me stop you, in order to save time,

24   I'm sorry.  Mr. Lewis, when you said he began using it, how

25   did he use it other than it was registered?

```
 1              MR. LEWIS:  Okay, Your Honor, I should -- I should
 2    be clear.  Our client uses the moniker Lambo and he called --
 3    he actually uses Lambo.com as his moniker.  It's not just
 4    Lambo but if you -- if the Court were to look at his NamePros
 5    account, I believe it says Lambo.com.
 6              THE COURT:  So when you say he's using it as a
 7    moniker, where is he using it?
 8              MR. LEWIS:  He's using it on websites on-line to
 9    identify himself.  It's his identity on the Internet space.
10              THE COURT:  Okay.  So why --
11              MR. LEWIS:  It is how people come to know him.
12              THE COURT:  Okay.  Why did he decide this should be
13    his identity?
14              MR. LEWIS:  Your Honor, that is a question that the
15    -- I mean, he liked the name.  If your -- if the Court is
16    asking me, he liked the name.  He -- so I -- I want to give
17    the Court a little bit of background in our client and what
18    other people who register domain names do.
19              It -- it sounds like from what Mr. Nowak was saying,
20    just registering a domain name and holding on to it and not
21    using it is somehow evidence of a bad faith intent or some
22    insidious purpose.
23              Mr. Blair owns over 130 domain names currently.
24    None of them are trademarks, none.  This is the only one that
25    -- arguably that anyone has ever accused him of registering
```

1    what they claim is a trademark.  That is the factor that cuts

2    against a finding of bad faith.

3            But the point is, if the Court were to look down the

4    list of 130-plus domain names, it would become apparent there

5    are things like ceec, c-e-e-c.com, or other generic-sounding

6    terms.  At one point he had coinex.com, c-o-i-n-e-x.com.

7            A number of his domain names have to deal with

8    cryptocurrency-type names.  They're dictionary words.  They're

9    fanciful terms that are clear, simple and marketable,

10   brandable terms.  He acquired this one, and then he liked it

11   as -- for the possibility that this could be used as an

12   identity.

13           So that is a question of fact.  It is -- it is not

14   a -- something which is hard and fast and clear; and if

15   Lamborghini had wanted to ask our client about why he

16   registered the domain name they could have deposed him, but

17   they chose not to; and so that is something which would be

18   left for trial and for the Court to assess and evaluate

19   whether the Court believes his explanation, but he should be

20   allowed the opportunity to explain why he registered the

21   domain name as a moniker and why it was appealing to him.

22           THE COURT:  So what are the -- why is he -- I'm

23   still having a little trouble when he has 150 of these

24   registered domains.  Compare it to something else and why he

25   chose this one and it just happened to be one that was

```
 1   trademark protected.
 2           MR. LEWIS:  Well, so it's -- it's not trademark
 3   protected, Your Honor.  "Lambo" itself is not trademark
 4   protected.
 5           THE COURT:  No, I meant but "Lamborghini" is
 6   trademark protected, yes?
 7           MR. LEWIS:  The -- so -- so here's a list of the
 8   names.  Like cheek, c-h-e-e-k.com, chinaflights.net,
 9   chinacoalgoals.net, chinese-coins.com, cigarroller.com,
10   coinex.com, computercase.com, datafeed.com, dnas.com.
11           None of these names are really -- lend themselves to
12   being used as a nickname.  Babywalker.com, blackthumbs.com,
13   byebye.com, artville.com, algar.com.  I guess he could have
14   called himself Algar, but that's kind of a strange-sounding
15   one.
16           Some of them are numbers like 1017.com.  He owns
17   sociology.com, pandacoins.com, c-e-e-c.com, and some of these
18   domains he is developing and he has developed into websites.
19   It is not -- some of them he sells, and some of theme he keeps
20   and develops.
21           All of them he lists for sale, and many of them he
22   lists for prices which a reasonable person could believe are
23   very, very high to insane; but it's his prerogative.  It's not
24   different than somebody who owns a piece of land and can
25   decide what price they want to offer to sell it for.
```

1          The fact I own a valuable or potential piece of

2   property somewhere and I choose to put it up for sale for 50

3   times what it's worth, well, no one's going to buy it; but it

4   doesn't give someone else the right to take it from me.

5          So unless he was targeting Lamborghini with the bad

6   faith attempt to profit off their trademark -- and he has

7   stated that he has zero intention of selling this domain name

8   to Lamborghini and when opposing counsel said he's

9   entertaining offers, he's rejected these offers.

10         He didn't negotiate with anyone.  He never

11  negotiated or made any kind of ask or even counter.  He has

12  rejected people who have inquired about buying this domain

13  name, and just to throw one other thing in there.

14         The fact that the name started at a certain price,

15  it increased over time relates directly to the fact our client

16  used this name as his identity, and as he became more tightly

17  integrated with the idea that this is his on-line identity.

18  It became more valuable to him, and he has posted on-line

19  about the fact just because he lists his domain names for sale

20  doesn't mean they're all really for sale.

21         So that is also a factual question.  It is not that

22  he actually thinks that someone's going to pay him 75 million

23  dollars for this domain name.  Increasing the price is more of

24  a telling the world that he's not selling it.  It might seem

25  an unorthodox way of doing that, Your Honor, but this is how

1  my client thinks.

2       THE COURT:  Okay.  So did he offer to sell this for

3  1.2 million?

4       MR. LEWIS:  There was a price in -- he had listed it

5  for somewhere around a million dollars originally shortly

6  after he acquired it.  I don't recall if it was 800 and

7  something thousand or if it was 1.2 million, as Mr. Nowak

8  states.  It's not materially different either way, and over

9  time he's increased the selling price on it.

10       Again, he's increased the selling price on a lot of

11  his domain names.  ceec.com, I believe, is listed for 30 or 40

12  million dollars.  I -- I can't imagine who would pay 30 or 40

13  million dollars for that name.  I don't want to draw my

14  client's ire by saying that; but if the Court were to look at

15  all of his sale prices for domains names, which are dictionary

16  words, completely legitimate domains, he tends to list them

17  for high prices.

18       So it's not the fact that in this case he did that

19  is a singularity that demonstrates that he's targeting

20  Lamborghini, and he's also a person who believes very strongly

21  in protecting his right.  If this was property, which it is,

22  but if this was real property, there are people that feel very

23  strongly about defending themselves against someone trying to

24  steal their property; and that's how our client views this,

25  that Lamborghini is attempting to steal his property.

28

1          There are many, many, many cases where there are

2     dictionary word domain names that are also adopted as

3     trademarks where the fact that a party uses that domain name

4     as a -- registers the domain name has nothing to do with the

5     trademark holder.

6          There are many cases of this, hundreds, thousands of

7     cases like this where someone registers a domain name that has

8     nothing to do with a trade -- but a trademark holder wants the

9     name, and so because they're identical they allege it's bad

10    faith.  Just because someone registered it they claim that

11    they had exclusive rights to it, but that is far from the case

12    here.  It is not the case as all.

13          THE COURT:  Okay.  So let me follow up on that,

14    though.  Lambo, even though that he claims he really likes

15    this name and it's his moniker and all of that and that it's

16    used by many others you said on -- you could make a -- or your

17    Google searches have shown that others use it and that's in

18    response to the question of whether or not it is confusingly

19    similar, I guess I'm having a problem understanding why Lambo,

20    the name, moniker Lambo is so valuable unless it is associated

21    with Lamborghini?

22          MR. LEWIS:  Your Honor --

23          THE COURT:  I mean, it's not as if someone adopted

24    the name Bozo and, you know, that name, of course, would be

25    associated -- he would decide that I'm a bozo and, therefore,

```
 1   that's my moniker.  This is so closely related to Lamborghini.
 2             MR. LEWIS:  Your Honor, that is the case in many,
 3   many situations where parties register a dictionary domain
 4   name -- dictionary word domain name and there also exists a
 5   trademark holder.
 6             However, at the same time, there exists other uses
 7   for that dictionary word.  The trademark holder does not own
 8   that word exclusively here.  Lamborghini's not even a
 9   trademark holder of Lambo.  It's a nickname that is not
10   trademark.  They're arguing confusing similarities, but
11   they're already taking a step out on the limb.  It's not the
12   same thing.
13             I have a -- I have another trademark here for Lambo
14   for teleconferencing and video services.  This is a
15   registered -- United States registered trademark that does not
16   belong to Lamborghini, and there's also another one.  Lambo as
17   an apparatus for tattooing, beard clippers, beard trimmers.
18   It's another federal registration not associated with
19   Lamborghini.
20             This term could be used for a myriad of uses that
21   have nothing to do with Lamborghini, and that's the point.
22   It's not that -- yeah, it could also refer to Lamborghini, but
23   it is the -- it is Lamborghini's burden to prove that that's
24   the reason why our client registered this domain name.
25             As to why he listed it for a million dollars
```

1   initially, Your Honor, he lists many of his domain names for a

2   million dollars, many of them.  The fact that he listed one

3   for a million dollars does not mean that he was targeting

4   Lamborghini.

5           It is -- it is evidence of the fact that he values

6   his domain names at high prices, and the fact that he's raised

7   the price on this domain name more than any other in his

8   portfolio is a reflection of how much he values it is and how

9   much he's willing to fight for it.

10          We've told counsel for Lamborghini our client will

11  not sell this domain name.  He does not want to sell it.  He's

12  not interested in selling.  He's not interested in being

13  bought out.  He doesn't want Lamborghini to have it or anybody

14  else.  If it would satisfy the Court, I might be able to talk

15  him out of -- we haven't touched the public sale listing for

16  fear of interfering with any -- any inferences in this case,

17  but our client is not interested in selling his domain name.

18          It's not why it's listed for 75 million dollars.  If

19  he was interested in selling it, he would list it for a price

20  that someone might actually pay; and so it's a factual

21  question.

22          THE COURT:  If tomorrow Lamborghini offered him that

23  35 million, he wouldn't take it?

24          MR. LEWIS:  He has told me that he would not take

25  it.

31

```
 1              THE COURT:  And he would testify to that under oath?
 2              MR. LEWIS:  He'll testify to it under oath, Your
 3    Honor.
 4              THE COURT:  Okay.  Mr. Lewis.
 5              MR. LEWIS:  Yes, Your Honor.
 6              THE COURT:  I'm mean, Mr. Nowak, I'm sorry.
 7              Mr. Nowak, in response to this we're dealing now --
 8              MR. NOWAK:  Yes, Your Honor.
 9              THE COURT:  Okay.  And why -- importantly, first of
10    all, we start with it has to be that there are no genuine
11    issues of material fact.  In other words, the facts are
12    undisputed, and you're moving for summary judgment.
13              So are we to take all of these facts that have been
14    offered by Mr. Lewis as undisputed?  And, of course, the other
15    aspect is that they have to be admissible evidence.  So what's
16    your response to that?  And then, is it relevant?
17              MR. NOWAK:  Yes, so on the -- since you brought it
18    up, Your Honor, on the admissibility issue, we think
19    Mr. Blair's going to run into all kinds of issues on
20    admissibility.  He -- he's only listed himself as a witness in
21    the case.  He's got nobody else to corroborate any of this
22    proposed testimony that he may offer at trial.  It's all
23    self-supervising.  A lot of it's hearsay, Your Honor.
24              So I think that we have -- if we're allowed to
25    file -- or if we go ahead with the summary judgment motion and
```

```
 1  they will put forward whatever they have in their opposition,

 2  I think, you know, we've got -- we've got some positions we

 3  are going to probably take on admissibility of the evidence

 4  because as you pointed out, the -- the evidence that they --

 5  that they put in on the summary -- on summary judgment has to

 6  be admissible at trial as well, as as ours.

 7          THE COURT:  Okay.  So let me -- let me stop you --

 8  let me stop you on that very important issue, and I appreciate

 9  you raising it, as I did.

10          So he's going to testify to a number of things.

11  Number one is that this name is his moniker.  He intends to

12  use it and it's very valuable to him.  Why can't he testify to

13  that?  It's his opinion.

14          MR. NOWAK:  Well, he could, Your Honor.  He could --

15  he could testify to that, and even if you take that as true,

16  Your Honor, for purposes of the summary judgment motion, we

17  still think we win because -- because the evidence shows that

18  he offers it for sale and he -- and he's produced documents to

19  us that show that he is still going back and forth with

20  individuals who want to buy it from him.

21          Now, they may not want to buy it for 75 million

22  dollars but -- but he is still -- he is still corresponding

23  with individuals who want to buy it from him and he's still

24  listing it for sale.  So I think the other --

25          THE COURT:  So your point would be -- your point
```

```
 1   would be on that is that that's a credibility issue?

 2              MR. NOWAK:  It's a credibility issue, but on summary

 3   judgment even if you take it as true I think we still win,

 4   Your Honor, because we still win -- we still win because the

 5   mark is famous.  Mr. Blair's already essentially conceded the

 6   confusingly similar issue here, and a lot of what he was

 7   pointing out with regard to other -- other -- other trademarks

 8   and other people using Lambo, that has to go to the

 9   confusingly similar point, Your Honor, which he's already

10   conceded it's confusingly similar on this telephone call.

11              So -- so that really doesn't bear on the question of

12   anything under bad faith.  Your Honor, we don't have to show

13   -- Mr. Blair -- Mr. Blair makes -- I'm sorry, Mr. Blair's

14   attorney, counsel for Mr. Blair, makes a big point of saying

15   that he's got all kinds of domains, right, that don't infringe

16   on anybody else's trademarks; and he's implying that that's

17   evidence of good faith, Your Honor.

18              We don't -- that's not the inquiry here, Your Honor.

19   It's bad faith.  It's bad faith.  We don't have to prove that

20   he's got -- that Mr. Blair has a hundred other domains that

21   potentially infringe other trademarks.  It could be one, ours,

22   period, that's it, that's it, and -- and we think that the

23   balance of the factors that we can prove in -- the balance of

24   the factors go to bad faith under the ACPA inquiry --

25              THE COURT:  Okay.
```

```
 1          MR. NOWAK:  -- and that's why we should win on
 2   summary judgment.  Even if you take, you know, some of these
 3   other -- other factors as true, as you -- as you -- you may
 4   have to under the summary judgment standard, right --
 5          THE COURT:  Okay.
 6          MR. NOWAK:  -- in evaluating this.
 7          THE COURT:  All right.  So I have a much better
 8   understanding of whether or not summary judgment is
 9   appropriate.  Seems to me there is a tentative agreement that
10   Lambo is confusingly similar to Lamborghini.  So then we're
11   dealing with bad faith.  There's a variety of different ways
12   to establish that.  I don't have a full understanding of what
13   the case law is on that.
14          You're both making some interesting points.  As I
15   mentioned to Mr. Lewis, I have some concern truly about his
16   offering this for 75 million dollars.  I don't know what he's
17   offered everything else.  It may be everything else is offered
18   for 75 million dollars, and maybe that isn't bad faith; and
19   the issue of his using it as a moniker, I have some questions
20   about that.
21          But importantly, as you both mentioned, which is
22   important for me to be cognizant of is that I will be the
23   trier of fact as it turns out.
24          So this may be -- may be a case for summary judgment
25   on the issue of bad faith, but the parameters are always that
```

```
 1  there must be admissible evidence and the undisputed evidence
 2  has to establish that there's bad faith or the undisputed
 3  evidence has to establish that there is not bad faith.
 4         I certainly do not have to hear from Mr. Blair to
 5  decide it on summary judgment, but I might have to hear
 6  Mr. Blair if, in fact, I cannot decide it based upon the
 7  undisputed admissible facts to establish or not establish bad
 8  faith.
 9         Have I made myself clear, Mr. Lewis?
10         MR. LEWIS:  Your Honor, generally speaking, yes.  I
11  have a question on some of the things that -- that counsel
12  said previously.  There were several misrepresentations.
13         THE COURT:  Okay.  Okay, if they're
14  misrepresentations, I'm not to decide that now.  I just want
15  to give you the framework.
16         So it's important now for both of you, whether you
17  settle it or not and whether we go forward on summary judgment
18  -- you go forward on summary judgment and I make a decision or
19  whether or not it's necessary for us to go to trial, that you
20  confer with each other with the legal guidelines for summary
21  judgment on bad faith.
22         So you said there's misrepresentations.  I don't
23  want to hear about them now, but you need to talk to Mr. Nowak
24  about those and whether or not those misrepresentations are
25  facts that you would offer to establish that there is no bad
```

 1  faith; and, of course, the overall issue, too, is case law.
 2  Is there case law on point that would lead me to finding bad
 3  faith or not?  So there you have it.
 4           All right.  Mr. Nowak, anything else or -- for us to
 5  discuss?
 6           MR. NOWAK:  No -- no, your Honor.  We -- we
 7  certainly appreciate the -- the time today.
 8           THE COURT:  Okay.  And I appreciate it, too, because
 9  whatever happens in the future I will be reminded of our
10  conversation, and I will have a transcript.
11           So I strongly urge you to decide between the two of
12  you what the evidence is that you would offer on whether or
13  not there's bad faith and whether that evidence is admissible
14  and is it undisputed?  Is it undisputed that I can decide it
15  on summary judgment?  If it's disputed and it's material, then
16  I can't decide it on summary judgment.
17           Okay, that's my last word.  Thank you, counsel, for
18  your very active, vigorous participation.
19           MR. NOWAK:  Thank you, your Honor.
20           MR. LEWIS:  Thank you, your Honor.
21           MR. NOWAK:  This is Mr. Nowak one more time before
22  we -- we convene, sorry -- or we -- we end.
23           One question.  I know that we have our summary
24  judgment briefing coming up, I think, a week from Thursday.
25  It may be that Mr. Lewis and I have some back and forth that

37

```
 1   we need to do in terms of trying to establish some facts.  We
 2   may not need it, but I'm just heads up that perhaps we --
 3            THE COURT:  Why don't we put it off for two weeks.
 4            So when is it due?  When is summary judgment?
 5            MR. NOWAK:  I believe it's due a week from -- a week
 6   from this Thursday.  So next Thursday, the 18th, I think, is
 7   the date.
 8            THE COURT:  18th?  So, okay, two weeks after the
 9   18th would be -- we're gonna hear from my courtroom deputy.
10            COURTROOM DEPUTY:  May 2nd, Judge.
11            THE COURT:  May 2nd.
12            MR. NOWAK:  May 2nd, okay.
13            THE COURT:  All right.  So either summary judgment
14   will be filed or you will tell me that we need a trial.
15            All right, this matter's adjourned.
16            MR. NOWAK:   All right.  Thank you, your Honor.
17            THE COURT:  Yes.
18            MR. LEWIS:  Thank you, your Honor.
19   (Whereupon the proceedings adjourned at 11:59 a.m.)
20
21
22
23
24
25
```

38

1        ***REPORTER'S CERTIFICATION***

2

3            I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6            I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11           DATED at Phoenix, Arizona, this 22nd of

12   April, 2024.

13

                        ____s/Teri Veres____
14                      TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

# Exhibit U

Case 2:22-cv-01439-ROS   Document 57-21   Filed 05/02/24   Page 2 of 2



Basic Domain Report for lambo.com - domainIQ

July 19, 2023

**Archived on August 8, 2020**

```
Domain Name: LAMBO.COM
Registry Domain ID: 21448845_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.namesilo.com
Registrar URL: http://www.namesilo.com
Updated Date: 2020-04-24T00:00:00Z
Creation Date: 2000-03-05T15:13:13Z
Registry Expiry Date: 2021-03-05T15:13:13Z
Registrar: NameSilo, LLC
Registrar IANA ID: 1479
Registrar Abuse Contact Email: abuse@namesilo.com
Registrar Abuse Contact Phone: +1.4805240066
Domain Status: clientTransferProhibited
```

```
Name Server: NS1.DIGITALOCEAN.COM
Name Server: NS2.DIGITALOCEAN.COM
```

```
DNSSEC: unsigned
URL of the ICANN Whois Inaccuracy Complaint Form: https://www.icann.org/wicf/
```

```
Domain Name: lambo.com
Registry Domain ID: 21448845_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.namesilo.com
Registrar URL: https://www.namesilo.com/
Updated Date: 2019-01-24T07:00:00Z
Creation Date: 2000-03-05T07:00:00Z
Registrar Registration Expiration Date: 2020-03-05T07:00:00Z
Registrar: NameSilo, LLC
Registrar IANA ID: 1479
Registrar Abuse Contact Email: abuse@namesilo.com
Registrar Abuse Contact Phone: +1.4805240066
Domain Status: clientTransferProhibited https://www.icann.org/epp#clientTransfer
Registrar Registrant ID:
Registrant Name: Domain Administrator
Registrant Organization: See PrivacyGuardian.org
Registrant Street: 1928 E. Highland Ave. Ste #104 PMB# 255
Registrant City: Phoenix
Registrant State/Province: AZ
Registrant Postal Code: 85016
Registrant Country: US
Registrant Phone: +1.3478717726
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: pw-ce5fdf6c33daeee947c62b962ab3b4dcd@privacyguardian.org
```

PI 000010

Brett E. Lewis (*pro hac vice*)
Brett@iLawco.com
**LEWIS & LIN LLC**
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
Email: Brett@iLawco.com

*Attorneys for Plaintiff Richard Blair*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Blair,<br><br>       Plaintiff/Counter-Defendant,<br><br>vs.<br><br>Automobili Lamborghini S.p.A.,<br><br>       Defendant/Counterclaimant. | Case No.: 2:22-cv-01439-ROS<br><br>**PLAINTIFF'S DISCLOSURES UNDER FED. R. CIV. P. 26(A)(3)** |

Pursuant to Fed R. Civ. P. 26(a)(3) and this Court's Scheduling Order dated August 23, 2023 (ECF No. 38) (the "Scheduling Order"), Plaintiff/Counter-Defendant Richard Blair ("Blair" or "Plaintiff") submits the following disclosures:

**A.**   **Witnesses that Plaintiff Expects to Call at Trial**

Richard Blair (may be contacted via the undersigned).

**B.**   **Witnesses that Plaintiff Expects to Present by Deposition**

None.

1

**C.     Documents that Plaintiff Expects to Offer**

    a.  Documents related to Plaintiff's acquisition of the <lambo.com> domain name, including the date, the amount that Plaintiff paid for, and the non-party that Plaintiff purchased the domain name from;

    b.  Documents related to Plaintiff's correspondence with the registrar of <lambo.com> and the relevant Purchase and Sale Agreement;

    c.  Screenshots of <lambo.com> landing page;

    d.  Domain report on <lambo.com> generated by domainIQ;

    e.  Search results of domain names consisting of or including the term "lambo;"

    f.  Search results of business entities using the term "lambo" in the entity name;

    g.  Documents related to Plaintiff's use of the term "lambo" as usernames on social media platforms, including WhatsApp, Telegram, and Twitter;

    h.  Documents related to Plaintiff's use of the term "lambo.com" or "lambodotcom" as usernames on social media platforms, including Twitter, lichess.org, and namepros.com;

    i.  Logs and records of Plaintiff's activities on namepros.com under the username "Lambo.com;"

    j.  Documents showing non-parties' identifying Plaintiff as "Lambo" on namepros.com;

    k.  Documents reflecting Plaintiff's change of username to "Lambo.com" on namepros.com dated December 8, 2019;

    l.  Documents related to Plaintiff's correspondence with non-parties regarding their inquiries on purchasing the <lambo.com> domain name;

    m. Documents reflecting Plaintiff's registration, acquisition, purchase and sale of other domain names;

2

n. Documents that Plaintiff used and/or relied on in relation to the WIPO proceeding *Automobili Lamborghini S.p.A. v. Domain Administrator, See PrivacyGuardian.org / Richard Blair, Case No. D2022-1570*;

o. The parties' pleadings filed in this lawsuit; and

p. Any and all documents that Defendant Automobili Lamborghini S.p.A. ("Defendant") has produced, will produce, and/or intends to offer in this lawsuit.

Plaintiff reserves the right to supplement his disclosures in any pretrial submissions, to introduce any documents and/or exhibits listed or produced by other parties in this action, and to use demonstrative documents and/or exhibits not yet finalized. Plaintiff also reserves the right to introduce any documents and/or exhibits listed or produced by other parties at trial.

Dated: March 5, 2024

    Brooklyn, New York

                                    Respectfully submitted,

                                    By: */s/Brett E. Lewis*
                                    Brett E. Lewis, Esq. (*pro hac vice*)
                                    **LEWIS & LIN LLC**
                                    77 Sands Street, 6th Floor
                                    Brooklyn, NY 11201
                                    Tel: (718) 243-9323
                                    Fax: (718) 243-9326
                                    Email: Brett@iLawco.com

                                    *Attorneys for Plaintiff Richard Blair*

3

1
2
3
4
5
6        **IN THE UNITED STATES DISTRICT COURT**
7          **FOR THE DISTRICT OF ARIZONA**
8
9    Richard Blair,                          No. CV-22-01439-PHX-ROS
10                  Plaintiff,                **ORDER**
11   v.
12   Automobili Lamborghini SpA,
13                  Defendant.
14
15           Pursuant to the terms of the Case Management Plan (Doc. 36), all parties shall
16   comply with the deadlines established in this Order.
17           **IT IS ORDERED** the Rule 16 Case Management Plan is set as follows.
18           A.      All proceedings concerning this case shall be in accordance with the Federal
19   Rules of Civil Procedure.
20           B.      All Initial Disclosures as defined in FRCP 26(a)(1), if not already disclosed
21   prior to the Scheduling Conference, shall be made no later than five days after the date of
22   the entry of this Order.
23           C.      To satisfy the requirements of FRCP 26(a)(1), the parties shall file a Notice
24   of Initial Disclosure, rather than copies of the actual disclosures.
25           D.      Procedural motions including Motions to Amend the Complaint or Answer,
26   and Motions to Join Additional Parties shall be filed no later than **September 12, 2023**.
27           E.      The Plaintiff shall disclose the identity of all persons who may be used at
28   trial to present evidence under Federal Rules of Evidence (FRE) 701, 702, 703, 704, and

705 no later than **November 28, 2023**. The Defendant shall disclose the identity of all persons who may be used at trial to present evidence under FRE 701, 702, 703, 704, or 705 no later than **November 28, 2023**. No deposition of any expert witness shall occur before the disclosures concerning expert witnesses mandated by this Order have been made.

The disclosures of the identities of all persons who may be used at trial to present evidence under FRE 701,702, 703, 704, or 705 shall also include all of the disclosures required by FRCP 26(a)(2)(B) if the witness is either (1) retained or specifically employed to provide expert testimony in the case, or (2) is an agent or employee of the party offering the testimony whose duties regularly involve giving expert testimony.[1]

F.    All discovery, including answers to interrogatories, production of documents, depositions and requests to admit shall be completed by **January 19, 2024**.

G.    The parties shall finally supplement all discovery, including material changes in expert witness opinions and material disclosures, pursuant to FRCP 26(a)(3), of all exhibits to be used and all witnesses to be called at trial, on or before **March 5, 2024**.[2]

H.    Discovery by interrogatory shall be governed by the national uniform requirements set forth in FRCP 33.

I.    Depositions shall be limited by the national uniform requirements set forth in Rules 30, 31, and 32 of the FRCP.

J.    Motions on discovery matters are prohibited. Should a discovery dispute arise Counsel shall consult and make a sincere effort to resolve the matter(s). If the parties cannot reach a resolution, they are directed to consult the Court's Standing Order concerning discovery disputes to ensure full compliance with the Court's discovery dispute procedures, some of which are not included here. Discovery Dispute Instructions are

---

[1] The parties are on notice that this Order requires disclosure different than that required by FRCP 26(a)(2).

[2] The parties are on notice that this order supersedes the "30 days before trial" disclosure deadline contained in FRCP 26(a)(3). Therefore, failure to timely supplement pursuant to Rule 26(e), including attempts to include witnesses and exhibits in the Proposed Final Pretrial Order or at trial that were not previously disclosed in a timely manner may result in the exclusion of such evidence at trial or the imposition of other sanctions including dismissal and the imposition of default pursuant to FRCP 37, the Local Rules of Civil Procedure of the District Court, and the inherent power of the Court.

- 2 -

1  available on the District of Arizona website at www.azd.uscourts.gov / Judges' Information
2  / Orders, Forms & Procedures for the Hon. Roslyn O. Silver.

3      K.    This Order contemplates that each party will conduct discovery to permit
4  completion within the deadline. Any discovery which results in insufficient time to
5  undertake necessary additional discovery and which requires an extension of the discovery
6  deadline will be met with disfavor, will only be granted for good cause or only to prevent
7  manifest injustice pursuant to FRCP 16(b) and (e), and may result in denial of an extension,
8  exclusion of evidence, or the imposition of other serious sanctions pursuant to FRCP
9  37(b),(c),(d).

10     L.    All dispositive motions shall be filed no later than **April 18, 2024**. Unless
11  permitted by Order of the Court, only **one** dispositive motion is allowed to be filed by each
12  party.

13     M.    All parties are specifically admonished that pursuant to LRCiv 7.2(i), "[i]f a
14  motion does not conform in all substantial respects with the requirements of this Rule, or
15  if the opposing party does not serve and file the required answering memoranda, or if
16  counsel for any party fails to appear at the time and place for oral argument, such non-
17  compliance may be deemed a consent to the denial or granting of the motion and the Court
18  may dispose of the motion summarily."

19     N.    The parties shall keep the Court apprised of settlement negotiations and the
20  progress of discovery. A joint letter to the Court concerning the status of settlement
21  discussions (containing no specific settlement terms or offers) and the progress of
22  discovery shall be filed by **February 2, 2024** and initially labeled "FIRST NOTICE OF
23  DISCOVERY AND SETTLEMENT," and shall be subsequently filed every FOUR
24  months thereafter. If settlement is reached the parties shall file a <u>Notice of Settlement</u> with
25  the Clerk of the Court with a copy to Judge Silver's Chambers.

26     O.    A Joint Proposed Pretrial Order, all Motions in Limine, a Joint Statement of
27  the Case, Joint Jury Instructions, Verdict Form, and Stipulated *Voir Dire* Questions to be
28  added to the Court's standard Jury Questionnaire shall be lodged and filed by **June 17,**

- 3 -

**2024**. <u>If dispositive motions have been filed, the Joint Proposed Pretrial Order and Motions in Limine and other documents shall be due either on the above date or 30 days following resolution of the dispositive motions, whichever is later</u>. The content of the Joint Proposed Pretrial Order is that prescribed in the Court's form of <u>Joint Proposed Pretrial Order</u>. [See Court's website: www.azd.uscourts.gov under "Judges and Courtrooms/Orders, Forms & Procedures"). Responses to Motions in Limine are due 15 days after the Motions are filed, and no Replies are permitted unless specifically ordered by the Court.

P.    If the case will be tried to the Court, rather than to a jury, <u>in addition to</u> filing a Joint Proposed Pretrial Order, each party shall file Proposed Findings of Fact and Conclusions of Law on the same date the Joint Proposed Pretrial Order is due.

Q.    The attorneys who will be trying the case for each of the parties shall appear at the Final Pretrial Conference that will be scheduled as promptly as possible after the filing of the Joint Proposed Pretrial Order. The attorneys appearing at the conference shall be prepared to address the merits of all issues raised in the Joint Proposed Pretrial Order and fully briefed Motions in Limine. Unless one has already been established, the Court will set a firm trial date at the Pretrial Conference, and will sign the Final Pretrial Order with any additional instructions for trial preparation.

R.    Any other final pretrial matters required pursuant to FRCP 26(a)(3) are due in accordance with this Order prior to the preparation and filing of the Joint Proposed Pretrial Order.

S.    The parties shall email to chambers mailbox (Silver_Chambers@azd.uscourts.gov) their proposed *voir dire* questions and statement of the case for the juror questionnaire, jury instructions, and form of verdict in Microsoft Office Word 2010 format, in addition to other written materials filed with the Clerk of the Court.

T.    An Interim Rule 16 Status Conference is scheduled for **March 19, 2024**, at **10 A.M.** Prior to the Interim Conference, counsel are to prepare and file a Joint Status Report by **March 12, 2024**. That Joint Status Report shall indicate whether any party plans

- 4 -

on filing a dispositive motion. If a party plans on filing a dispositive motion, the party planning to do so shall include in the Joint Status Report a brief overview of the planned basis for that motion. The party planning to oppose the motion shall include a brief overview of why a dispositive motion would not be successful.

This Court views compliance with the provisions of this Order as critical to its case management responsibilities and the responsibilities of the parties under FRCP 1.

**IT IS FURTHER ORDERED** the Rule 16 Case Management Conference set on August 29, 2023, at 10:00 a.m., is **VACATED.**

**IT IS FURTHER ORDERED** the Stipulation for Telephonic Appearance (Doc. 33) is **DENIED AS MOOT**.

Dated this 22nd day of August, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge

- 5 -